IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,
*ex rel.* TODD HEATH,

       Plaintiff-Relator,                             Civil Case No. 2:08-CV-00724-LA

v.

WISCONSIN BELL, INC.,

       Defendant.

---

## SECOND AMENDED COMPLAINT

---

Relator, Todd Heath, on behalf of the United States of America, for his Second Amended Complaint against Wisconsin Bell, Inc., alleges as follows:

### I.       NATURE OF THE CASE

1. By passing the Telecommunications Act of 1996 (the "Act"), Congress intended, in part, to speed the introduction of advanced telecommunications services (including internet access) throughout the nation. In conjunction with the Act, and in an effort to meet this objective, four new government programs were created under the umbrella of the Universal Service Fund ("USF"). One of those programs is the "Schools and Libraries Program of the Universal Service Fund," commonly known as the E-Rate Program (or "E-Rate"). The E-Rate Program provides federal subsidies for telecommunications, internet and related services provided to schools and libraries throughout the nation. The E-Rate Program is administered by the Universal Service Administrative Company ("USAC") under the direction and control of the Federal Communications Commission ("FCC").

2. More than $2 billion has been paid for telecommunications services annually under the E-Rate Program, with a large portion of those funds being paid directly to telecommunications companies (rather than to the schools and libraries themselves). Until recently, E-Rate funding was capped nationwide at $2.25 billion per year. In December 2014, that cap was increased to $3.9 billion annually. In total, since E-Rate funding began to be paid in 1997, more than $50 billion has been paid by the E-Rate Program for telecommunications services provided to schools and libraries. This spending has benefited the telecommunications industry, which has experienced substantial growth since 1996. Given the E-Rate Program's popularity with schools and libraries, and the high need levels of these recipients, "[r]equests for E-Rate funding consistently exceed the annual funding cap." *Telecommunications: Long Term Strategic Vision Would Help Ensure Targeting of E-Rate Funds to Highest-Priority Uses*, GAO-09-253, Washington, D.C., Mar. 27, 2009. To ensure that these scarce federal monies are spent appropriately and that the available funds are stretched as far as possible, the E-Rate Program depends on adherence to the regulations governing this federal program. In this regard, none of those regulations are more important than those governing the *pricing* of eligible services.

3. When Congress passed the Act, it specifically mandated that all telecommunications service providers participating in E-Rate must "provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates *less than the amounts charged for similar services to other parties*." 47 U.S.C. § 254(h)(1)(B) (emphasis added). The FCC recognized the importance of this requirement to the success of the E-Rate Program, and the need for telecommunications service providers to charge schools and libraries at discounted prices was a fundamental objective of Congress.

> [T]o achieve the goal of allowing schools and libraries to obtain telecommunications services at discounted rates, Congress designed a system by which common carriers, in the course of providing service to the public generally, are required to offer discounted rates to those eligible entities.

*In the Matter of Federal-State Joint Board on Universal Service,* FCC Docket No. 96-45, Jan. 29, 1999 (Declaratory Order), 14 F.C.C.R. 3040, at 3043.

4. Despite knowing of E-Rate favored pricing requirements, Defendant Wisconsin Bell, Inc. ("Wisconsin Bell" or "Defendant"), an E-Rate service provider, unlawfully and secretly refused to abide by these requirements and routinely failed to bid, offer or charge Wisconsin schools and libraries at the favorable, discounted pricing required under federal law. In the process, Defendant unlawfully obtained funding commitments for its own benefit, and knowingly overcharged the E-Rate Program and falsely certified its compliance with E-Rate's pricing requirements in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733.

## II.  THE PARTIES

5. Relator, Todd Heath ("Relator" or "Heath"), is an adult resident and citizen of Waupun, Wisconsin. Heath is the owner of "The Telephone Company," a business through which he performs for-hire audits of the telecommunications records and bills of schools, school districts, and other entities. Through these audits and subsequent investigations conducted by Heath and his attorneys, and based upon Heath's own professional experience and industry knowledge, Heath discovered the unlawful acts and practices described herein.

6. Defendant Wisconsin Bell is a corporation organized under the laws of Wisconsin with its headquarters and principal place of business located at 722 North Broadway, Milwaukee, Wisconsin.

3

## III.  SOURCE AND SCOPE OF RELATOR'S ALLEGATIONS

7.      The information set forth herein and related to the United States Government before the filing of this case was derived from the original and first-hand knowledge, professional experience and detailed phone billing records that Relator obtained through his work auditing phone bills for schools and libraries. This information was supplemented with additional factual investigation conducted by Heath and his counsel. Prior to the filing of his initial Complaint, Relator, through his counsel, advised the United States that he would be filing a complaint and apprised the United States of his allegations. The claims set forth herein concern Wisconsin Bell's acts and practices throughout the State of Wisconsin over the ten years prior to the filing of Relator's initial Complaint and up to the present day.

## IV.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the False Claims Act, 31 U.S.C. §§ 3729-3733.

9.      This Court has personal jurisdiction over the parties because Wisconsin Bell is a Wisconsin corporation that does substantial business in Wisconsin and provided a substantial portion, if not all, of the telecommunications services at issue to schools and libraries located within Wisconsin.

10.     Venue is proper within the Eastern District of Wisconsin pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because Relator resides in this District, Defendant is a Wisconsin corporation that does business and has headquarters in this District, and many of the acts and practices complained of herein occurred in this District.

