# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| BellSouth Telecommunications, LLC, | ) | File No.: EB-IHD-14-00017954 |
| d/b/a AT&T Southeast | ) | NAL/Acct. No.: 201632080007 |
| | ) | |
| | ) | |

**NOTICE OF APPARENT LIABILITY FOR FORFEITURE**

**Adopted: July 27, 2016** **Released: July 27, 2016**

By the Commission: Commissioner Pai Dissenting and issuing a statement; Commissioner O'Rielly Dissenting.

**TABLE OF CONTENTS**

Heading                                                                                                    Paragraph #

I.   INTRODUCTION ........................................................................................................................ 1
II.  BACKGROUND ......................................................................................................................... 3
     A.  The E-rate Program and LCP Requirement ...................................................................... 3
     B.  The Commission's Investigation ...................................................................................... 6
III. DISCUSSION ........................................................................................................................... 28
     A.  Legal Framework of the LCP Requirement .................................................................... 29
     B.  AT&T Apparently Violated the LCP Requirement ........................................................ 35
         1.  AT&T Failed to Charge One-Year Contract Prices ................................................. 38
         2.  AT&T Charged the Districts Rates Higher than the SUNCOM E-rate Contract ..................... 41
         3.  AT&T's Pricing Policies Apparently Do Not Lead to LCP Requirement Compliant
             Prices ...................................................................................................................... 45
         4.  AT&T's Arguments Do Not Justify Its Failure to Comply with the LCP Requirement ......... 53
IV.  FINDINGS ............................................................................................................................... 60
V.   COMPLIANCE AND PROPOSED FORFEITURE ................................................................. 63
VI.  CONCLUSION ......................................................................................................................... 72
VII. ORDERING CLAUSES ........................................................................................................... 73

# I. INTRODUCTION

1.      We propose a penalty of $106,425 against BellSouth Telecommunications, LLC, d/b/a AT&T Southeast (AT&T or the Company) for apparently willfully and repeatedly violating the Communications Act of 1934 (Act), as amended, and the Commission's rules by failing to charge legally mandated lower prices to two school districts in Florida — Orange County Public Schools (Orange County) and Dixie District Schools (Dixie County) (collectively, Districts). The Districts are participants in the Universal Service Schools and Libraries Universal Support Program, commonly referred to as the E-rate Program. Since its inception, the E-rate Program has been instrumental in providing our nation's schools and libraries with access to essential communications services. Providers that offer services to E-rate eligible schools and libraries must adhere to specific pricing requirements, which provide that "[a]ll telecommunications carriers serving a geographic area shall . . . provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged

for similar services to other parties."[1] This requirement is designed to ensure that the schools and libraries who participate in the E-rate program receive fair, competitive rates and that public funds are disbursed efficiently to support these services.

2.      Rather than charge public schools and libraries lower prices, as AT&T was obligated to do, it charged the Districts some of the *highest prices* in the state over a number of years for basic telephone services.  Each year, after apparently charging these unlawfully high prices, AT&T certified or submitted forms to the Universal Service Administrative Company (USAC), the administrator of the E-rate Program, inaccurately claiming that it complied with the Commission's rules.  On the basis of these forms, AT&T received public funds from the Universal Service Fund (Fund) to subsidize high-priced services provided by AT&T to the Districts.  Not only did AT&T apparently cause direct harm to the Districts from years of excessively high prices, AT&T also undermined the effectiveness of the E-rate Program by depleting limited public funds that could have supplied other schools and libraries with access to crucial learning technologies and services.

## II.     BACKGROUND

### A.      The E-rate Program and LCP Requirement

3.      Congress has charged the Commission with promoting universal access to advanced telecommunications and information services at just, reasonable, and affordable rates.[2]  Pursuant to the Act and our rules, every interstate telecommunications carrier must contribute a portion of its quarterly interstate and international telecommunications revenue to the Fund.[3]  The Commission appointed USAC to administer the Fund,[4] and to use the monies collected to support low-cost telecommunications services to schools, libraries, health-care providers, low-income consumers, and subscribers in high cost-areas.[5]

4.      The E-rate Program enables eligible schools, libraries, and consortia of eligible schools and libraries to receive discounts on telecommunications services, Internet access, internal connections, basic maintenance costs, and managed internal broadband services.[6]  The program subsidizes the cost of these services with money from the Fund.[7]  The Commission has emphasized its commitment to maximizing cost-effectiveness of spending for E-rate supported purchases, reducing improper E-rate payments, and combating waste, fraud, and abuse in the E-rate Program.[8]  As the Commission explained in the 2014 *E-rate Modernization Order*, "[e]very dollar spent inefficiently for E-rate supported services is one less dollar available to meet schools' and libraries' broadband connectivity needs."[9]

---

[1] 47 U.S.C. § 254(h)(1)(B) ("All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the definition of universal service under subsection (c)(3) of this section, provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties.").

[2] Telecommunications Act of 1996, Pub. L. No. 104-104 § 254, 110 Stat. 56, 71–75.

[3] *See* 47 U.S.C. § 254; 47 CFR §§ 54.706, 54.709.

[4] 47 CFR § 54.701(a).

[5] 47 U.S.C. § 254(b); 47 CFR § 54.701(c).

[6] *See* 47 CFR § 54.502 (identifying E-rate eligible services, including Telecommunications, Telecommunications Services, Internet access, internal connections, basic maintenance and managed internal broadband services); *see also* http://www.usac.org/sl/applicants/beforeyoubeginleligible-services-list.aspx (last visited February 2, 2016).

[7] See 47 U.S.C. § 254(h)(1)(B); Fed.-State Joint Bd. on Universal Serv., Report and Order, 12 FCC Rcd 8776, 9082 paras. 583-584 (1997) (Universal Service First Report and Order).

[8] *Modernizing the E-rate Program for Schools and Libraries*, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 8870, 8890–91, paras. 50–54 (2014) (*E-rate Modernization Order*).

[9] *E-rate Modernization Order,* 29 FCC Rcd at 8934, para. 155.

5.     To address concerns about effective price competition, Congress included a provision in the Act that requires telecommunications carriers to "provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties."[10]  To implement this provision, the Commission established the "Lowest Corresponding Price," or LCP, Rule as a condition of participation in the E-rate Program. The Rule prohibits service providers from submitting bids for or charging E-rate eligible entities prices that exceed the "lowest corresponding price" offered by the company to similarly situated customers.[11]  The statutory provision and corresponding Rule, which we refer to collectively as the "LCP Requirement," "ensure[s] that inexperience does not prevent schools and libraries from receiving competitive prices, [and] service providers must offer services to eligible schools and libraries at prices no higher than the lowest price the provider charges to similarly situated non-residential customers for similar services."[12]  The LCP Requirement does not place the burden of asking or negotiating for lowest corresponding prices on the school – it requires the service provider to affirmatively submit bids for and charge prices compliant with the LCP Requirement.[13]

### B.     The Commission's Investigation

6.     The Orange County School District covers the area including and surrounding Orlando, Florida.  As of the 2014–2015 school year, Orange County had an enrollment of 190,341 students, making it the 11th largest school district in the United States.[14]  The school district had 184 schools as of the 2013–14 school year including elementary, middle, and high schools and exceptional education centers.[15]  The Dixie School District covers schools in Dixie County, a rural area west of Gainesville, Florida.  It currently includes five schools including elementary, middle, and high schools and an adult learning center.[16]

7.     The Company, together with its parent organization AT&T, Inc. and AT&T Inc.'s subsidiaries, is one of the largest providers of landline telecommunications services in the United States and one of the largest providers of E-rate-supported services, receiving more than $1.23 billion in

---

[10] 47 U.S.C. § 254(h)(1)(B).

[11] 47 CFR § 54.511(b); *see also Universal Service First Report and Order,* 12 FCC Rcd at 9031, 9033, paras. 484, 488*; E-rate Modernization Order*, 29 FCC Rcd at 8943–44, paras. 184–85. While the LCP Requirement does not expressly mention an obligation to "offer" eligible entities the lowest corresponding price, this obligation was articulated in the *Universal Service First Report and Order* where the Commission described the LCP Requirement as requiring service providers to "offer" services at the lowest corresponding price.  *See Universal Service First Report and Order,* 12 FCC Rcd at 9031–32, para. 484. This means that providers must both: (i) submit bids to applicants at prices no higher than the lowest price they charge to similarly-situated non-residential customers for similar services; and (ii) charge applicants a price no higher than the lowest corresponding price.  *E-rate Modernization Order,* 29 FCC Rcd at 8944, para. 185.

[12] *Fed.-State Joint Bd. on Universal Serv. Changes to the Bd. of Directors of the Nat'l Exch. Carrier Ass'n, Inc.,* Fourth Order on Reconsideration, 13 FCC Rcd 5318, 5398, para 133 (1997) (*Fourth Order on Reconsideration*); *see also Universal Service First Report and Order,* 12 FCC Rcd at 9031-32, paras. 484-485 ("[E]ligible schools and libraries can take advantage of any cost-based rates that other customers may have negotiated with carriers during a period when the market was subject to actual, or even potential, competition."); *see also* 141 Cong. Rec. S7972-03, 141 Cong. Rec. S7972-03, 1995 WL 340416 ("Our part of the bill on this is not intended to give something away for nothing. It merely assures financially strapped public institutions like libraries and schools will get affordable rates for access.").

[13] *E-rate Modernization Order*, 29 FCC Rcd at 8943–44, paras. 183–85.

[14] *See* https://www.ocps.net/fs/budget/Documents/16%20Adopted%20Budget%20Summary.pdf (last visited December 25, 2015).

[15] *See* https://en.wikipedia.org/wiki/Orange_County_Public_Schools (last visited December 25, 2015).

[16] *See* http://www.dixie.k12.fl.us/ (last visited December 25, 2015).

payments from the Fund as a result of their participation in the E-rate program from July 2012 to June 2015.[17] AT&T claims to provide "a complete range of E-rate eligible services including voice, data, network, wireless, Internet, video and more to meet your needs. We can help you understand the E-rate program and how to maximize your benefits."[18] AT&T has provided E-rate supported services to schools and libraries in Florida since the E-rate Program's inception in 1998.[19]

8.     Since at least 1998 and through the 2014 funding year, AT&T has provided E-rate supported services to Orange County and Dixie County.[20] USAC's records demonstrate that the Fund disbursed at least $789,542 for services provided to the Districts by AT&T between the 2012 and 2014 funding years.[21] We focused our investigation on two particular telephone services called non-Centrex Primary Rate Interface Integrated Services Digital Network (PRI)[22] and business flat-rate multiline (MFB), which are both common enterprise landline telephone services.  PRI is composed of three services which are usually purchased together; for simplicity we refer to them as PRI Service 1, 2 and 3.

9.      As we discuss in greater detail below, the record reflects that at least since July 2012, AT&T charged Orange County and Dixie County prices for PRI and/or MFB service that were many times higher than other customers.  The Districts were paying significantly higher prices than other business customers in Florida, including other customers receiving the same MFB and PRI services on the same one-year length of service as the Districts.[23]  The Districts were also paying prices for PRI that were many times higher than the rates available in a state-wide contract that all schools and libraries in Florida, including the Districts here, were eligible to order from.  These dramatic price differences underpin our finding that AT&T violated the LCP Requirement.

10.     ***Services Ordered and Prices Paid by the Districts.*** From at least July 2012 through June 2015, AT&T provided PRI and/or MFB services to the Districts.[24]  The Districts did not seek

---

[17] *See* http://www.slforms.universalservice.org/drt/default.aspx (last visited February 2, 2016).  The E-rate funding year runs from July-June, *i.e.*, the 2012 funding year runs from July 2012-June 2013.  Disbursements by the Fund can be made after the close of the funding year.  For instance, 2012 funding could be disbursed after July 2013.

[18] *See* http://www.corp.att.com/erate/ (last visited February 2, 2016).