4

## V.   FRAUDULENT CONCEALMENT - TOLLING OF STATUTE OF LIMITATIONS

11.   To cover up the scheme and actions described in this Complaint, Wisconsin Bell took affirmative actions to conceal its overbilling of the E-Rate Program, remained silent when required to speak, and failed to disclose material facts despite its duty to do so under the terms of its contracts and applicable law, including but not limited to the statutes and regulations governing the USF and the E-Rate Program, and the False Claims Act.

12.   Because Defendant withheld and concealed information about its overcharges and illegal billing practices, the FCC was prevented from discovering Defendant's malfeasance, despite its exercise of reasonable care and diligence.

13.   At all material times, Defendant had knowledge of its own wrongful actions and of the facts giving rise to the claims asserted herein.

14.   At all material times, Defendant concealed material facts from the United States Government, including the FCC, by withholding information about its billing practices, falsely representing that it was billing the E-Rate program and schools and libraries consistent with the law, making affirmative representations and certifications that Defendant knew were false, and failing to disclose its routine overbilling of the E-Rate Program, despite having an obligation to disclose these material facts under applicable law.

15.   Until this unlawful conduct was disclosed to the United States Government in connection with the filing of Relator's initial Complaint in this matter, the United States Government did not know the material facts of Defendant's routine overbilling of the E-Rate Program and schools and libraries, and in the exercise of reasonable care and diligence it could not have known of the material facts of Defendant's unlawful conduct.

5

Case 2:08-cv-00724-LA   Filed 07/01/15   Page 5 of 28   Document 105-1

16.     Until Heath's disclosure of Defendant's misconduct in connection with this lawsuit, no facts were known to the FCC sufficient to put the United States Government on notice of the harm sustained as a direct result of the Defendant's wrongful conduct.

## VI.     AGENCY ALLEGATIONS

17.     Wisconsin Bell and its employees and any others carrying out the scheme alleged in this Complaint (and each of them) were the agents and employees of Wisconsin Bell, and each was acting within the course, scope and authority of said agency and employment, with the full consent, permission and authorization of Wisconsin Bell. Wisconsin Bell ratified and approved all actions in furtherance of the scheme alleged herein by such it agents and employees.

## VII.     SUBSTANTIVE ALLEGATIONS

### A.     The Telecommunications Act of 1996

18.     Congress passed the Act, in relevant part, to speed the introduction of advanced telecommunications and information services (including internet) for schools and libraries.

19.     When Congress passed the Act in 1996 and authorized the E-Rate Program, it required that telecommunications carriers and others provide the telecommunications services at issue "at rates *less than* the amounts charged for *similar services* to other parties." 47 U.S.C. § 254(h)(1)(B) (emphasis added). The Act also gave the FCC authority to determine the appropriate amount of the reduced rates. *Id.* Thus, Wisconsin Bell has known, since 1996, that it would need to charge favorable prices to schools and libraries participating in the E-Rate Program.

20.     The Act further required the FCC to convene a Federal-State Joint Board ("Joint Board") to recommend changes to the FCC's existing universal support mechanisms. In particular, the Act directed the Joint Board to recommend, and the FCC to adopt, a new set of

6

Case 2:08-cv-00724-LA    Filed 01/04/15    Page 6 of 28   Document 27

universal support regulations to advance the universal service principles enumerated in the Act. 47 U.S.C. § 254(a). Pursuant to this directive, the FCC created the Joint Board, which released its *Recommended Decision* on November 8, 1996. FCC Docket No. 96-45, Nov. 8, 1996.

21. Thereafter, after further hearings, the FCC issued its final decision and order on May 8, 1997. *In the Matter of Federal-State Joint Board on Universal Service*, FCC Docket No. 96-45, May 8, 1997 ("Universal Service Order").

22. Among other things, the Universal Service Order implemented the E-Rate Program, making it clear that this federal program was to be administered by USAC under the direction and control of the FCC. The Universal Service Order established that schools and libraries would receive substantial federal subsidies on their telecommunications services, including internet access. These subsidies were to be paid with funds that Congress and the FCC mandated that telecommunications companies pay into the USF, a government fund administered by USAC in its capacity as an agent of the United States charged by Congress and the FCC with the responsibility for administering the E-Rate Program.

23. Under the Act and the FCC's Universal Service Order, each telecommunications carrier was required to make regular payments to the USF based on the carrier's interstate and international telecommunications revenue pursuant to a formula devised by the FCC. Under the Act, telecommunications companies also could choose to pass this cost through to their subscribers; thus, the charge frequently appears on consumers' telephone bills as a separate line item such as "Universal Service" fee.

24. Pursuant to the authority granted by the Act, the FCC authorized USAC to collect, pool and disburse the USF funds contributed by carriers, all under the direction and control of the FCC. All of USAC's operations are carried out pursuant to regulations promulgated by the

7

FCC and under the FCC's supervision. When it administers the E-Rate Program, USAC acts on behalf of, and under the direction and control of, the FCC, such that it as an agent of the FCC.

**B.     The E-Rate Program**

25.     E-Rate provides discounts and federal subsidies to assist schools and libraries throughout the United States to obtain affordable telecommunications and internet access.

26.     Subsidies available to schools and libraries depend on the level of poverty and the urban/rural nature of the population that the school or library serves.  These subsidies are substantial, ranging from 20% to 90% of the costs of eligible services.  Eligible schools, school districts and libraries may apply for these subsidies individually or as part of a consortium.