[19] *See* http://www.slforms.universalservice.org/drt/default.aspx; Letter from Terri L. Hoskins, General Attorney, AT&T Services Inc., to Gregory Simon, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, and Pam Slipakoff, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, at Attach. 1, Response No. 2(b), p. 2 (Feb. 4, 2015) (on file in EB-IHD-14-00017954) (AT&T LOI Response).

[20] *See* http://www.slforms.universalservice.org/drt/default.aspx; *see also* Email from Thomas Ranallo, President, Troy & Banks, to Jia-Ming Shang, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, et. al. and Attachment. "July 2014.pdf" (April 19, 2016, 15:54 EDT) (on file in EB-IHD-14-00017954) (Ranallo April 19, 2016 Email); AT&T LOI Response Nos. 4(a) and 5(a), pgs. 3-5.

[21] AT&T LOI Response 4(d) and 5(d), pgs. 4-6; *see also* http://www.slforms.universalservice.org/drt/default.aspx.

[22] PRI is a service bundle comprised of three components that are usually purchased together: PRI Non-Dist Sensitive Mileage (Service 1), PRI Voice/Data Interface (Service 2), and B channel, voice/data (standard) (Service 3). One line of PRI service typically contains 23 items of "B-channel" service, which is what Orange County received.  Dixie County had 10 "B-channels." *See* Email from Terri Hoskins, General Regulatory, AT&T Services Inc., to Gregory Simon, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, *et. al.* Attach. "Answers to EB 061815 Questions final 070915.pdf" Attach. C, D and E (July 9, 2015, 17:18 EDT) (on file in EB-IHD-14-00017954) (AT&T July 9, 2015 Email).

[23] *See* Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024522-024541, ATT024542-024544; AT&T First Supplemental LOI Response at ATT024548-ATT024553, ATT024609-ATT024613; AT&T Third Supplemental LOI Response at ATT027613-ATT027626, ATT027631-027634; and AT&T Fourth Supplemental LOI Response at ATT027642-ATT027659, ATT027715-ATT027720.

[24] *See* http://www.slforms.universalservice.org/drt/default.aspx; Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024522-024541, ATT024542-024544; Letter from Terri L. Hoskins, General Attorney, AT&T

(continued….)

reimbursement for services provided in the 2014 funding year until July and August 2015, and USAC made its disbursements for the 2014 funding year around July 24, 2015 and September 1, 2015.[25]

11.     Florida deregulated all pricing for telephone services on July 1, 2011, after which AT&T began to dramatically increase its pricing for previously regulated services.[26]  In every month between July 2012 and June 2015 in which they received the service, Dixie County and ███████████ were charged AT&T's month-to-month "Guidebook,"[27] or tariff, rate for MFB service, which is the ██████ rate charged to customers for MFB service.[28]  AT&T steadily increased the MFB month-to-month Guidebook rates and charged the Districts the higher prices with each increase.[29]  Between July 2011 and January 2015, AT&T raised its Guidebook rates for MFB at least five times, with the price increasing from \$52 per month to \$97 per month.[30]  Further, between January 2014 and September 2014, both Districts paid among the highest rates of all non-residential customers for PRI service.[31]  As with MFB service, AT&T also raised its month-to-month Guidebook rates for PRI service every year.[32] Between July 2011, and June 2015, AT&T raised its Guidebook rates for PRI service at least four separate times, with the price increasing over that period from \$723 per month to \$1,245 per month.[33] AT&T moved Dixie County to Guidebook rates in November 2012 and switched Orange County to Guidebook rates in

(Continued from previous page) ───────────────

Services Inc., to Gregory Simon, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, and Pam Slipakoff, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, Attach. "Attachment 1-ATT024545.pdf" at ATT024548-ATT024553, ATT024609-ATT024613 (Feb. 18, 2015) (on file in EB-IHD-14-00017954) (AT&T First Supplemental LOI Response); Letter from Terri L. Hoskins, General Attorney, AT&T Services Inc., to Gregory Simon, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, and Pam Slipakoff, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, Attach. "Attachment II-BST Erate LOI Question 7 2013 Data updated 031115.pdf" at ATT027613-ATT027626, ATT027631-027634 (March 4, 2015) (on file in EB-IHD-14-00017954) (AT&T Third Supplemental LOI Response); Letter from Terri L. Hoskins, General Attorney, AT&T Services Inc., to Gregory Simon, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, and Pam Slipakoff, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, Attach. "Attachment I-BST Erate LOI Question 7 2012 Data final.pdf" at ATT027642-ATT027659, ATT027715-ATT027720 (March 18, 2015) (on file in EB-IHD-14-00017954) (AT&T Fourth Supplemental LOI Response).

[25] See USAC Report "Request 110615.xlsx" dated November 12, 2015 (on file in EB-IHD-14-00017954).

[26] See http://cpr.bellsouth.com/pdf/fl/filings/flfiling.htm; AT&T July 9, 2015 Email, Response Nos. 12-13 ("[AT&T] was relieved of all pricing regulation in Florida as of July 1, 2011. ████████████████████████████████████████████████████████████████.").

[27] Florida deregulated pricing for telephone services effective July 1, 2011 and AT&T referred to its published rates after deregulation as "Guidebook" prices.  See AT&T Service Publications Guide at http://www.att.com/gen/public-affairs?pid=13532 (describing Guidebook and tariffs); AT&T admits that it ████████████████████████████████████████ AT&T July 9, 2015 Email, Response Nos. 11, 12, and 13, pgs. 4-6 and Attach. F, fn. 2.

[28] See Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024522-024541, ATT024542-024544.

[29] See http://cpr.bellsouth.com/pdf/fl/filings/flfiling.htm; see also AT&T LOI Response at ATT024522-024541, ATT024542-024544; AT&T July 9, 2015 Email at Attach. E and F.

[30] See http://cpr.bellsouth.com/pdf/fl/filings/flfiling.htm; AT&T July 9, 2015 Email, Attach. F.

[31] See AT&T LOI Response at ATT024522-024541, ATT024542-024544; AT&T First Supplemental LOI Response at ATT024548-ATT024553, ATT024609-ATT024613; AT&T Third Supplemental LOI Response at ATT027613-ATT027626, ATT027631-027634; and AT&T Fourth Supplemental LOI Response at ATT027642-ATT027659, ATT027715-ATT027720.

[32] See http://cpr.bellsouth.com/pdf/fl/filings/flfiling.htm.

[33] See http://cpr.bellsouth.com/pdf/fl/filings/flfiling.htm; AT&T July 9, 2015 Email, Attach. E.  This price is based on just one item of PRI Service 3.

January 2014.[34]  After those dates, respectively, both Districts were also charged higher month-to-month rates with each Guidebook increase.[35]

12.    The Guidebook prices that Orange County and Dixie County paid for PRI and MFB service between July 2012 and June 2015, are reflected in the following charts:

| | MFB Service | |
|---|---|---|
| **Dixie County Charges**[36] | July 2012 - Jan. 2013 | $60 |
| | Feb. 2013 – Dec. 2013 | $68 |
| | Jan. 2014 – June 2014 | $81.75 |
| | July 2014 - Jan. 2015 | $90 |
| | Feb. 2015 - June 2015 | $97 |
| **Orange County Charges** | July 2012 - Jan. 2013 | $█ |
| | Feb. 2013 – Nov. 2013 | $█ |
| | Dec. 2013 – June 2014 | $█ |
| | July 2014 - Sept. 2014 | $90 |

---

[34] Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024522-024541, ATT024542-024544; AT&T July 9, 2015 Email at Attach. E and F.

[35] Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024522-024541, ATT024542-024544.

[36] Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024522-024541, ATT024542-024544.

| | | PRI Service | | |
|---|---|---|---|---|
| | | **Service 1** | **Service 2** | **Service 3** |
| **Dixie County Charges[37]** | Nov. 2012 - May 2013 | $180 | $510 | $95 |
| | June 2013 - Mar. 2014 | $198 | $561 | $105 |
| | Apr. 2014 - Sept. 2014 | $238 | $673 | $126 |
| **Orange County Charges** | Jan. 2014 - Mar. 2014 | $198 | $561 | $105 |
| | Apr. 2014 - Sept. 2014 | $238 | $673 | $126 |

13.     AT&T has offered no reason for the repeated price increases, other than .[40] AT&T has not demonstrated and does not argue that the escalating prices it charged to the Districts were necessary to offset "demonstrably and significantly higher" costs necessary to provide service to the schools.[41] Indeed, AT&T has not offered any justification for its pricing at all despite requests from the Enforcement Bureau (Bureau).[42] We are left to conclude that AT&T sought to maximize profits at the expense of the Districts and at the expense of the publicly-funded E-rate program.

14.     ***The Districts Requested One Year of Service***. The Districts sought yearly rather than month-to-month service and it is not clear whether the Districts understood that they were paying the month-to-month Guidebook rates for either MFB or PRI. When schools are seeking services under the E-

---

[37] Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024522-024541, ATT024542-024544.

[38] *See* AT&T Sixth Supplemental LOI Response, p. 1-13.

[39] AT&T July 9, 2015 Email, Response No. 10(a)-(d).

[40] AT&T July 9, 2015 Email, Response Nos. 11, 12 and 13; *LCP Clarification Order*, 13 FCC Rcd at 14082, para. 4.

[41] *See Universal Service First Report and Order*, 12 FCC Rcd at 9033-34, para. 488-89 ("[W]e will only permit providers to offer schools and libraries prices above the prices charged to other similarly situated customers when those providers can show that they face demonstrably and significantly higher costs to serve the school or library seeking service… If the services sought by a school or library include significantly lower traffic volumes or their provision is significantly different from that of another customer with respect to any other factor that the state public service commission has recognized as being a significant cost factor, then the provider will be able to adjust its price above the level charged to the other customer to recover the additional cost incurred so that it is able to recover a compensatory pre-discount price.").

[42] In response to questions in the LOI asking for an explanation of its costs to provide these services, AT&T stated only that                                and did not provide any cost data. *See* AT&T July 9, 2015 Email Response Nos. 12 and 13.

rate program, they typically issue an FCC Form 470 listing the types of service they want, inviting providers to submit bids for service in response. After a school and provider reach an agreement on the terms of service, the school asks for funding by submitting a FCC Form 471 to USAC describing the service and its price. The school may submit a FCC Form 472 to request reimbursement from the Fund, which USAC will typically pay if the provider certifies that all the E-rate rules have been followed. Both Districts here utilized this procedure.

15. In all years relevant to this investigation, the Districts each put out or relied on a FCC Form 470 request for service indicating that they wanted service for the entire E-rate year, *i.e.*, they did not request service for only a select number of months.[43] For Orange County, nothing in the record indicates that AT&T responded to any of the bid requests for either PRI or MFB service.[44] For Dixie County, AT&T produced ███████████████████████████████, demonstrating that AT&T understood Dixie County was not requesting month-to-month service.[45] However, AT&T ultimately did not charge rates for a 12-month term as the Districts requested, or even other lower rates that the Districts were eligible to receive under a Florida state E-rate contract, but instead charged the month-to-month Guidebook rates.[46] Dixie County specifically indicated on its forms to USAC in 2013 and 2014 that it was not requesting funding for month-to-month service, and that its service was pursuant to a Florida state contract.[47] Orange County made similar representations in 2012 and 2013.[48]

---

[43] *See* http://www.slforms.universalservice.org/drt/default.aspx.

[44] ████████████████████████████████████████████████████████████████████ ████████████████████████. *See* Letter from Terri L. Hoskins, General Attorney, AT&T Services Inc., to Jennifer Epperson, Deputy Chief, Investigations and Hearings Division, FCC Enforcement Bureau, and Pam Slipakoff, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, Attach. "Attachment I-ATT Question 6 Response 032715.pdf" at No. 6, p. 11-12 (March 27, 2015) (on file in EB-IHD-14-00017954) (AT&T Sixth Supplemental LOI Response).