27.     The actual percentage of the subsidy available to any given school or library is determined by a formula created by the FCC.  The principal consideration under this formula is the school district's rate of participation in the federal school lunch program. Schools and libraries located in school districts at the highest rates of lunch program participation receive a 90% subsidy, while those with the lowest rates of lunch program participation receive a 20% subsidy.

28.     These subsidies are funded through the E-Rate Program, with the subsidy typically being paid directly to the telecommunications carrier on behalf of an E-Rate beneficiary (the school or library), thus reducing the amount the beneficiary must pay to the telecommunications carrier on its bill.  *See* 47 C.F.R. § 54.515.

**C.     Pricing Under the E-Rate Program**

29.     Wisconsin Bell and all other service providers participating in the E-Rate Program are required to abide by FCC regulations, including regulations governing the prices they can charge for their services when participating in the E-Rate Program.

8

30. The E-Rate Program requires telecommunications carriers to offer their "lowest corresponding price" ("LCP") to schools and libraries to be eligible for E-Rate reimbursement. 47 C.F.R. § 54.511(b). The FCC adopted regulations in 1997 requiring Wisconsin Bell and other telecommunications service providers to charge no more than LCP. *Id.*; *see also* 47 C.F.R. § 54.500(f).

31. This LCP requirement, defined at ¶¶ 484 - 491 of the Universal Service Order, at 47 C.F.R. § 54.511, and further refined in response to telecommunications carriers' concerns in the FCC's *Fourth Order on Reconsideration in CC Docket No. 96-45, Report and Order in CC Docket Nos. 96-45, 96-262, 94-1, 91-213, 95-72*, FCC 97-420 (Dec. 30, 1997), protects and saves money for both the school and libraries (on their portions of the telecommunications bill) and the E-Rate Program (on the portion of the telecommunications bill it pays).

32. The Universal Service Order also requires service providers, as a condition of receiving E-Rate funding, to certify that the prices they offer and charge to schools and libraries are no more than the LCP. *See* Universal Service Order at ¶ 487. Telecommunications charges that do not satisfy the LCP requirement are ineligible for reimbursement.

**D.      Wisconsin Bell's Failure to Offer LCP**

33. Wisconsin Bell for many years has offered E-Rate eligible services to hundreds of Wisconsin schools and libraries. Indeed, Wisconsin Bell sells millions of dollars of its services and products to E-Rate beneficiaries around the state each year. Between 1996 and the present, Wisconsin Bell has benefitted from not less than $150 million in E-Rate reimbursements. In the process of selling these services and seeking E-Rate reimbursement, Wisconsin Bell must repeatedly certify that it is charging schools and libraries no more than LCP. *See* Universal Service Order at ¶ 487.

34. As described above, federal law requires Wisconsin Bell to charge E-Rate beneficiaries the LCP for all covered telecommunications services. However, when Heath asked Wisconsin Bell to comply with its LCP obligations under E-Rate for several of his school district customers, Wisconsin Bell employees either claimed not to know of the requirement or refused to admit that Wisconsin Bell had a duty to comply. Even after this lawsuit was filed, Wisconsin Bell persisted in denying that it had a duty to provide schools and libraries with the LCP. In 2009, Wisconsin Bell demanded that Heath (who was consulting for school districts on various types of overcharges) communicate *only* with Bevan, Mosca, Giuditta & Zarillo, PC, a K Street law firm in Washington, D.C. In 2009 and 2010, this K Street law firm wrote numerous letters to Heath disputing that Wisconsin Bell had any duty to comply with the LCP requirement. Given Wisconsin Bell's persistent refusal to admit that it owed any duty to charge no more than LCP, it is unsurprising that Wisconsin Bell chose not to comply with E-Rate's LCP requirement.

35. Notwithstanding the clear mandates of the E-Rate Program, Wisconsin Bell knowingly chose not to implement the LCP requirement. It failed to create a system to offer, *or even calculate*, LCP. Never did it make any effort, prior to learning about the Relator's initial Complaint, to determine LCP, or to offer LCP to school districts and libraries in Wisconsin. As set forth herein, even after learning of this lawsuit, Wisconsin Bell continued to deny its obligations under E-Rate and still refuses to comply with its LCP obligations.

36. At all relevant times, Wisconsin Bell and its sales force were motivated to deny that Wisconsin Bell had any LCP obligations because they did not want to sell Wisconsin Bell's services to customers at these relatively low prices. Wisconsin Bell and its sales force were financially motivated to sell to schools at higher "retail" rates, which offered more profit to Wisconsin Bell. Furthermore, Wisconsin Bell and its sales force knew that most E-Rate

10

beneficiaries (schools and libraries) are unsophisticated with respect to telecommunications services, the E-Rate Program, and E-Rate's pricing requirements, and that the schools and libraries could not determine what Wisconsin Bell's best prices were. Wisconsin Bell clearly had superior knowledge concerning the prices it was offering to similarly situated customers, as well as its pricing structure generally. Despite having this superior knowledge, Wisconsin Bell made no effort to develop any method to determine LCP, and it did not train its sales force to offer, or even calculate, LCP. Even after it learned of this lawsuit, Wisconsin Bell continued to overcharge many schools and libraries for their E-Rate eligible services and falsely certified its compliance with the LCP requirement.