[45] *See* AT&T LOI Response at ATT000017. ███████████████████████████████████████████████████████ ████████. For 2014, AT&T says that Dixie County did not ████████████████████████████████████████ *See* AT&T Sixth Supplemental LOI No. 6, p. 2-7. For 2012, AT&T produced emails showing ████████████████████████████████████████████████████████████████████████████. *See* AT&T LOI Response at ATT0016929 and ATT0016931. It is not clear from the emails that ████████████████████████████████████████████████████████. For 2013, AT&T ████████████████████████████████████████████████████████ AT&T LOI Response at ATT000005-000017.

[46] For both 2012 and 2013, AT&T stated, "████████████████████████████████████████████ ██████████████████." AT&T Sixth Supplemental LOI No. 6, p. 3-7. We note that AT&T's ████████████ does not appear to be LCP Requirement compliant, at least with respect to PRI, because AT&T's own ████████████ Rates for PRI offer lower prices for the same █-month term. In March 2013, AT&T ████████████████████ per month for PRI (including █ items of Service 3) on a █-month term. *See* AT&T LOI Response at ATT000017 and *supra*, fn. 22, for details on the three components that make up PRI service. This ███ was *higher* than AT&T's 2013 ████████ Rates in effect at that same time of $███ for PRI, also on a █-month term. *See* AT&T LOI Response at ATT001531, ATT001606 (quoting a total of $███ for PRI, including █ items of Service 3).

[47] *See* http://www.slforms.universalservice.org/drt/default.aspx (FCC Form 471 Nos. 969833 (2014), 924534 (2013)); *see also infra* paras. 17-19 and accompanying cites for details on the Florida contract. In both 2013 and 2014, Dixie County indicated that PRI service was not month-to-month and listed the Florida contract number. In both years, Dixie County indicated that "local telephone service" was pursuant to a state contract, but did not identify the contract number.

[48] Orange County listed the Florida contract as the applicable contract vehicle in 2012 and 2013, and did not indicate that it was buying month-to-month service. *See* http://www.slforms.universalservice.org/drt/default.aspx

(continued….)

16.     ***AT&T Pricing Policy***.  AT&T has a flowchart called a "█████████████████" in its E-rate Pricing Policy that guides its sales representatives in determining the appropriate price to charge E-rate eligible entities.[49]  The █████████████████ directs AT&T salespeople to first █████████████████████████████████████████████████████████████████████████████████ [50]  If the conditions are not met, the next step in the █████████████████ requires a determination as to whether a "█████████████" rate is available.[51]  Even where such rate is available, the ████████████████ requires that a █████████████ Rate be offered to E-rate eligible entities if it would be lower than the ████ rate.[52]  ███████ Rates are ██████████████████████████████████████████ [53]  Only if neither a █████████ nor a ████ Rate are available for the particular service ordered by the school or library should the salesperson offer ████████ rates.[54]  For the reasons described below, AT&T's pricing policy failed to achieve LCP Requirement compliant pricing for the Districts' PRI and MFB services.

17.     ***Florida SUNCOM E-rate Contract***.  Florida's Department of Managed Services (Florida DMS) is an E-rate consortium lead that administers a state telecommunications network called SUNCOM.[55]  It entered into a contract with AT&T in February 2007, which remains in effect today, that enables eligible schools and libraries throughout Florida—along with other entities, including state agencies—to purchase E-rate supported services at reduced prices.[56]  A comparison of the SUNCOM E-rate contract PRI rates to the Guidebook rates for PRI, which were both available on a month-to-month basis, shows that the Guidebook rates were 400% to 500% higher than those under the SUNCOM E-rate contract.[57]  MFB is not available under the SUNCOM E-rate contract.

---

(Continued from previous page) ───────────────

(FCC Form 471 Nos. 901556 (2013) and 836856 (2012)).  In contrast in 2014, it stated the service was month-to-month. *See* http://www.slforms.universalservice.org/drt/default.aspx (FCC Form 471 No. 992222 (2014)).

[49] The policy warns readers that non-compliance can result in dire consequences, such as "█████████████████ ████████████████████████████████████████████" AT&T LOI Response at ATT001508-ATT001510.

[50] AT&T LOI Response at ATT001508-ATT001510.

[51] AT&T LOI Response at ATT001510.

[52] AT&T LOI Response at ATT001510.

[53] *See* AT&T LOI Response No. 13 at pg. 10 fn. 14. Although the Company asserts that █████████ Rates provide ████████████, as further discussed herein, it does not appear that the use of █████████ Rates necessarily results in the Company charging LCP Requirement compliant pricing for eligible schools and libraries.

[54] AT&T LOI Response at ATT001510.

[55] *See* Fla. Stat. § 282.703; Fla. Admin. Code  r. 60FF-1.001 ("[T]he Department of Management Services (the Department) shall design, acquire, engineer, implement and operate a statewide network referred to as SUNCOM. Barring exceptions described within these rules, the Department shall obtain, secure, manage, coordinate State communications and provision for use of State communications services, equipment and communications software.")

[56] All schools and libraries in Florida, along with other Florida state agencies, are eligible to order from the SUNCOM E-rate contract. *See* http://www.dms.myflorida.com/business_operations/telecommunications/suncom_e_rate_contracts; http://www.dms.myflorida.com/business_operations/telecommunications/suncom_customer_qualifications; AT&T LOI Response at ATT024625-ATT025604.

[57] http://www.dms.myflorida.com/business_operations/telecommunications/suncom_e_rate_contracts; Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024625-ATT025604; Letter from Terri L. Hoskins, General Attorney,

(continued….)

18.     Though the schools and libraries that order service under the SUNCOM E-rate contract receive bills from the Florida DMS, and the Florida DMS in turn pays a monthly invoice to AT&T for all of the services delivered across the state, AT&T's recordkeeping tracks the service and associated cost provided to each agency.  The monthly invoice from AT&T to the Florida DMS ████████████████████████████████████████.[58] As a result, AT&T has detailed, easily audited records of the services delivered and prices charged to schools and libraries participating in the SUNCOM consortium.

19.     AT&T did not charge the Districts the lower Florida SUNCOM prices.  AT&T claims it does not have ███████████████████████████████████████.[59]  However, an email produced by AT&T discussing PRI states ████████████████████████████████████████████████████ ████████████████████[60] AT&T argues that the Florida SUNCOM E-rate contract is not a ██████████████" under the ████████████████ and has not identified any other contract that would be a "████████████," nor has it further explained its claim that it █████████████████████████████████████████████████ in light of the email stating that Dixie County "███████████████████████"[61]  Regardless of whether the SUNCOM E-rate contract was a "████████████████████████" under the ████████████████████, AT&T apparently did not consider the Florida SUNCOM rates or other schools receiving those rates in determining the lowest corresponding price to charge the Districts.[62]

20.     ████████████ ***Rates.***  PRI is one of the services for which AT&T has established a ███ ████████ Rate,[63] which is orders of magnitude less than Guidebook rates.  The Districts were not offered or

(Continued from previous page) ————————————————————

AT&T Services Inc., to Jennifer Epperson, Acting Deputy Division Chief, Investigations and Hearings Division, FCC Enforcement Bureau, Gregory Simon, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, and Pam Slipakoff, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, Attach. 1, Response No. 11, p. 1 (May 15, 2015) (on file in EB-IHD-14-00017954) (AT&T Corrected Ninth Supplemental LOI Response) (████████████████████████████████████████████████ ██████).  The Commission has encouraged schools and libraries to aggregate their demand and create consortiums with power to negotiate lower rates from service providers.  *See* 47 CFR § 54.501(c); *First Universal Service Report and Order* at 9027, para. 476; *Fourth Order on Reconsideration* at 5433, para. 200; *E-Rate Modernization Order* at 8941–42, paras. 177–78.

[58] *See* Fla. Admin. Code r. 60FF-2.006; *see also* 47 C.F.R. § 54.501(c)(2); Ranallo April 19, 2016 Email.

[59] AT&T Sixth Supplemental LOI, Response No. 6, fn 32 ("████████████████████████████████████████ ████████████").

[60] AT&T LOI Response at ATT000421.

[61] AT&T LOI Response at ATT000421.  AT&T further argued in this investigation that the SUNCOM contract is not a "Master Contract" as defined in and under the Commission's rules.  The LOI and Section 54.500 of the rules define Master Contract as "a contract negotiated with a service provider by a third party, the terms and conditions of which are then made available to an eligible school, library, rural health care provider, or consortium that purchases directly from the service provider."  AT&T argues that the SUNCOM contract does not meet this definition because schools and libraries purchase from the state of Florida and not directly from AT&T. *See* AT&T LOI Response No. 11, p. 8-9; *see also* Email from Terri Hoskins, General Regulatory, AT&T Services Inc., to Gregory Simon, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, Attach "ATT Response to 052115 Email.pdf" (May 26, 2015, 17:36 EDT) (on file in EB-IHD-14-00017954).

[62] After representatives for the Districts questioned AT&T about the lowest corresponding price and why they were charged Guidebook rates instead of the Florida rates, AT&T's internal emails acknowledged that ████████ █████████████████████████████████████████████████████████████████████ AT&T LOI Response at ATT000421 ("█████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████").

[63] AT&T LOI Response at ATT001606.  Service 1 was $███, Service 2 was $████ and Service 3 was $██.  The total price of $███ is based on 23 items of Service 3.

charged this rate either, with no explanation from AT&T.  For MFB, AT&T ████████████ █████ Rate.

21.    ***Other Non-residential Customers.***  Other non-residential customers also paid much lower prices for PRI and MFB, at varying contract lengths and terms.  For MFB, the lowest price AT&T charged other customers in Florida was $███ in 2012, $███ in 2013, and $███ in 2014.[64]  There are hundreds of different prices between that lowest price and the Guidebook, and in 2014 alone, AT&T charged ███ different prices across thousands of non-residential customers in Florida for a single line of MFB service.[65]  Equally striking is how much lower many of those prices were compared to the prices charged to the Districts.  In September 2014, for example, AT&T charged ████████████ and Dixie County the ████████ price of $90 for MFB service, which was magnitudes higher than other customers and more than ███ times the lowest price in 2014.[66]

22.    These varied prices were given to a wide range of customers.  The lowest rate for MFB service, $███, was charged to a large financial institution.[67]  The ████████████████ was charged $███.[68]  Hundreds of commercial businesses, including a Wall Street investment bank, several Fortune 500 companies, and at least four other E-rate eligible entities were charged between $███ and $███ for MFB service in March 2014 alone.[69]  In addition to offering lower prices to enterprises and federal agencies, AT&T also charged much lower prices to other schools in Florida.  For all of 2014, at least eight schools or school districts, including the ████████████████████, paid $███ for MFB service, ███% less than what AT&T charged the Districts.[70]  Schools and libraries in ████████ County, ████████ County, ████████ County and ████████████ County were charged between $███ and $███ for their MFB service in calendar year 2014, less than ███ of what the Districts were paying.[71]  The record shows that AT&T offered a 12 month contract for MFB service to at least one other non-residential customer in the state of Florida, at a rate of $███ per month, which is much lower than what was charged to the Districts, who also sought MFB service for 12 months.[72]

23.    Large variations in pricing also exist for PRI service.  In all of 2014, across its Florida market, AT&T had many different price points for each of the three PRI service components.[73]  For all non-residential customers in Florida in 2014, the Service 1 monthly rate ranged from $███ to $███; Service 2 ranged from $███ to $███; and Service 3 ranged from $███ to $███.[74]  For each of these components, the

---

[64] AT&T First Supplemental LOI Response at ATT024548-ATT024553, ATT024609-ATT024613; AT&T Third Supplemental LOI Response at ATT027613-ATT027626, ATT027631-027634; AT&T Fourth Supplemental LOI Response at ATT027642-ATT027659, ATT027715-ATT027720.

[65] AT&T First Supplemental LOI Response at ATT024548-ATT024553, ATT024609-ATT024613.

[66] Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024522-024541, ATT024542-024544.

[67] *See* Email from Jacquelyne Flemming, Vice President, AT&T Services Inc., to Jiaming Shang, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, and Jennifer Epperson, Deputy Chief, Investigations and Hearings Division, FCC Enforcement Bureau, Attach. "FCC LOI Mar 2014.xlsx" (Nov. 2, 2015, 17:47 EDT) (on file in EB-IHD-14-00017954) (AT&T MFB March 2014 Price Points).