37. Instead of offering or attempting to calculate LCP, Wisconsin Bell generally offered rates to schools on an individual case basis (ICB), which resulted in disparate, non-LCP pricing. For example, in 2005, Heath reviewed information obtained from his school district clients when consulting for them, from which he determined based on his professional knowledge and industry experience that, on an ICB basis, Fond du Lac School District paid $13.00 per month for each Centrex (central office exchange) line, while Burlington School District paid $13.25, Grafton School District paid $16.44, Cudahy schools paid $20.24 and Altoona schools paid $22.06 for the identical service. All of these school districts were E-Rate Program participants. The prices offered to them by Wisconsin Bell were not LCP, a fact that the school districts had no way of knowing. Rather, these prices were at least 140 to 240 percent of Wisconsin Bell's actual LCP. Throughout the relevant period of time, Wisconsin Bell similarly overcharged many other Wisconsin school districts, and Defendant has never complied with its LCP obligations under the E-Rate Program.

11

## E.    Wisconsin Bell's VNS Agreements as One Measure of LCP

38.    Beginning in approximately 1996, Wisconsin Bell began entering into Voice Network Services Agreements ("VNS Agreement(s)" or "Agreement(s)") with the State of Wisconsin Department of Administration ("DOA"). These VNS Agreements continue to be negotiated by Wisconsin Bell and the DOA periodically, and they set Wisconsin Bell's price for telecommunications services provided to state departments and agencies during the term of the Agreement. On or about June 1, 2006, Wisconsin Bell and the DOA entered into a five-year VNS Agreement ("2006 VNS Agreement"), which arose from a DOA Request for Proposals ("RFP") dated July 1, 2005. In June 2011, the 2006 VNS Agreement was extended for another five years, effective July 1, 2011.

39.    Under the VNS Agreements, Wisconsin Bell agrees to provide telephone services, including Centrex services, to state departments, agencies, universities and other users at specified rates and charges.

40.    Under these Agreements, public school districts have been identified as "authorized users" entitled to the favorable pricing provided. For example, the 2006 VNS Agreement states, at paragraph 1.7, that all government-related organizations are "authorized users" entitled to enjoy the favorable rates and terms set forth in the Agreement. In fact, the July 1, 2005 RFP, which was the basis for the 2006 VNS Agreement, specifically required that Wisconsin Bell and other bidders agree to provide these favorable rates to public school districts.

41.    Given that Wisconsin schools and libraries are entitled to the favorable rates set forth in the VNS Agreements, the prices set forth therein may be considered Wisconsin Bell's LCP for E-Rate Program purposes. Furthermore, even if the rates set forth in the VNS Agreements were not considered to be the LCP for some reason, Wisconsin Bell still has

12

routinely failed to charge Wisconsin schools the LCP in violation of E-Rate law. Indeed, as alleged herein, Wisconsin Bell completely refused even to acknowledge that it owes any duty to charge schools and libraries the LCP and, therefore, it made no effort for many years even to determine what the appropriate LCP was for any school or library. Given that Wisconsin Bell never put processes in place to determine what LCP was, it is clear that Wisconsin Bell and its employees and sales agents made no effort whatsoever to comply with the LCP requirement.

42. Notwithstanding the provisions of the Wisconsin Bell/DOA VNS Agreements, and the E-Rate LCP requirement, Wisconsin Bell routinely withheld information about the rates available to schools and libraries under the 2006 VNS Agreement, and it continues to withhold that information under the 2011 extension of that Agreement. Instead of providing schools and libraries with bids, quotes, or charges based on the favorable pricing that should have been provided under the 2006 VNS Agreement and 2011 extension, Wisconsin Bell regularly bills schools and libraries at much higher rates (sometimes more than three times greater than LCP) than the amounts allowed under the E-Rate Program. In approximately 2009, after considerable effort by Heath acting on behalf of his school district clients, Wisconsin Bell began to bill some, but far from all, of its Wisconsin E-Rate customers at the substantially lower rates pursuant to the 2006 VNS Agreement. However, as alleged in greater detail below, even then, Wisconsin Bell continued to overcharge Wisconsin schools and libraries routinely for telecommunications services, and it still refuses to acknowledge even that it had a duty to offer and bill these customers at prices that were no more than LCP.

43. As a result of Wisconsin Bell's failure and refusal to offer the LCP pricing to schools and libraries, many of those schools and libraries paid vastly more for telecommunications services than was necessary. For instance, in 2005, the Milwaukee School

13

District paid $13.84 per Centrex line per month, West Bend paid $16.14, and Sheboygan paid $17.61, all while the available rate under the 2006 VNS Agreement was either $9.25 or $9.45, depending on certain circumstances. All of these school districts were E-Rate Program participants, and none of them were offered or charged Wisconsin Bell's LCP.

44. When Heath began to ask Wisconsin Bell about the 2006 VNS Agreement, Wisconsin Bell originally stonewalled and refused to admit that the Agreement existed. Then, it refused to provide a copy of the Agreement to Heath, even though Heath made it clear he was working on behalf of school districts that he believed were entitled to whatever favorable rates might be contained in the Agreement. In addition, Wisconsin Bell refused to disclose to Heath the prices it was charging similar customers. Despite Wisconsin Bell's stonewalling, Heath eventually learned that the City of Waupaca library (a relatively small customer in a rural area) was receiving during 2007 far more favorable prices on its telecommunication service (specifically, PRI service) than any of Heath's school district customers. The amount being charged to the City of Waupaca library for this PRI service was another possible measure of LCP for Heath's school district clients. Again, Wisconsin Bell was in the best position to determine the LCP for its customers, but it made no effort to do so.