[68] *See* AT&T MFB March 2014 Price Points.

[69] *See* AT&T MFB March 2014 Price Points; *see also* AT&T Third Supplemental LOI Response at ATT025734-ATT027553.

[70] AT&T Third Supplemental LOI Response at ATT025734-ATT027553.

[71] AT&T Third Supplemental LOI Response at ATT025734-ATT027553.

[72] *See* AT&T MFB Analysis of March 2014 Customers.

[73] *See* AT&T First Supplemental LOI Response at ATT024548-ATT024553, ATT024609-ATT024613.  AT&T had ███ different prices for Service 1, ███ different prices for Service 2, and ███ different prices for Service 3.

[74] *See* AT&T First Supplemental LOI Response at ATT024548-ATT024553, ATT024609-ATT024613.

Districts were again charged some of the highest prices in the entire state, with September 2014 monthly Guidebook rates of $238 for Service 1, $673 for Service 2, and $126 for Service 3.[75] For the Service 3 component, the Districts again paid ███████████████.[76]

24.      In comparison, other public school districts in Florida, such as ███████████ School District and ███████████ School District, were charged just $██ for Service 1. ███████ County Schools was charged $██ for Service 2 (less than ████ of the Districts) and $█ for Service 3 (██% less than the Districts).[77] AT&T also gave favorable PRI rates to parochial and private schools. The ███████ School paid $██ for Service 1, $██ for Service 2, and $█ for Service 3, for a total price of $██ for PRI service in 2014.[78] Comparable totals for those same services to the Districts ranged ███ or ███ times higher, from $864 to $1,037 in 2014.[79]

25.      The Districts' PRI charges were also far higher than the rates in the SUNCOM contract of $120 for Service 1, $340 for Service 2, and $7 for Service 3.[80] Indeed, the Districts were paying prices that exceeded even the ███████████ Rates that AT&T's own ███████████████ emphasized should be offered to the schools as one potentially LCP Rule-compliant pricing option. The lowest ███████ Rate, on a three-year term, for Service 1 was priced at $██, Service 2 at $██ and Service 3 at $█. The ███████████ Rate for a one-year term was $██ for Service 1, $██ for Service 2 and $█ for Service 3.[81]

26.      These price ranges are reflected in the charts below:

|  | MFB |
| --- | --- |
| **2014 Ranges of All Prices**[82] | $██ - $90 (Guidebook) |
| **Highest 2014 Price Charged to the Districts** | $90 |

|  | PRI Service 1 | PRI Service 2 | PRI Service 3 |
| --- | --- | --- | --- |
| **2014 Ranges of All Prices** | $██ - $██ | $██ - $██ | $█ - $██ |
| **SUNCOM E-rate Contract Rates**[83] | $120 | $340 | $7 |

---

[75] For comparison, in 2012, the lowest price for Service 1 was $██, Service 2 was $██ and Service 3 was $█. In 2013, the lowest price for Service 1 was $██ Service 2 was $██ and Service 3 was $█. *See* Third Supplemental LOI at ATT27554, ATT27631-ATT27634; Fourth Supplemental LOI at ATT027715-ATT027719.

[76] *See* AT&T First Supplemental LOI Response at ATT024548-ATT024553, ATT024609-ATT024613.

[77] AT&T Third Supplemental LOI Response at ATT025734-ATT027553.

[78] AT&T Third Supplemental LOI Response at ATT025734-ATT027553.

[79] AT&T LOI Response at ATT024522-024541, ATT024542-024544.

[80] Ranallo April 19, 2016 Email; AT&T Second Supplemental LOI Response at ATT024939.

[81] AT&T LOI Response at ATT001605-ATT001607.

[82] These are the ranges of prices paid by AT&T non-residential Florida customers in calendar year 2014. *See* AT&T First Supplemental LOI Response at ATT024548-ATT024553, ATT024609-ATT024613.

[83] *See* Ranallo April 19, 2016 Email; AT&T Second Supplemental LOI Response at ATT024604-ATT025625.

| One-Year ▮▮▮▮ Rates | $▮▮ | $▮▮ | $▮ |
|---|---|---|---|
| **Highest 2014 Price Charged to the Districts (Guidebook)** | $238 | $673 | $126 |

27.     In July 2014, the Bureau received a referral on the issue from USAC.  On January 5, 2015, the Bureau issued a Letter of Inquiry (LOI) to the Company directing it to provide the Bureau with information about the prices it charges to E-rate eligible and other non-residential customers in the state of Florida.[84]  Over the course of several months, AT&T responded to the request.

## III.     DISCUSSION

28.     We find that AT&T apparently willfully and repeatedly violated Section 254(h)(1)(B) of the Act and Section 54.511(b) of the rules by failing to offer and charge the lowest corresponding price to Orange County and Dixie County since at least July 2012, until June 2015.[85]  After charging the Districts prices above the lowest corresponding price in violation of the LCP Requirement, AT&T apparently submitted forms to USAC in each of those three funding years that falsely certified compliance with our rules and caused USAC to disburse money from the Fund to subsidize the overpriced services.

### A.     Legal Framework of the LCP Requirement

29.     The Communications Act of 1934, as amended, provides:

> All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its [E-rate eligible] services . . . provide such services to [schools and libraries] for educational purposes at rates less than the amounts charged for similar services to other parties.  The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities.[86]

30.     The rules enacted by the Commission to implement this statute prohibit providers from charging schools, school districts, libraries, library consortia, or consortia including any of these entities, "a price above the lowest corresponding price for supported services … [unless] the lowest corresponding price is not compensatory."[87]  "Lowest corresponding price" is defined as "the lowest price that a service provider charges to non-residential customers who are similarly situated to a particular school, library, or library consortium for similar services."[88]  The Commission has referred to the lowest corresponding price in absolute terms and described it as an "upper limit" that can be charged in both competitive and

---

[84] *See* Letter of Inquiry from Jeffrey J. Gee, Acting Chief, Investigations and Hearings Division, FCC Enforcement Bureau, to Jacquelyne Flemming, AVP-External Affairs/Regulatory, AT&T Services, Inc. (Jan. 5, 2015) (on file in EB-IHD-14-00017954) (LOI).

[85] Although AT&T apparently continued to charge Dixie County Guidebook rates for MFB after June 2015, money from the Fund has not yet been used to reimburse those charges.  *See, infra,* fn. 111.

[86] 47 U.S.C. § 254(h)(1)(B).

[87] 47 CFR § 54.511(b); *see Fed.-State Joint Bd. on Universal Serv.*, Order and Order on Reconsideration 12 FCC Rcd 87, 363 para. 540 (1996); *see also AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 377-78 (1999) (Commission has rulemaking authority to implement provisions of the Communications Act of 1934, including the 1996 Amendments).

[88] 47 CFR § 54.500.

non-competitive markets.[89]  The LCP Requirement does not force providers to sell their services at a loss; rather, if a provider is charging a lower rate for a similar service to another non-residential customer in the same geographic service area, that rate is presumed "remunerative" and should be extended to schools.[90]

31.    Providers are "required to offer schools and libraries services at their lowest corresponding prices throughout their geographic service area."[91]  Geographic service area is defined as "the area in which a telecommunications carrier is seeking to serve customers with any of its services covered by [the E-rate program]."[92]

32.    Additionally, a service provider's obligation is triggered by service to any E-rate eligible school or library and is not limited to a response to an FCC Form 470 or request for proposal (RFP).[93]  As the *E-rate Modernization Order* made clear, bids for E-rate service must be LCP compliant and service providers must ultimately charge the lowest corresponding price for E-rate service.[94]

33.    The Commission has recognized that charging a rate lower than a rate charged to any other similarly situated customer may result in a loss to the service provider.  Therefore, the LCP Rule and the Commission's *Universal Service First Report and Order* allow the service provider to charge more than that lowest price if, and only if, it would be "not compensatory"[95] to do so because the provider's costs to serve that E-rate applicant are "demonstrably and significantly higher" than the lower price that must otherwise be charged.[96]  This allowance for a demonstrable and justified upward adjustment gives providers the flexibility to charge higher prices where the service provider has affirmatively shown that actual cost-impacting terms and conditions necessitate a higher price to remain compensatory.[97]

34.    The LCP Requirement seeks to protect a specific class of non-residential customers (*i.e.*, schools and libraries) by mandating *preferential* pricing for E-rate participants for services to be subsidized with public money from the Fund.[98]  Unlike other frameworks that seek non-discriminatory

---

[89] *See Universal Service First Report and Order*, 12 FCC Rcd at 9031-32, paras. 484-485 ("[T]he lowest corresponding price [is] an upper limit on the price that carriers can charge schools and libraries in non-competitive markets, as well as competitive markets, so that eligible schools and libraries can take advantage of any cost-based rates that other customers may have negotiated with carriers during a period when the market was subject to actual, or even potential, competition.").

[90] *See id.* ("We conclude that requiring providers to charge their lowest corresponding price would impose no unreasonable burden, even on non-dominant carriers, because all carriers would be able to receive a remunerative price for their services.").

[91] *Id.* at 9033, para. 487.

[92] *Id.*

[93] *See* 47 CFR §§ 54.500, 54.511(b); *E-rate Modernization Order*, 29 FCC Rcd at 8943, para. 183 ("we remind service providers that they not only must charge eligible schools, libraries, and consortia the LCP when providing E-rate services, but also must offer eligible entities the LCP when submitting competitive bids to provide E-rate supported services").

[94] *E-rate Modernization Order*, 29 FCC Rcd at 8944, para. 185.

[95] 47 CFR 54.511(b).

[96] *See Universal Service First Report and Order*, 12 FCC Rcd at 9033-34, para. 488-89.

[97] *Id.*; *Fourth Order on Reconsideration*, 13 FCC Rcd at 5401, para 141.

[98] *Universal Service First Report and Order* at 9027-28, para. 477 ("[P]ermitting large private sector firms to join with eligible schools and libraries to seek prices below tariffed rates could compromise both the federal and state policies of non-discriminatory pricing.  Thus, although we find congressional support for permitting eligible schools

(continued….)

pricing, the LCP Requirement does not seek to equalize pricing among customers; it seeks *better* pricing for schools and libraries. Our analysis and proposed forfeiture is informed by that statutory intent.

### B.     AT&T Apparently Violated the LCP Requirement

35.     We find that AT&T apparently violated the LCP Requirement with respect to prices it charged Orange County and Dixie County for PRI and MFB services in the three E-rate funding years from July 2012 to June 2015. AT&T had actual knowledge that the Districts were receiving E-rate support for PRI and MFB. The Districts have received E-rate supported services from AT&T since 1998 and AT&T filed or received E-rate-related filings every year in connection with those services.[99] AT&T nevertheless continued for years to charge the Districts prices for PRI and MFB that were far higher than other customers, including other customers on one-year contracts, as the Districts were seeking, and other schools and libraries paying SUNCOM contract rates for PRI.

36.     Indeed, the Commission's investigation revealed that for MFB, for every month in the three funding years running from July 2012 to June 2015 in which one or both schools received the service, AT&T was charging ███████████ and Dixie County the ███████████ rates in the state of Florida. For PRI, at different times since November 2012, one or both schools were also charged among the highest rates in Florida. AT&T executed or submitted FCC Forms 472 and 473 in each of the three funding years that repeatedly and inaccurately certified its compliance with, *inter alia*, the LCP Requirement.[100] Specifically, AT&T inaccurately certified each year that "this Service Provider is in compliance with the rules and orders governing the schools and libraries universal service support program."[101] Although AT&T continues to assert that its pricing of these services are somehow compliant with the LCP Requirement, the Company has failed to substantiate its plainly paradoxical position that some of the highest prices in the state of Florida for these services were the lowest corresponding prices.

37.     We confined our investigation to services provided and prices charged in Florida. We note that the Company seeks to serve customers in several states and its ███████████ Rates ███████████████████████████████████████████████████████████████████.[102] ███████████████████████████████████████████████████████████[103] Different prices are offered for states grouped into ███████████████████████████████████████████████.