45. Despite Heath's best efforts, Wisconsin Bell never explained why it allowed some school and library customers to benefit from the favorable pricing under the DOA Agreements, without offering or providing those favorable rates to others. Given Wisconsin Bell's unwillingness to disclose the LCP to schools and libraries (or even admit that it owed a duty to charge them no more than LCP), the fact that most schools and libraries did not know they were being overcharged is unsurprising. When it adopted the lowest corresponding price requirement, the FCC explained that schools and libraries are relatively unsophisticated and lack the

14

telecommunications knowledge necessary to negotiate favorable rates. As a result, even though the VNS Agreements were supposed to benefit schools and libraries, many did not know that the rates were available, or how to demand or obtain them. Even when school district customers asked Wisconsin Bell for its most favorable rates (some even specifically inquiring about the VNS Agreements), Wisconsin Bell sales representatives falsely told them that they were already getting the best rates, and falsely told them they were not authorized to get the favorable pricing under the VNS Agreement.

46.     The VNS Agreements, which date back to approximately 1996 or 1997, first became known to certain Wisconsin schools when Heath told them about the Agreements in connection with his consulting work. This knowledge was then passed among some of the school districts, a number of which later obtained the prices that should have been made available to them years earlier under the VNS Agreements. Still, many other schools and libraries never received the favorable pricing under the 2006 VNS Agreement because Wisconsin Bell never told them that such pricing was available.

47.     Even the schools and libraries that eventually received favorable rates under the 2006 VNS Agreement often still were overcharged by Wisconsin Bell for telecommunications services, as Wisconsin Bell continued to take advantage of their lack of sophistication in such matters. In some cases, even after Heath corrected certain overcharging on his school and library clients' telephone bills, Wisconsin Bell later began overcharging these schools and libraries again several months or years later, making it necessary for Heath to continue auditing phone bills to determine if Wisconsin Bell's improper billing had resumed. In other cases, Wisconsin Bell provided schools and libraries with the LCP available under the VNS Agreements for some services (*i.e.* Centrex services), but not others. For example, the 2006 VNS Agreement provided

15

that ISDN Prime lines - a service that consolidates multiple voice and data services onto a single circuit terminating in the school's PBX or host computer - were to be billed to authorized users at a rate of $390.00 per month. Wisconsin Bell was aware that these ISDN Prime lines (also known as "PRI Service") are covered by the VNS agreement, but it decided to treat this PRI Service as though it was never covered by the VNS Agreement. Thus, Wisconsin Bell billed schools and libraries for this telecommunications service at much higher rates, notwithstanding the VNS Agreement and the LCP requirement. By way of example, prior to 2009, in the Fond du Lac, Hartford Joint 1, Kaukauna and Kimberly School Districts, ISDN Prime lines were billed at $640.00, $760.00, $820.00 and $845.00 per month, respectively. The West Bend School District had four ISDN Prime Lines, all of which were billed at different rates averaging $1,268.19 per month.

48. Wisconsin Bell's pattern of overbilling Wisconsin schools, without regard for its obligation to charge them the LCP, continued even after this lawsuit was filed and after the government began issuing civil investigative demands as part of the investigation that followed. For example, even though the 2006 VNS Agreement promised that ISDN Prime Lines would be billed at $390.00 per month (including local calling), *during 2010 and thereafter*, Wisconsin Bell regularly billed school districts significantly more than this amount, including the following amounts for ISDN Prime Lines:

- Hartford Joint I: $686/month

- Kaukauna: $460/month

- West Bend: $500+/month

- Fond du Lac: $460/month

- Kimberly: $460/month

16

In some cases, this overcharging was exacerbated by the fact that Wisconsin Bell continued to bill for local calls, even though the $390 per month rate for ISDN Prime lines under the 2006 VNS Agreement included unlimited local calls, meaning that these schools never should have been charged for local calling once they purchased these lines. Thus, *during 2010 and after*, Wisconsin Bell was billing for local calling services that never should have been billed, including local calls as high as *$2,000 per month* in some cases (specifically, for the West bend School District).

49. Based on his knowledge, education, professional experience and careful analysis of the telecommunications charges and supporting documentation provided to him by his school and library clients as part of his consulting work, Heath determined that, *during 2010 and thereafter*, Wisconsin Bell has continued to engage in its practice of overbilling schools and libraries, notwithstanding the VNS Agreements and the LCP requirement of the E-Rate Program.

### F.    **Wisconsin Bell's False Certifications**

50. At all times between 1997 and the present, Wisconsin Bell's obligation to certify that it was charging no more than LCP was an express requirement of the E-Rate Program. In addition, by seeking and accepting reimbursement under the E-Rate Program, Wisconsin Bell was certifying its compliance with the LCP requirement.

51. Wisconsin Bell's compliance with the LCP requirement is a material condition for reimbursement under the E-Rate Program.