(Continued from previous page) ───────────────────

and libraries to secure prices below tariffed rates, we find no basis for extending that exception to enable all private sector firms to secure such prices.").

[99] *See* AT&T LOI Response Nos. 4(a) and 5(a) and at ATT001136-ATT001294, ATT017174-ATT017184.

[100] AT&T LOI Response at ATT001272-ATT001273 (2012 Form 473), ATT001292-ATT001293 (2013 Form 473), ATT001312-ATT001313 (2014 Form 473), ATT017174-ATT017184 (2012-2013 Orange County Form 472's) and ATT017189-ATT017199 (2012-2013 Dixie County Form 472's); *see also* Feb. 9, 2016 USAC Report on AT&T Certifications (on file in EB-IHD-14-00017954). On each year's Form 472, AT&T certifies that "this Service Provider is in compliance with the rules and orders governing the schools and libraries universal service support program." The same certification is made on the 2014 Form 473. Although the certifications on the 2012 and 2013 Form 473 do not specifically identify the LCP Rule, AT&T understands that the certifications require LCP Requirement-compliant pricing ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* AT&T LOI Response at ATT001509.

[101] AT&T LOI Response at ATT001312-ATT001313 (2014 Form 473), ATT017174-ATT017184 (2012-2013 Orange County Form 472) and ATT017189-ATT017199 (2012-2013 Dixie County Form 472); *see also* Feb. 9, 2016 USAC Report on AT&T Certifications (on file in EB-IHD-14-00017954).

[102] *See* AT&T LOI Response at ATT001604-1606.

[103] *See* AT&T LOI Response at ATT001604-1606.

███████ regions.[104] Nevertheless, as it appears that AT&T offered many lower prices for PRI and MFB services in Florida, we analyzed AT&T's prices in reference only to other prices in Florida in order to streamline our review and simplify the analysis.[105] The appropriate geographic scope of review in other situations may be different.

### 1. AT&T Failed to Charge One-Year Contract Prices

38. AT&T apparently violated the LCP Requirement by failing to charge the Districts the lowest corresponding price for a one-year contract for MFB and PRI. In every relevant year here, the Districts' FCC Form 470s requested service for the entire E-rate funding year, and did not ask for service for a few months.[106] A one-year contract term is the length of service that the Districts were seeking. AT&T therefore should have examined all other similarly situated non-residential customers requesting one-year contracts and charged the Districts the lowest corresponding price for a one-year term. It apparently failed to do so, as many other AT&T customers received PRI and MFB service for a 12-month term at much lower rates.

39. As clarified by the Commission in the 2014 *E-rate Modernization Order*, all bids for E-rate service must be LCP Requirement compliant, and all actual charges for E-rate service must also be compliant.[107] Here, there is no record of AT&T responding to the Districts' request for 12-month service, and yet later it provided the same service requested in the bid, but charged much higher month-to-month Guidebook rates instead of 12-month rates. If AT&T had charged the Districts rates that reflected a 12-month term contract, instead of month-to-month Guidebook rates, the Districts would have paid far less for PRI and MFB service. For PRI, AT&T's ███████ Rates with a 12-month term was $██ per month.[108] In 2014, Orange County paid as much as $3,809 per month (almost ████ more than the 12-month ████ Rate) for the same PRI service.[109] For MFB, the record indicates that a business customer on a 12-month contract with ███████ paid $██ in 2014, while the Districts paid as much as $90.[110] Both Districts have had MFB service since at least July 2012. Orange County received MFB service continuously for over two years until September 2014 while Dixie County had continuous MFB service for at least three years, and apparently continues to receive MFB service.[111]



---

[104] *See* AT&T LOI Response at ATT001604-1606.

[105] Nor has AT&T argued for any smaller geographic scope. ███████████████████████████████████████████████████████████████████████████. *See* AT&T LOI Response at ATT001510.

[106] *See, supra*, discussion at para. 14 and 15.

[107] *E-rate Modernization Order*, 29 FCC Rcd at 8944, para. 185.

[108] AT&T LOI Response at ATT001606. Service 1 was $██, Service 2 was $██ and Service 3 was $██. The total price of $███ is based on 23 items of Service 3.

[109] Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024522-024541, ATT024542-024544. Dixie County only received 10 items of Service 3, but still paid as much as $2,171 a month.

[110] *See* Email from Jacquelyne Flemming, Vice President, AT&T Services Inc., to Jiaming Shang, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, and Jennifer Epperson, Deputy Chief, Investigations and Hearings Division, FCC Enforcement Bureau, Attach. "MFB Analysis – FCC Selected Customer List.xlsx" (Nov. 9, 2015, 16:56 EDT) (on file in EB-IHD-14-00017954) (AT&T MFB Analysis of March 2014 Customers).

[111] Ranallo April 19, 2016 Email; AT&T LOI Response at ATT024522-024541, ATT024542-024544; *see* Email from Jacquelyne Flemming, Vice President, AT&T Services Inc., to Jiaming Shang, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, *et. al.*, (Nov. 9, 2015, 16:56 EDT) (on file in EB-IHD-14-00017954) ████████████████████████████████████████).

40. Unless otherwise required by law or some other commitment, AT&T is not generally obligated to respond to each service request from a school. But if it does respond, the bid must be LCP Requirement compliant. Further, AT&T cannot fail to respond to a bid requesting a service for 12 months or more, and yet continue to provide the same service requested in the bid at high month-to-month rates.

## 2. AT&T Charged the Districts Rates Higher than the SUNCOM E-rate Contract

41. AT&T's apparent violation of the LCP Requirement is also evidenced by its failure to charge Orange County and Dixie County the lower SUNCOM E-rate contract rates that they were eligible to receive. AT&T charged the Districts higher prices for PRI services than the rates for identical AT&T services that the Districts were eligible to purchase through the SUNCOM E-rate contract.[112] The SUNCOM E-rate contract allowed any school or library anywhere in Florida to purchase PRI service from AT&T at a set rate of $621 per month with no term, volume, or revenue commitments or early termination fees.[113] However, services that Orange County and Dixie County ordered directly from AT&T were priced at significantly higher, Guidebook rates, with Orange County paying as much as $3,809 for the service in September 2014.[114]

42. AT&T negotiated the SUNCOM E-rate contract with the Florida DMS, which acted as a consortium lead so that schools and libraries anywhere in Florida could take advantage of negotiated rates, but the Florida DMS is not the AT&T customer to which comparisons should be made for LCP compliance. Rather, AT&T should have determined whether the individual Florida state agencies (including dozens of other school districts) purchasing under the SUNCOM E-rate contract were similarly situated to the Districts here. AT&T provided those agencies the same services that AT&T also provided to the Districts at substantially higher rates. Regardless of whether these other agencies were billed directly by AT&T or whether AT&T billed them through a consolidated monthly invoice sent to DMS specifying the exact amount, type, and price of services that AT&T provided to each entity, AT&T nevertheless charged them the SUNCOM E-rate contract rates.[115]

43. We also can be sure that AT&T was aware of the SUNCOM E-rate contract rates and, further, that the Districts were eligible to purchase AT&T's PRI service at the SUNCOM E-rate contract rates. The record demonstrates that AT&T had knowledge of the SUNCOM E-rate contract rates. The

---

[112] See AT&T First Supplemental LOI Response at ATT024548-ATT024553, ATT024609-ATT024613; Ranallo April 19, 2016 Email; AT&T Second Supplemental LOI Response at ATT024604-ATT025625

[113] The total of $621 a month assumes 23 items of Service 3. AT&T does not dispute that the SUNCOM E-rate contract prices are available month-to-month. See AT&T Corrected Ninth Supplemental LOI Response No. 11(b), p. 2 ("███████████████████████████████████████████"); see also Email from Terri Hoskins, General Regulatory, AT&T Services Inc., to Gregory Simon, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, et. al. (May 6, 2015, 11:48 EDT) (on file in EB-IHD-14-00017954) (█████████████████████████ ███████████).

[114] See AT&T First Supplemental LOI Response at ATT024548-ATT024553, ATT024609-ATT024613.

[115] See AT&T First Supplemental LOI Response at ATT0024625-0025604; Fla. Admin. Code r. 60FF-2.006; 47 C.F.R. § 54.501(c)(2). AT&T has also suggested that Florida regulations bar AT&T from charging the SUNCOM prices because they specify a procedure the applicants must follow to purchase from the SUNCOM agreement. See Letter from Terri L. Hoskins, General Attorney, AT&T Services Inc., to Hillary Burchuk, Deputy [sic] Bureau Chief, FCC Enforcement Bureau, et al. (July 20, 2016) (on file in EB-IHD-14-00017954). However, the regulations AT&T identified only specify a procurement process that parties should follow if they wish to purchase from the SUNCOM agreement. They do not prohibit AT&T from charging other customers the same rate in the agreement, and AT&T documents reflect that customers outside of the SUNCOM agreement have been charged the same rate as the SUNCOM agreement for PRI Service 1 and Service 2. See AT&T LOI Response at ATT025734-027553.

record contains AT&T emails discussing the Districts that ███████████████████████████,
demonstrating that AT&T had actual knowledge that the Districts were eligible to receive service under
the SUNCOM E-rate contract, which would have resulted in lower prices for the same services.[116]
Moreover, AT&T sends a consolidated monthly invoice to the Florida DMS setting forth, ██████
██████, the SUNCOM E-rate ██████████████████. Consequently, AT&T also had actual knowledge in
every month between July 2012 and June 2015 that other schools and libraries were paying less than the
Districts' Guidebook rates for PRI. Despite this knowledge, AT&T continued to charge the Districts
Guidebook rates.

44.    By charging the Districts almost 400% more for PRI services than the price in the
SUNCOM E-rate contract, AT&T apparently neglected its obligation to offer and charge the Districts the
lower prices that they were eligible to receive for the same AT&T services provided in accordance with
the SUNCOM E-rate contract. The LCP Requirement ensures that schools and libraries that are eligible
to receive service under a state or local governmental contract, like the SUNCOM E-rate contract here,
are not to be charged more than the price offered in that contract, regardless of whether the school or
library ultimately orders its service pursuant to the contract—making such contract rate a ceiling on the
rate that the provider may offer and charge. We note that this does not necessarily mean that the
governmental contract rate is the *lowest* corresponding price under the LCP Requirement. If, for
example, other non-residential customers are paying even less than the governmental contract for similar
services, schools and libraries should receive those even lower rates where required under the LCP
Requirement. In sum, we conclude that the failure to charge the rates available under the SUNCOM E-
rate contract is further evidence of AT&T's apparent violation of the LCP Requirement, as those rates
were also much lower than the Guidebook Rates ultimately charged to the Districts for PRI service.

### 3. AT&T's Pricing Policies Apparently Do Not Lead to LCP Requirement Compliant Prices

45.    Under the LCP Requirement, AT&T is obligated to charge E-rate eligible schools the
lowest price charged to similarly situated, non-residential customers. Therefore, if any one of the thousands
of customers who received lower prices was similarly situated to one of the schools, that school should have
received that customer's lower price. If the school did not receive one of those lower prices, AT&T should
be able to demonstrate that none of the entities receiving lower prices were similarly situated to either Dixie
County or Orange County, or that the lower prices were not compensatory.

46.    Throughout the course of this investigation, AT&T could not make this showing. When
asked, AT&T could not confirm that it had examined other non-residential customers receiving a lower
price to determine whether any were similarly situated to the Districts; rather it was simply "████████" of
any similarly situated customers.[117]

47.    Having certified compliance with the LCP Requirement, AT&T may not rest on a
professed lack of knowledge. Indeed, AT&T's lack of knowledge is the result of its pricing policies and
processes that, far from facilitating LCP Requirement compliance, would seem to make it next to
impossible to comply with the LCP Requirement. For each service, there can be multiple customers with
different contracts at each price point. For MFB, in March 2014 alone, there were ██ different customers
with individual contracts at the $█ price point.[118] For all of the ██ different price points for MFB in

---

[116] AT&T LOI Response at ATT000421.