52. As set forth above, Wisconsin Bell still has not complied with its LCP obligations, resulting in substantial overcharges to Wisconsin schools and libraries and the E-Rate Program. At most, Wisconsin Bell might have made some token effort to comply with the LCP requirement after it learned that Heath filed this lawsuit. However, documents obtained by Heath

17

from his clients after this lawsuit was filed show that Wisconsin Bell still failed and refused to comply with the LCP requirement *during 2010 and thereafter.*

53. Despite learning of this lawsuit, Wisconsin Bell has withheld and continues to withhold from the FCC all pertinent information about its past noncompliance with LCP.

54. At all relevant times, from 1996 to the present, Wisconsin Bell has known that LCP is an express requirement of the E-Rate Program and that LCP compliance is a material condition for E-Rate reimbursement. Each request for payment from the E-Rate Program is a certification by Wisconsin Bell that it is complying with the E-Rate Program requirements, and not charging more than LCP. *See* Universal Service Order at ¶ 487. Despite knowing this, Wisconsin Bell sought funding from E-Rate many thousands of times between 1996 and the present, thus certifying that it was complying with E-Rate's LCP requirement many thousands of times. When these certifications were made, Defendant knew it had no processes in place to determine what the LCP was for any given school or library, that it had not trained its employees and sales representatives on how to determine LCP, and that it was not complying (or even attempting to comply) with E-Rate's LCP requirement. Thus, Wisconsin Bell made knowingly false certifications to the E-Rate Program many thousands of times between 1996 and the present. Indeed, *every single one* of the certifications of E-Rate/LCP compliance ever made by Wisconsin Bell was knowingly false when made, as Wisconsin Bell has always known that it never complied with the LCP requirement and never even made a significant effort to comply with the LCP requirement.

55. **FCC Form 473** is the E-Rate Program's "Service Provider Annual Certification Form" (referred to in E-Rate terminology as a "SPAC"), which every service provider must fill out annually.

18

> The Form 473 must be completed by each service provider, for each separate service provider Identification Number (SPIN), to confirm that the invoice forms submitted by each service provider are in compliance with the FCC's rules governing the schools and libraries universal support mechanism.

Instructions for FCC Form 473, p. 1.

56. Additionally, service providers must fill out and submit FCC **Form 474** ("Service Provider Invoice Form," or "SPIF") with each invoice they submit to the E-Rate Program administrators for reimbursement. Form 474 notes that, as a prerequisite to any Form 474 request, a SPAC certification of compliance with E-Rate rules must be on file:

> Service Provider Annual Certification Form
>
> The FCC Form 473, Service Provider Annual Certification Form, is used by the service provider and confirms that the service provider's invoice forms are completed in compliance with FCC rules governing the schools and libraries Universal Service support mechanism. The Form 473 must be completed and submitted by the service provider prior to the service provider submitting its first invoice to USAC. No invoices will be paid without a Form 473 filed for the pertinent year. If you have not done so already, please be sure to complete and submit the Form 473.

Instructions to Form 474, p. 2.

57. Wisconsin Bell executed Forms 473 every year since 1997, and each separate request it made for E-Rate reimbursement included an executed Form 474.

58. In every Form 473 it signed, Wisconsin Bell certified that the invoice forms it submitted to USAC:

> contain requests for Universal Service support for services which have been billed to the service customers on behalf of schools, libraries, and consortia of those entities, **as deemed eligible for Universal Support by the fund administrator**.

Form 473, line 10 (emphasis added).

59. Wisconsin Bell further certified that its invoices:

are based on bills or invoices issued by the service provider to the service provider's customers on behalf of schools, libraries and consortia of those entities, **as deemed eligible for Universal Service support by the fund administrator**.

Form 473, line 11 (emphasis added).

60. Each and every Form 473 submitted by Wisconsin Bell since 1997 was false, as Wisconsin Bell has never undertaken the steps necessary to identify and charge LCP.

61. Each and every Form 473 submitted by Wisconsin Bell since 1997 violated the False Claims Act.

62. Each and every Form 473 submitted by Wisconsin Bell since 1997 subjects Wisconsin Bell to potential False Claim Act liability.

63. In addition, each and every Form 473 submitted by Wisconsin Bell since 1997: (1) covered up Wisconsin Bell's scheme; (2) contained false, fictitious or fraudulent statements or representations; and (3) made use of a false writing, all in violation of federal law, including but not limited to the False Claims Act.

64. E-Rate Program recipients must execute and file two other FCC forms. Each school and library participating in E-Rate must execute and file **FCC Form 471,** which requests discounts from E-Rate on eligible services. In it, the signer must certify compliance with bidding requirements, including that the most cost-effective service was selected (Line 27), that all competitive bidding requirements have been complied with (Line 28), and that the school or library has "complied with all program rules." (Line 30).

65. **FCC Form 472**, the "Billed Entity Applicant Reimbursement Form" (known as a "BEAR"), is the form used to invoice USAC for E-Rate discounts on a retroactive basis (when the service provider does not discount applicant bills directly). **Form 472 is jointly submitted by the applicant and the service provider**. On it, the school or library must certify that the

20

amounts listed on the BEAR "represent charges for eligible services delivered to and used by eligible schools, libraries . . ." FCC Form 472, Block 3, Section A. The service provider must sign the Form 472 in Block 4.