[117] Despite thousands of other customers receiving better rates than the Districts, AT&T stated that it "████████████
████████" where schools and libraries were charged more than other similarly situated customers. *See* AT&T
LOI Response No. 15, p. 13.

[118] *See* Email from Jacquelyne Flemming, Vice President, AT&T Services Inc., to Jiaming Shang, Attorney Advisor,
Investigations and Hearings Division, FCC Enforcement Bureau, *et. al.*, Attach. "March 2014 Customers at selected
rates.xlsx" (Sept. 29, 2015, 18:36 EDT) (on file in EB-IHD-14-00017954).

2014, there are thousands of individual customer contracts.  Per its ████████████████, AT&T salespeople do not directly consider those other contracts and prices when they decide what to offer and charge the schools.[119]

48.     The ████████████████ implies that the choices are: (1) ████████████████ ████████, (2) a price set in a ████████████████ (which was not charged to the Districts and does not exist for MFB), (3) the ████████ Rate (which was also not charged to the Districts ████████████████) or (4) the ████████ rate.  Nowhere is there any mention of checking the lowest price offered for the service.  Nowhere is there any directive to match service offers and prices to the term requested in a FCC Form 470.  Nowhere is there any instruction to consider lower prices that may be available under a consortium agreement.  Nowhere is there any guarantee that the ████████ price or the ████████ Rate, ████████████████, are the lowest corresponding price.  The only remaining alternative, the ████████ rate, appears to almost always be the highest price offered, not the lowest.  For a product like MFB, which is not offered in any state contract and for which AT&T chose not to develop a ████████ ██, AT&T ended up charging hundreds of different prices in 2014.

49.     During the course of the investigation, AT&T could not identify the contract terms of customers who received a lower MFB price, but AT&T's counsel offered to examine the circumstances of certain customers with lower MFB prices.  Fourteen customers were ultimately selected and AT&T's counsel provided *post-hoc* justifications as to why those customers received lower prices.  AT&T explained, for instance, that the $██ rate paid by one financial institution in 2014 was the rate for ████████████████, and that the actual contracted rate was $███, while the ████████████ rate of $███ was given because it is a "████████████████."[120]  AT&T's counsel explained that many of the customers paying between $█ and $█ for MFB, including the customer on a 12-month contract, also ████████ from AT&T, such as ████████████████.[121]  More generally, AT&T indicated that the ████████████ and ████████████ are two major factors that determine prices.  In its analysis of the fourteen customers' MFB service, "████████████" and "████████████" were the primary factors it used to explain its pricing.[122]

50.     These limited and specific justifications with respect to selected customers do not demonstrate AT&T's compliance with the LCP Requirement.  AT&T, for example, has not explained why the ████████████ is a protected class of customer entitled to lower rates, while E-rate entities like the Districts are not, notwithstanding the fact that pricing charged to a protected class of customer can set the lowest corresponding price.  Nor has AT&T explained why it matters that some customers ████████████████, particularly given that the Districts also ████████████████.[123]

51.     In addition, in contrast to AT&T's assertion, its own analysis indicates that even favorable ████████████ and ████████████ do not necessarily result in lower prices.  For example, in March 2014, the business customer on a 12-month contract with no ████████████ paid $███ for MFB service.[124]  A county public library on a ██-month contract *with* ████████████

---

[119] *See* ████████████, AT&T LOI Response at ATT001510.

[120] *See* Email from Jacquelyne Flemming, Vice President, AT&T Services Inc., to Jiaming Shang, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, and Jennifer Epperson, Deputy Chief, Investigations and Hearings Division, FCC Enforcement Bureau, Attach. "MFB Analysis – FCC Selected Customer List.xlsx" (Nov. 9, 2015, 16:56 EDT) (on file in EB-IHD-14-00017954) (AT&T MFB Analysis of March 2014 Customers).

[121] *See* AT&T MFB Analysis of March 2014 Customers.

[122] *See* AT&T MFB Analysis of March 2014 Customers.

[123] AT&T LOI Response No. 2(a), p. 2 (████████████████ ████████████████).

[124] *See* AT&T MFB Analysis of March 2014 Customers.

 paid $ ████ for the same service, despite having both a ████████ and ████ ████.[125]

52.     More importantly, there is no evidence that AT&T conducted any sort of similar analysis in developing, offering, and charging prices to the Districts or other E-rate eligible entities. Rather, the analysis was conducted after-the-fact by its lawyers in response to this investigation.  However, compliance with the LCP Requirement necessarily requires an ongoing, real-time process that evaluates the rates offered and charged for services provided to (or requested by) E-rate applicants with the rates to other similarly situated customers.  As noted above, it appears that AT&T had no such process.

### 4.     AT&T's Arguments Do Not Justify Its Failure to Comply with the LCP Requirement

53.     AT&T contends that the prices it charged to the Districts were appropriate because these districts were not similarly situated to any of the thousands of other customers receiving lower prices. AT&T defines "similarly situated" as ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████."[126]  As discussed above, however, AT&T is apparently incapable of demonstrating that each of the Districts were not similarly situated to each and every one of the thousands of other customers that received lower rates, or even the dozens of members eligible to purchase PRI from the SUNCOM contract.

54.     By employing such a wide-ranging and open definition of "similarly situated," AT&T allows itself to make each customer individualized and effectively "similarly situated" to no one else, should it chose to do so.  This is plainly contrary to the intent of the LCP Requirement and the Commission's previous admonition that service providers may not avoid providing the lowest corresponding price "by arguing that none of their non-residential customers are identically situated to a school or library or that none of their service contracts cover services identical to those sought by a school or library."[127]

55.     AT&T also argues that the other customers that received lower prices were willing to negotiate.[128]  As discussed above, AT&T concedes that ████████████████████████████

████████████[129]  This entirely misses the point of the LCP Requirement.  Schools and libraries are not obligated to negotiate or ask for better rates; providers are required to submit bids for and charge the lowest corresponding price to eligible schools and libraries at the outset.[130]  Emails suggest that AT&T at a minimum was aware that ████████████████████████████████████

████████████ but ultimately charged the higher Guidebook rates.[131]

56.     AT&T argues that the Districts wanted month-to-month service, and the Guidebook prices are the month-to-month prices.  However, as we previously discussed, in every relevant year here, the Districts' FCC Form 470 requested service for the entire E-rate funding year, and did not ask for

---

[125] *See* AT&T MFB Analysis of March 2014 Customers.

[126] *See* AT&T Sixth Supplemental LOI Response No. 6, p. 1.

[127] *Universal Service First Report and Order*, 12 FCC Rcd at 903, para. 488.

[128] AT&T Sixth Supplemental LOI Response No. 6, p. 1-12.

[129] AT&T LOI Response at ATT00421.

[130] *E-rate Modernization Order*, 29 FCC Rcd at 8943, para. 183.

[131] AT&T Sixth Supplemental LOI Response No. 6, p. 7 fn. 32.

service for a few months.[132]  AT&T could have charged the Districts 12-month ███████ Rates for PRI and 12-month contract prices for MFB at least one other business customer.  Instead, AT&T charged the Districts month-to-month Guidebook rates that were many times higher.

57.     In any event, AT&T's prices may not be compliant with the LCP Requirement even if the Districts actually requested month-to-month services.  In the course of its investigation, the Bureau specifically asked AT&T to list the lowest month-to-month MFB or PRI prices charged to other customers since January 2011, to which AT&T responded by merely listing its Guidebook rates.[133]  The record, however, reflects at least ███ instances in which customers received month-to-month rates for MFB or PRI below the Guidebook rates.  Schools eligible to purchase services under the SUNCOM Contract (which included the Districts) could purchase PRI services on a month-to-month basis at rates lower than the Guidebook rates.  AT&T's pricing records reveal that AT&T provided at least █ lines of month-to-month PRI service at the SUNCOM contract rates in the 2013-2014 calendar years.[134]

58.     In addition, the █████████████████ received a lower price than the Districts for MFB in 2014 and paid $█ compared to the Districts' $81.75, despite also ordering service on a month-to-month basis.[135]  AT&T admitted that the ████████ specifically ordered service off the Guidebook in 2013 but explains that Guidebook price increases in 2014 were not passed on because federal government prices are "███████."[136]  But as with its justifications for the preferential rates given to the ███████, AT&T has not explained why the ████████ was allowed to █████ lower pricing while the Districts were not.  In short, there is no evidence that AT&T determined whether any of the thousands of other non-residential customers in its service territory was paying a lower rate than the Guidebook rate for the same services on a month-to-month basis.

59.     AT&T posited that other customers paid the *same* Guidebook rates AT&T charged the Districts, arguing for example that "in FY 2013, [AT&T] charged [Dixie County] the month-to-month guidebook rates of $68.00/line and $81.75/line for [MFB] service; the same rates that [AT&T] charged other customers like ███████, which complies with the LCP rule."[137]  This argument clearly mistakes the purpose of the LCP Requirement.  The issue is not whether some other, similarly-situated

---

[132] *See, supra*, discussion at para. 14 and 15.

[133] AT&T July 9, 2015 Email, Response No. 2 and 3, Attach. A and B.  AT&T's response listing its Guidebook rates was particularly evasive because the Bureau specifically asked AT&T to identify the lowest month-to-month rates for service, including services pursuant to the SUNCOM contract and similar agreements.

[134] AT&T Third Supplemental LOI Response at ATT025734-ATT027553 (listing ██ lines of PRI Service 1, ██ lines of PRI Service 2, and ██ lines of PRI Service 3 provided at the Florida contract rates).

[135] *See* Email from Terri L. Hoskins, General Attorney, AT&T Federal Regulatory, to Jiaming Shang, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau, Attach. "████████████.pdf" (Dec. 4, 2015, 08:39 EDT) (on file in EB-IHD-14-00017954).

[136] *See* Email from Terri L. Hoskins, General Attorney, AT&T Federal Regulatory, to Jiaming Shang, Attorney Advisor, Investigations and Hearings Division, FCC Enforcement Bureau (Dec. 4, 2015, 08:39 EDT) (on file in EB-IHD-14-00017954) ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.").  Regardless of the reason that ████████ rates remained frozen, the fact remains that the ████████ ordered the same month-to-month Guidebook services as the Districts. AT&T's failure to charge the E-rate supported Districts the same preferential rate it gave a federal government entity would appear to plainly violate the LCP Requirement.

[137] *See* AT&T Sixth Supplemental LOI Response, Response No. 6, p. 11-12 (identifying, among others, a large pharmaceutical company, creative entertainment company, and real estate brokerage also charged Guidebook rates for PRI and MFB).

customers paid the *same* high rates as the Districts. The issue is whether *any* similarly-situated customer paid *less*.

## IV. FINDINGS

60. In conclusion, the record shows an apparent violation of the LCP Requirement and suggests that the Districts were offered and charged some of the highest rates, rather than the lowest rates. We find that AT&T apparently violated the LCP Requirement when it failed to charge the Districts the lowest corresponding price for MFB and PRI. The Districts requested one year of service on their FCC Form 470, and the record shows that AT&T charged other customers lower rates for MFB or PRI service on one-year terms. Further, AT&T charged a much higher rate than what the Districts were eligible to receive under the SUNCOM contract. In fact, AT&T charged the Districts month-to-month prices that were some of the highest prices charged to any customer in the state. AT&T has offered no explanation for not giving the Districts one-year pricing, particularly in the case of PRI where there was a one-year ███████ Rate, and has not argued that one-year term prices would not be compensatory if charged to the Districts. Nor does there appear to be any legitimate explanation for why AT&T failed to charge the Districts the SUNCOM E-rate contract rates.

61. While we recognize the Districts' own duty to be cost-effective, we need not reach the issue of their conduct in this matter given the fault by AT&T.[138] AT&T was obligated to offer and charge the lowest corresponding price and nothing higher, particularly in a case where AT&T had been providing the same, legacy telephone service to the Districts for many years and receiving payments from the Fund each year.