66. The Forms 471 submitted to USAC by Wisconsin Bell's customers since 1997, and the Forms 472 jointly submitted by Wisconsin Bell and Wisconsin Bell's customers since 1997, were false because of Wisconsin Bell's failure to offer LCP during that time period. Wisconsin Bell's certifications of compliance with E-Rate rules for procurement, pricing, and eligibility of services were knowingly false when made by Wisconsin Bell, inasmuch as they were premised on certifications of E-Rate compliance and the legitimacy of Wisconsin Bell's offers. With regard to the Forms 471 submitted by Wisconsin Bell's school and library clients, the false certifications made by the schools and libraries were inadvertent and *not* knowingly made by the schools and libraries, as these Wisconsin Bell customers were the victims of Wisconsin Bell's overbilling and related misconduct, not the perpetrators. However, Wisconsin Bell was fully aware of the E-Rate Program rules, fully familiar with Forms 471 and Forms 472, fully aware that the schools' and libraries' certifications on the Forms 471 were false, and fully aware that USAC relied on these certifications as a condition of payment. Wisconsin Bell caused, jointly submitted (in the case of the Forms 472), benefitted from, and is responsible for the schools' and libraries' false certifications.

67. Wisconsin Bell's causing, and using, the false certifications by the schools and libraries on FCC Forms 471 violated the False Claims Act. Wisconsin Bell's joint submission of FCC Forms 472, and its causing and using the false certifications by the schools and libraries on FCC Forms 472, also violated the False Claims Act.

21

**G.      USAC Acts as an Agent of the United States When Administering E-Rate**

68.      At all relevant times, while USAC has been administering the E-Rate Program, it has acted on behalf of the United States. In this regard, the USF and E-Rate funds distributed by USAC to telecommunications service providers, schools and libraries are funds that were provided and made available to USAC by the United States Government and only because USAC is acting as the administrator of the E-Rate Program, appointed by the FCC on behalf of the United States Government. Absent the governmental authority provided to USAC by Congress and the FCC, USAC would have no power to obtain, collect or distribute the billions of dollars that it pays out annually as the administrator of E-Rate.

69.      At all relevant times, USAC acted at the direction and under the supervision of the FCC when administering the E-Rate Program. *See* 47 C.F.R. §§ 54.500 – 54.523, 54.701 – .725.

70.      The amount that telecommunications providers must contribute to fund the E-Rate Program is determined quarterly by the FCC. *See* 47 C.F.R. § 54.709(a). If the amount of the contributions is insufficient in any given quarter, USAC cannot seek commercial loans unless it first obtains the permission of the FCC to do so. *See* 47 C.F.R. § 54.709(c).

71.      Telecommunications carriers may pass through to consumers the amounts that they contribute to the USF, and they often do so under a heading such as "Universal Service" fee that is included on the customers' phone bills. In such cases, the ultimate cost of the E-Rate Program is borne by consumers generally, rather than the telecommunications companies.

72.      USAC was appointed by the FCC to administer the E-Rate Program. Without the government's authority, USAC would not have the ability or right to collect the billions of

22

dollars that the telecommunications providers contribute to E-Rate annually. *See* 47 C.F.R. § 54.701, *et seq.*

73. USAC has no independent legal right or authority to pay E-Rate funds to schools, libraries or telecommunications service providers. *Id.*

74. The FCC is intimately involved in the auditing of USAC, given that the auditor appointed to review USAC's finances and operations is required to file its final audit report with the FCC. *See* 47 C.F.R. § 54.717(j). The FCC is then allowed, after receiving the audit report, to take any action necessary to ensure that USAC is operating consistent with regulatory requirements. *See* 47 C.F.R. § 54.717(k).

75. USAC is prohibited from making public policy, interpreting statutes or rules, or interpreting the intent of Congress. In all such situations, USAC must seek guidance from the FCC. *See* 47 C.F.R. § 54.702(c).

76. To assist the FCC in overseeing the E-Rate Program, USAC must regularly provide the FCC with a wide range of information, including: (1) annual reports detailing USAC's operations, activities, and accomplishments for the prior year; (2) quarterly reporting on E-Rate disbursements; (3) full access to all data collected by USAC when administering E-Rate; (4) an accounting of USAC's financial transactions in accordance with generally accepted principles for federal agencies; (5) performance measurement reports when requested by the FCC; and (6) projected quarterly budgets that must be approved by the FCC before USAC can disburse any E-Rate funds. *See* 47 C.F.R. §§ 54.702(g), (h), (j), (n), (o), 54.715(c).

77. The annual compensation for USAC officers and employees may not exceed the basic rate of pay in effect for "Level I of the Executive Schedule" for federal government employees. 47 C.F.R. § 54.715(b).

Case 2:08-cv-00724-LA Filed 07/01/15 Page 23 of 28 Document 105-1

78. Without the authority provided by the federal government, USAC could not collect E-Rate contributions, administer the E-Rate Program, or pay billions of dollars for telecommunications services annually.

79. The FCC closely supervises and retains ultimate control over USAC's activities.

80. When USAC is administering the E-Rate Program, it is acting as an agent of the United States.

## VIII.   DAMAGES AND CIVIL PENALTIES

81. Because Wisconsin Bell never calculated LCP, and all information about Wisconsin Bell's pricing is entirely within Wisconsin Bell's control, Relator cannot posit a damages estimate at this time. However, given that all of Wisconsin Bell's certifications and submissions to the E-Rate Program have been false and unlawful, Relator alleges that damages to the United States are, at least, in the millions of dollars. In addition, civil penalties are available under the False Claims Act in amounts ranging from $5,500 to $11,000 per violation. Given that Wisconsin Bell has had hundreds of E-Rate-eligible school and library customers in Wisconsin, and that it ordinarily requested reimbursement from E-Rate quarterly (if not more frequently) for each school or library, there have been many thousands of false claims submitted by Wisconsin Bell to the E-Rate Program during the relevant time period.