62. AT&T's pricing process as a whole does not show LCP Requirement compliance; rather many lower prices have been charged to other non-residential customers in Florida for the same services provided to the Districts. Looking only at two services and examining just a handful of customers, we found customers who apparently were paying much lower prices despite either having substantially the same terms of service as the Districts or having substantially the same terms the Districts were seeking. AT&T at least should have considered these customers when determining the lowest corresponding price. AT&T did not do so because its pricing policies apparently do not require such consideration. If AT&T persists in applying a methodology that fails to compare E-rate eligible entities with other non-residential customers, the Commission may take additional action in the future.

## V. COMPLIANCE AND PROPOSED FORFEITURE

63. For the reasons set forth above, we find that AT&T apparently violated the LCP Requirement. AT&T must comply with the LCP Requirement and make changes to its processes that track the prices and terms of other non-residential customers and implement policies ensuring that E-rate eligible entities are charged prices that are compliant with the LCP Requirement. Further, and separately, AT&T shall file a report with the Commission within thirty (30) days of the release of this Notice of Apparent Liability in which it (1) identifies every non-residential customer who is similarly situated to one of the Districts and who, between July 2012 and June 2015, received MFB or PRI service on a one year contract, (2) describes how it intends to update the ████████████ to ensure that sales personnel offer only LCP Requirement compliant prices to E-rate eligible entities, including how it intends to ensure that schools and libraries receive no more than a state contract rate if they are eligible to order from such a contract, and (3) outlines a plan to identify, by name and contact information, all non-residential customers who are "similarly situated" to any given E-rate eligible entity.

64. Section 503(b) of the Act authorizes the Commission to impose a forfeiture against any entity that "willfully or repeatedly fail[s] to comply with any of the provisions of [the Act] or of any rule,

---

[138] *See* 47 CFR § 54.511(a).

regulation, or order issued by the Commission."[139] In this instance, Section 503(b)(2)(B) of the Act authorizes the Commission to assess a forfeiture against AT&T of up to $160,000 per violation or for each day of a continuing violation, up to a statutory maximum of $1,575,000 for a single act or failure to act. In exercising our forfeiture authority, we must consider the "nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."[140] In addition, the Commission has established forfeiture guidelines, which establish base penalties for certain violations and identify criteria that we consider when determining the appropriate penalty in any given case.[141] Under these guidelines, we may adjust a forfeiture upward for violations that are egregious, intentional, or repeated, or that cause substantial harm or generate substantial economic gain for the violator.[142]

65.    The Commission has not previously established a base penalty for violations of Section 254(h)(1)(B) of the Act, or Section 54.511(b) of the Commission's rules. Administering the E-rate Program is an intensive undertaking, which requires that service providers submit complete and accurate information. In seeking to modernize the E-rate Program in recent years, the Commission has sought to protect the program against waste, fraud, and abuse. The rules of the E-rate program ensure that limited funds available for schools and libraries are distributed in the most efficient and equitable manner possible. Imposing a significant forfeiture on rule violators is important to deter service providers that fail to devote sufficient resources to ferreting out company practices that result in improper collections from the Fund. In addition, a significant forfeiture should achieve broader industry compliance with the LCP Requirement, which is critical to the effective functioning of the Fund.

66.    In calculating a proposed forfeiture, we are guided in part by the forfeiture methodology previously set forth for other violations involving the Universal Service Fund, particularly where a carrier apparently submitted inaccurate forms to USAC and, as a result, collected support to which it was not entitled.[143] We propose a forfeiture based on: (1) a base forfeiture of $20,000 for each instance in which the provider files an inaccurate certification on a FCC Form 472 or FCC Form 473 in the 2014-2015 year that it complied with the rules of the E-rate Program, including the LCP Requirement; and (2) an upward adjustment of the base forfeiture equal to three times the overcharge amount received by the provider above the lowest corresponding price during the July 2014 to June 2015 timeframe.

67.    With respect to the first component of the forfeiture methodology, we conclude that AT&T certified or submitted at least nine (9) inaccurate forms in the three funding years from July 2012

---

[139] *See* 47 U.S.C. § 503(b)(1)(B); 47 CFR § 1.80(2)(2). These amounts reflect inflation adjustments to the forfeitures specified in Section 503(b)(2)(B) ($160,000 per violation or per day of a continuing violation and $1,575,000 per any single act or failure to act).

[140] 47 U.S.C. § 503(b)(2)(E).

[141] 47 CFR § 1.80(b)(8), Note to para. (b)(8).

[142] 47 CFR § 1.80(b)(8), Note to para. (b)(8).

[143] *See, e.g., Budget Prepay, Inc.*, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 2508, 2513 (2014). In *Budget Prepay*, the Commission imposed a three-part forfeiture for Lifeline violations: (1) a base forfeiture of $20,000 for each instance in which an ETC files an FCC Form 497 that includes ineligible subscribers; (2) a base forfeiture of $5,000 for each ineligible subscriber for whom the ETC requests and/or receives support; and (3) an upward adjustment of the base forfeiture equal to three times the reimbursements requested and/or received by the ETC for ineligible subscribers. While we draw on the overall structure of that framework, the calculation related to the number of ineligible subscribers is not applicable in the LCP context and we do not utilize it here. *See also VCI Company*, Notice of Apparent Liability for Forfeiture, 22 FCC Rcd 15933, 15940 para. 18 (2007) ("Accordingly, we establish $20,000 per form as the base forfeiture amount for the filing of inaccurate requests for reimbursement under the low-income program, in violation of sections 54.407(c) and 54.413(b) of the Commission's rules.").

through June 2015: six (6) FCC Form 472[144] Billed Entity Applicant Reimbursement Forms (one from each school, each year) and three (3) Form 473[145] Service Provider Annual Certification forms. By certifying or submitting these forms, AT&T caused USAC to disburse funds to reimburse the Districts for MFB or PRI at prices that were not compliant with the LCP Requirement. These violations are continuing because the forms have not been corrected and AT&T has retained the excessive reimbursements. Because we limit our forfeiture to just three forms submitted in the 2014-2015 funding year, this results in a proposed base forfeiture amount of $60,000, at $20,000 per form.

68.     With respect to the second component, we calculate the overcharges by AT&T to the Districts for PRI and MFB services provided in the July 2014 to June 2015 E-rate funding year, and then treble that amount. The overcharge is the difference between the prices charged and what should have been charged absent the violation. Using the lowest price identified in this investigation for a 12-month contract, the overcharge during the three funding years between 2012 and 2015 was $63,760.[146] Exercising our discretion to limit the forfeiture determination only to overcharges in the most recent funding year, July 2014 to June 2015, the overcharge is $15,475, and the trebled upward adjustment is $46,425.

69.     In addition to assessing a forfeiture, we also believe it is appropriate to order that AT&T repay the amounts overpaid from the E-rate Fund as a result of AT&T's apparent violations, and plan to order a recovery of those disbursements at the forfeiture stage if we conclude that AT&T has violated the LCP Requirement. The Commission is compelled to seek recovery of funds disbursed in violation of a

---

[144] AT&T LOI Response at ATT017174-ATT017184 and ATT017189-ATT017199; s*ee also* Feb. 9, 2016 USAC Report on AT&T Certifications (on file in EB-IHD-14-00017954).

[145] AT&T LOI Response at ATT001272-ATT001273, ATT001292- ATT001293, and ATT001312- ATT001313.

[146] Between July 2012 and June 2015, we assume the applicable price for MFB was no higher than $▉▉▉, which was the price paid by another non-residential customer for a 12-month contract with no ▉▉▉▉▉▉▉▉▉▉▉. The Guidebook rates for MFB increased in January of each year after deregulation as follows: $60 in 2012, $68 in 2013, $81.75 in 2014, and $97 in 2015. *See* http://cpr.bellsouth.com/pdf/fl/filings/flfiling.htm. Between July 2012 and June 2015, we assume the applicable price for PRI based on the 12-month ▉▉▉▉▉▉▉ Rates was $▉▉ for Service 1, $▉▉ for Service 2, and $▉▉ for each item of Service 3. The Guidebook rates for PRI increased after deregulation as follows: May 2012 - Service 1: $180, Service 2: $510 and Service 3: $95; May 2013 - Service 1: $198, Service 2: $561 and Service 3: $105; April 2014 - Service 1: $238, Service 2: $673 and Service 3: $126; January 2015 - Service 1: $286, Service 2: $808 and Service 3: $151. *See* http://cpr.bellsouth.com/pdf/fl/filings/flfiling.htm. Dixie County was charged for MFB at Guidebook rates for the months of July 2012 through June 2015. The net overcharge to Dixie County was $8,650. Between July 2012 and June 2015, Dixie County should have paid no more than $5,216 for its five lines of MFB service. Instead, it paid $13,867. The E-rate program reimbursed Dixie County for 85% of charges in funding year 2012, 88% of the charges in funding year 2013, and 90% of the charges in funding year 2014, resulting in a loss to the Fund of $7,627. Dixie County was charged for PRI at Guidebook rates for the months of November 2012 to September 2014. The net overcharge to Dixie County for all three PRI components was $29,497. Between November 2012 and September 2014, Dixie County should have paid no more than $14,099 for its PRI service. Instead, it paid $42,596. The E-rate program reimbursed Dixie County for 85% of charges in funding year 2012, 88% of the charges in funding year 2013, and 90% of the charges in funding year 2014, resulting in a loss to the Fund of $24,919. Orange County was charged for MFB at ▉▉▉▉▉▉▉ rates for the months of July 2012 to September 2014. The net overcharge to Orange County was $15,059. Between July 2012 and September 2014, Orange County should have paid no more than $10,925 for its MFB service. Instead, it paid $25,984 for its MFB service. The E-rate program reimbursed Orange County for 75% of charges in funding year 2012 and 77% of the charges in funding years 2013 and 2014, resulting in a loss to the Fund of $11,455. Orange County was charged for PRI at Guidebook rates for the months of January 2014 to September 2014. The net overcharge to Orange County was $25,659. Between January 2014 and September 2014, Orange County should have paid no more than $7,628 for its PRI service. Instead, it paid $33,287. The E-rate program reimbursed Orange County 77% of the charges in funding year 2014, resulting in a loss to the Fund of $19,757.

statute or Commission rule, including the LCP Requirement.[147]  In the case of a violation, the Commission "should recover the full amount disbursed."[148]

70.      The Commission's *Schools and Libraries Fifth Report and Order* states that "recovery actions should be directed to the party or parties that committed the rule or statutory violation in question."[149]  Accordingly, AT&T is apparently responsible for returning the E-rate funds it received while in violation of the LCP Requirement.

71.      Recovery of such funds is not barred by the passage of time.[150]  The Commission stated in the *Schools and Libraries Fifth Report and Order* that funding "disbursed in violation of a statute or a rule that implements the statute or a substantive program goal must be recovered in full."[151]  Federal Agencies are directed by law to collect money owed to them, and the Commission followed this mandate in matters such as *Lakehills*, which instituted recovery in 2011 for funds improperly disbursed as early as 2002.[152]  Based on this temporally broad mandate, we propose a recovery of $63,760 for overcharges during the three year period from July 2012 to June 2015.  Although our proposed forfeiture is limited to AT&T's violations in the 2014-2015 funding year, AT&T must return all excess disbursements it received for the inflated prices it charged for MFB and PRI service it provided to the Districts beginning in July 2012.

## VI.      CONCLUSION

72.      We have determined that AT&T apparently willfully and repeatedly violated Section 254(h)(1)(B) of the Act and Section 54.511(b) of the Commission's rules. AT&T therefore is apparently liable for a forfeiture of $106,425. No portion of this proposed forfeiture is based on AT&T's violations between July 2012 and June 2014. Furthermore, we have determined that AT&T must return $63,760 in improperly disbursed monies to the Fund.

---

[147] *Sch. & Libraries Universal Serv. Support Mechanism*, Fifth Report and Order, 19 FCC Rcd. 15808, 15815, para. 20 (2004) (*Schools and Libraries Fifth Report and Order*) ("Amounts disbursed in violation of the statute or a rule that implements the statute or a substantive program goal must be recovered in full.").  Because this is the Commission's first enforcement of the LCP Requirement, we have limited our recovery to the amount overpaid by the Fund, but do so without prejudice to future action in other cases for additional recovery of amounts disbursed in violation of a statute or rule.