## COUNT I
## United States False Claims Act

82. Relator realleges paragraphs 1 through 81 of this Complaint.

83. From 1997 through the present, Wisconsin Bell knowingly made or used, and caused to be made or used, false statements including, but not limited to, false representations, material omissions, and/or false certifications relating to prices charged under the E-Rate Program, and its compliance with the E-Rate Program requirements as a condition of eligibility

24

Case 2:08-cv-00724-LA   Filed 07/07/15   Page 24 of 28   Document 127

to participate in E-Rate, in order to cause false or fraudulent claims to be presented to and paid by USAC as the agent of the United States responsible for administering the E-Rate Program, in violation of the False Claims Act. Defendant knowingly and willfully has violated the False Claims Act by submitting, and causing the submission of, false claims, and accepting payment pursuant to those false claims.

84. Defendant knowingly has caused school districts and libraries to submit false claims for payment to USAC, knowing that such false claims would be submitted to USAC for reimbursement, and knowing that such school districts and libraries were unaware that they were submitting claims for reimbursement with prices that violated the rules of the E-Rate Program. By virtue of the acts alleged herein, Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government, including its agent, USAC, for payment or approval, in violation of the False Claims Act, including 31 U.S.C. § 3729(a)(1)(A) and (B).

85. Compliance with E-Rate Program rules and regulations, including LCP, is an express condition of eligibility for reimbursement by the USF. If it were not for Wisconsin Bell's certifications of compliance, USAC would not have issued E-Rate reimbursement payments to Wisconsin Bell or the schools and libraries to which it provided telecommunications services.

86. In addition, Defendant violated and continues to violate 31 U.S.C. § 3729(a)(1)(G), because it knowingly has concealed and knowingly and improperly avoided or decreased its obligation to pay or transmit money to the USF. As set forth herein, Defendant knowingly has failed to comply with its statutory obligation to offer its telecommunications services at LCP to schools and libraries since the inception of the E-Rate Program, and it has

25

Case 2:08-cv-00724-LA    Filed 07/01/15    Page 25 of 28    Document 105-17

concealed the fact that it failed to comply with this obligation. Moreover, at various times since 1997, Wisconsin Bell's wrongdoing was highlighted, or in the exercise of reasonable diligence should have been apparent to Wisconsin Bell management and compliance personnel, and it failed to furnish information about its noncompliance with the E-Rate Program to the officials responsible for investigating such wrongdoing, in violation of the False Claims Act.

87.    The United States is entitled to three times the amount by which it has been damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim presented or caused to be presented. Defendant has been aware of its failure to calculate LCP and the other wrongdoing alleged herein since the inception of the E-Rate Program in 1997. Defendant is not entitled to the benefit of any of the reduced damages provisions of 31 U.S.C. § 3729(a)(2) because it did not provide the United States with information, promptly or otherwise, upon discovering the violations. To the contrary, Wisconsin Bell actively has withheld such information since the inception of the E-Rate Program.

88.    The FCC and USAC, unaware of the foregoing circumstances and conduct of Wisconsin Bell, approved ineligible transactions and funding requests for schools and libraries in Wisconsin and subsequently paid claims to Defendant and its customers out of the USF that were ineligible and either should not have been paid at all, or should only have been paid at lesser amounts than those sought. By reason of these payments, the United States Government has been damaged in an undetermined amount.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Relator prays for judgment against Wisconsin Bell as follows:

a.    that Wisconsin Bell be ordered to cease and desist from submitting false claims to the E-Rate Program;

b.  that judgment be entered in favor of the United States and against Wisconsin Bell in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus civil penalties and statutory damages to the maximum extent allowed under the False Claims Act;

c.  for all damages suffered by the United States, together with costs and all available pre- and post-judgment interest;

d.  that Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

e.  that judgment be granted for Relator and the United States and against Wisconsin Bell for all costs, including, but not limited to, court costs, expert fees, investigative expenses, other costs incurred in investigating and prosecuting this matter, and all attorneys' fees incurred by Relator and the United States in the prosecution of this suit; and

f.  that the United States be granted such other and further relief as the Court deems just and proper.

<u>**JURY TRIAL DEMAND**</u>

Relator, on behalf of the United States of America, hereby demands a jury trial on all claims so triable.

27

Respectfully submitted this 7th day of January, 2015.

**O'NEIL, CANNON, HOLLMAN, DEJONG
& LAING S.C.**
Attorney for Plaintiff/Relator

By:    s/Douglas P. Dehler_____
Douglas P. Dehler
Wis. State Bar No. 1000732
Doug.Dehler@wilaw.com
Laura J. Lavey
Wis. State Bar No. 1079346
Laura.Lavey@wilaw.com
Christa D. Wittenberg
Wis. State Bar No. 1096703
Christa.Wittenberg@wilaw.com

P.O. Address:
O'Neil, Cannon, Hollman, DeJong & Laing S.C.
111 East Wisconsin Avenue, Suite 1400
Milwaukee, Wisconsin 53202
(414) 276-5000

28