[148] *Schools and Libraries Fifth Report and Order*, 19 FCC Rcd at 15815-16, para. 21.

[149] *Fed.-State Joint Bd. on Universal Serv.*, Order on Reconsideration and Fourth Report and Order, 19 FCC Rcd 15252, 15255, para. 10 (2004).

[150] *Review of Decisions of the Universal Serv. Adm'r by Joseph M. Hill Tr. in Bankr. for Lakehills Consulting, LP. Sch. & Libraries Universal Serv. Support Mechanism,* Order, 26 FCC Rcd 16586, 16600-01, para. 28 (2011) (*Lakehills*) (citing *United States v. Wurts*, 303 U.S. 414, 415-16 (1938) ("The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. . . . Ordinarily, recovery of Government funds, paid by mistake to one having no just right to keep the funds, is not barred by the passage of time.")); *see also Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946) ("Traditionally, and for good reasons, statutes of limitation are not controlling measures of equitable relief."); *Request for Waiver or Review of a Decision of the Universal Service Administrator by Premio Computer, Inc.*, Order, 29 FCC Rcd 8185 para. 6 n.16 (WCB 2014) (*Premio Computer*) ("The Government's right to recover funds, from a person who received them by mistake and without right, is not barred unless Congress has clearly manifested its intention to raise a statutory barrier to recovery.  Congress has imposed no such statutory barrier to recovery but, to the contrary, in the Debt Collection Improvement Act, has generally directed agencies to try to collect a claim of the U.S. government for money or property arising out of activities of, or referred to, the agency.") (internal citations and quotations omitted).

[151] *Fifth Report and Order*, 19 FCC Rcd at 15815, para. 20.

[152] *Lakehills*, 26 FCC Rcd at 16596, 16601, paras. 20, 28; *see also Premio Computer*, 29 FCC Rcd 8185, para. 6 n.16.

## VII.    ORDERING CLAUSES

73.    Accordingly, **IT IS ORDERED** that, pursuant to Section 503(b) of the Act[153] and Sections 1.80 of the rules,[154] BellSouth Telecommunications, LLC, d/b/a AT&T Southeast is hereby **NOTIFIED** of this **APPARENT LIABILITY FOR A FORFEITURE** in the amount of One Hundred Six Thousand Four Hundred and Twenty-Five Dollars ($106,425) for willful and repeated violations of Section 254(h)(1)(B) of the Act[155] and Section 54.511(b) of the rules.[156]

74.    **IT IS FURTHER ORDERED** that regardless of whether BellSouth Telecommunications, LLC, d/b/a AT&T Southeast seeks a reduction or cancellation of the forfeiture, or modification or cancellation of any other requirement in this NAL, it shall file, within thirty (30) calendar days of the release date of this Notice of Apparent Liability for Forfeiture, a report in which it (1) identifies every non-residential customer who is similarly situated to one of the Districts and who, between July 2012 and June 2015, received MFB or PRI service on a one-year contract, (2) describes how it intends to update the ▮▮▮▮▮▮▮▮▮▮▮ to ensure that sales personnel offer only LCP Requirement compliant prices to E-rate eligible entities, and (3) outlines a plan to identify, by name and contact information, all non-residential customers who are "similarly situated" to any given E-rate eligible entity. Such report must include a detailed factual statement supported by appropriate documentation and affidavits pursuant to Sections 1.16 and 1.80(f)(3) of the Commission's rules. The report must be mailed to the Office of the Secretary, Federal Communications Commission, 445 12th Street SW, Washington, DC 20554, ATTN: Enforcement Bureau – Investigations and Hearings Division, and must include the NAL/Account Number referenced in the caption. The report must also be e-mailed to Jia-Ming Shang at jiaming.shang@fcc.gov and Jeffrey Gee at jeffrey.gee@fcc.gov.

75.    **IT IS FURTHER ORDERED** that, pursuant to Section 1.80 of the rules,[157] within thirty (30) calendar days of the release date of this Notice of Apparent Liability for Forfeiture, BellSouth Telecommunications, LLC, d/b/a AT&T Southeast **SHALL PAY** the full amount of the proposed forfeiture or **SHALL FILE** a written statement seeking reduction or cancellation of the proposed forfeiture consistent with paragraph 78 below.

76.    Payment of the forfeiture must be made by check or similar instrument, wire transfer, or credit card, and must include the NAL/Account Number referenced above. BellSouth Telecommunications, LLC, d/b/a AT&T Southeast shall send electronic notification of payment to Jia-Ming Shang at jiaming.shang@fcc.gov on the date said payment is made. Regardless of the form of payment, a completed FCC Form 159 (Remittance Advice) must be submitted.[158] When completing the FCC Form 159, enter the Account Number in block number 23A (call sign/other ID) and enter the letters "FORF" in block number 24A (payment type code): Below are additional instructions that should be followed based on the form of payment selected:

- Payment by check or money order must be made payable to the order of the Federal Communications Commission. Such payments (along with the completed Form 159) must be mailed to Federal Communications Commission, P.O. Box 979088, St. Louis, MO 63197-9000, or sent via overnight mail to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, 1005 Convention Plaza, St. Louis, MO 63101.

---

[153] 47 U.S.C. § 503(b).

[154] 47 CFR § 1.80.

[155] 47 U.S.C. § 254(h)(1)(B).

[156] 47 CFR § 54.511(b).

[157] 47 CFR § 1.80.

[158] An FCC Form 159 and detailed instructions for completing the form may be obtained at http://www.fcc.gov/Forms/Form159/159.pdf.

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001. To complete the wire transfer and ensure appropriate crediting of the wired funds, a completed Form 159 must be faxed to U.S. Bank at (314) 418-4232 on the same business day the wire transfer is initiated.

- Payment by credit card must be made by providing the required credit card information on FCC Form 159 and signing and dating the Form 159 to authorize the credit card payment. The completed Form 159 must then be mailed to Federal Communications Commission, P.O. Box 979088, St. Louis, MO 63197-9000, or sent via overnight mail to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, 1005 Convention Plaza, St. Louis, MO 63101.

77. Any request for making full payment over time under an installment plan should be sent to: Chief Financial Officer—Financial Operations, Federal Communications Commission, 445 12th Street, SW, Room 1-A625, Washington, DC 20554.[159] Questions regarding payment procedures should be directed to the Financial Operations Group Help Desk by phone, 1-877-480-3201, or by e-mail, ARINQUIRIES@fcc.gov.

78. The written statement seeking reduction or cancellation of the proposed forfeiture, if any, must include a detailed factual statement supported by appropriate documentation and affidavits pursuant to Sections 1.16 and 1.80(f)(3) of the rules.[160] The written statement must be mailed to the Office of the Secretary, Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554, ATTN: Enforcement Bureau – Investigations and Hearings Division, and must include the NAL/Account Number referenced in the caption. The statement must also be e-mailed to Jia-Ming Shang at jiaming.shang@fcc.gov.

79. The Commission will not consider reducing or canceling a forfeiture in response to a claim of inability to pay unless the petitioner submits: (1) federal tax returns for the most recent three-year period; (2) financial statements prepared according to generally accepted accounting practices; or (3) some other reliable and objective documentation that accurately reflects the petitioner's current financial status. Any claim of inability to pay must specifically identify the basis for the claim by reference to the financial documentation.

80. **IT IS FURTHER ORDERED** that a copy of this Notice of Apparent Liability for Forfeiture shall be sent by first class mail and certified mail, return receipt requested, to Jacquelyne Flemming, AVP-External Affairs/Regulatory, AT&T Services and BellSouth Telecommunications, LLC, d/b/a AT&T, 1120 20th St. NW, Suite 1000, Washington, DC 20036.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[159] *See* 47 CFR § 1.1914.

[160] 47 CFR §§ 1.16, 1.80(f)(3).

# DISSENTING STATEMENT OF
# COMMISSIONER AJIT PAI

Re:     *BellSouth Telecommunications, LLC, d/b/a AT&T Southeast*, File No. EB-IHD-14-00017954.

FCC rules state that an E-Rate provider "shall not . . . charge schools . . . a price above the lowest corresponding price for supported services,"[1] meaning a provider may not charge schools more than "the lowest price [the] service provider charges to non-residential customers who are similarly situated to a particular school . . . for similar services."[2]  I agree with my colleagues that AT&T may have violated that rule in Florida.  But the Enforcement Bureau's handling of the investigation has fatally compromised our ability to impose a lawful forfeiture upon the carrier.

Here's the problem:  We have issued this *Notice of Apparent Liability* (*NAL*) too late.  The Communications Act imposes a one-year statute of limitations.[3]  Like most other statutes of limitations,[4] it runs from when a violation is complete—in this case, when AT&T "charge[d]" Dixie County and Orange County "a price above the lowest corresponding price."  According to our records, AT&T last charged Dixie County for the relevant services on July 1, 2014, and Orange County for the relevant services on June 1, 2015.[5]  And the last relevant form AT&T filed in conjunction with these charges was October 27, 2014.[6]  So even in the best-case scenario, the statute of limitations ran out 56 days ago, on June 1, 2016.[7]

That's a shame because the Enforcement Bureau became aware of AT&T's conduct two full years ago,[8] just as the statute of limitations was beginning to run and long before it expired.  That means we could have imposed a lawful forfeiture had we acted with alacrity (or even a modicum of urgency).

In contrast, the *NAL* claims that these "violations are continuing because the forms have not been corrected and AT&T has retained the excessive reimbursements."[9]  That cannot be right.  As I have written before, this theory "stretches the concept of a continuing violation past the breaking point.  For example, under this theory, the statute of limitations for theft would begin to run not when an item is stolen or even when it is discovered that an item has been stolen, but rather when that item is returned to its rightful owner.  Needless to say, that is not the law and neither do I believe that a court would find our

---

[1] 47 C.F.R. § 54.511(b).

[2] 47 C.F.R. § 54.500(f).

[3] Communications Act § 503(b)(6)(B).

[4] *See Gabelli v. S.E.C.*, 133 S. Ct. 1216, 1220 (2013) ("Thus the 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.'").

[5] *See* USAC Report "Request 110615.xlsx" dated November 12, 2015 (on file in EB-IHD-14-00017954).

[6] *See* AT&T LOI Response at ATT017174–ATT017184, ATT017189–ATT017199, ATT001272–ATT001273, ATT001292–ATT001293, & ATT001312–ATT001313.

[7] What is more, even if this action had been brought by June 1, 2016, the proposed forfeiture would necessarily be minimal since the total amount AT&T apparently charged Orange County that month was only $37.50—and indeed, AT&T has not apparently charged Orange County more than $37.50 per month for the relevant services since October 1, 2014.  *See* USAC Report "Request 110615.xlsx" dated November 12, 2015 (on file in EB-IHD-14-00017954).

[8] *See NAL* at para. 27 ("In July 2014, the Bureau received a referral on the issue from USAC.").

[9] *See Notice* at para. 67.

reasoning in today's item to be persuasive."[10]

      One last point.  Under the *NAL*'s theory, the FCC could pursue potential rule violations dating back to 2012—or even back to 1996—but instead "exercis[es] its discretion to limit the forfeiture determination only to overcharges in the most recent funding year."[11]  Now, I don't agree with this theory.  But if I did believe that these claims were not time-barred, I would not endorse this exercise of discretion.  If the Commission can impose lawful forfeitures on a company in this situation, then we should; the *NAL* does not explain, and I cannot think of, any non-legal reason to excuse a service provider that overcharges schools.

      For all these reasons, I dissent.

---

[10] *Intelsat License LLC f/k/a Intelsat North America, LLC*, File No. EB-11-IH-1376; NAL/Acct. No. 201432080001; FRN 0009308008, Notice of Apparent Liability, 28 FCC Rcd 17183, 17194 (2013) (Statement of Commissioner Ajit Pai, Dissenting).

[11] *See Notice* at para. 68.