**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

UNITED STATES, *ex rel.*
TODD HEATH,

      Plaintiff,

v.

                           Case No.:  08-cv-876
                           (Lead Case No. 08-cv-00724-LA)

WISCONSIN BELL, INC.,

      Defendant.

**UNITED STATES' STATEMENT OF INTEREST IN RESPONSE TO
DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

# **INTRODUCTION**

The United States files this Statement of Interest in response to Wisconsin Bell, Inc.'s (Wisconsin Bell or Defendant) Motion for Judgment on the Pleadings (Dkt. Nos. 154-155). Specifically, Wisconsin Bell asserts that the false and inflated claims Wisconsin Bell submitted for reimbursement from the Federal Communications Commission's (FCC's) E-rate program for phone services provided to schools in Wisconsin were not "material" to the United States because: (1) the FCC trusted Wisconsin Bell to determine what its lowest price was for telephone services and only charge schools receiving E-rate support that price; (2) over the years the FCC considered requiring explicit service provider certifications that schools are not being overcharged by service providers, but instead only added a certification that *all* E-rate rules must be followed; and (3) during the pendency of this lawsuit, which has only just entered discovery and has not been adjudicated by a finder of fact, the FCC has *not yet* debarred Wisconsin Bell or demanded that Wisconsin Bell return all allegedly misbegotten gains to the E-rate program. None of these assertions show that "price" is not a material term to the United States, or that the FCC's Lowest Corresponding Price (LCP) provision is not a material condition of payment on all E-rate claims. Accordingly, Wisconsin Bell's Motion for Judgment on the Pleadings should be denied.

The United States respectfully submits this Statement of Interest pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, and 28 U.S.C. § 517 to address several of the Defendant's erroneous arguments regarding the import of the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. ---, 136 S. Ct. 1989 (2016).

The FCA is the "government's primary litigative tool for the recovery of losses sustained as the result of fraud against the government." *Avco Corp. v. United States Dep't of Justice*, 884 F.2d 621, 622 (D.C. Cir. 1989); *see also* S. Rep. No. 99-345, at 2 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266. The government, therefore, has a significant interest in how decisions by the courts, even in declined actions, may shape future enforcement of the statute.[1]

## PROCEDURAL HISTORY

Relator Todd Heath (Relator) filed a *qui tam* complaint on August 26, 2008 under 31 U.S.C. § 3730(b) (Dkt. Nos. 1, 64). After investigating the Relator's allegations, the United States filed a notice on June 27, 2011 that it would not intervene at that time (Dkt. No. 2).[2] The Relator's Complaint alleges that Wisconsin Bell submitted false claims in connection with the FCC's E-rate Program in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733.

Specifically, the Relator alleges that the Defendant failed to provide the LCP to schools in Wisconsin for phone service, as required, which caused the E-rate Program to pay too much for Wisconsin Bell's services on behalf of those schools. Under the LCP Rule imposed by the FCC, *see* 47 C.F.R. § 54.511, E-rate providers are required to sell their telecommunications products -- *e.g.*, telephone service, internet service, cabling, *etc.* -- to schools at rates that are no higher than the rates the provider charges similarly situated customers for similar services. The Relator alleged that Wisconsin Bell gave lower telephone rates to agencies of the State of

---

[1] This Statement of Interest only addresses the arguments concerning the materiality of the LCP rule under *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. ---, 136 S. Ct. 1989 (2016). The United States takes no position on the Defendant's arguments concerning the Statute of Limitations.

[2] Although the United States has not intervened in this action, it remains the real party in interest and may intervene for "good cause." *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 932 (2009), *quoting* 31 U.S.C. § 3730(c)(3).

Wisconsin than it did to Wisconsin schools, even though the schools were potentially eligible for those lower rates. *See United States ex rel. Heath v. Wis. Bell, Inc*., 760 F.3d 688, 689 (7th Cir. 2014) (summarizing Relator's allegations).

Defendant Wisconsin Bell filed a motion to dismiss in October 2011, based upon the FCA's public disclosure bar (Dkt. Nos. 49, 50, 68, 69). That motion was granted by this Court and Relator appealed (Dkt. Nos. 84, 86). The Seventh Circuit Court of Appeals found that the Relator's case was not based upon a public disclosure and reversed. *See Heath*, 760 F.3d at 692. Subsequently, in November 2014, Wisconsin Bell filed a second motion to dismiss, arguing no federal funds were implicated by the alleged fraud (Dkt. Nos. 96, 97). In that motion, Wisconsin Bell argued that the claims it submitted to the FCC's E-rate Program were not "claims" within the meaning of the False Claims Act because the E-rate funds are "private" funds. This Court denied that motion as well as a request for an interlocutory appeal (Dkt. Nos. 126, 140). In July 2015, the Relator filed a Second Amended Complaint (Dkt. No. 127). Now, Wisconsin Bell has filed a third motion for judgment on the pleadings, claiming that the price the government pays under the E-rate program to subsidize schools is not a material term. (Dkt. No. 154). Respectfully, if price is not a material term in Wisconsin Bell's E-rate contracts then nothing is a material term.

## BACKGROUND

### I. The FCC's Lowest Corresponding Price Rule

The FCC's E-rate program reimburses up to $3.9 billion annually to companies that provide eligible telecommunications services to schools and libraries at *discounted* prices. *See* 47 C.F.R. § 54.507(a). Per the authorizing statute: "All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the

definition of universal service under subsection (c)(3), provide such services to elementary schools, secondary schools, and libraries for educational purposes *at rates less than the amounts charged for similar services to other parties*." 47 U.S.C. § 254 (h)(1)(B) (emphasis added).

Under the program, schools put out requests for eligible services, service providers respond to those requests, and after a specified time, the schools sign contracts with the service providers to provide the telecommunications services. *See* 47 C.F.R. § 54.503, 47 C.F.R. § 54.504. The E-rate program pays a percentage of the overall price charged to the school, and the school picks up the remainder. *See* 47 C.F.R. § 54.505 ("[D]iscounts available to eligible schools . . . shall range from 20 percent to 90 percent of the pre-discount price for all eligible services provided by eligible providers."); 47 C.F.R. § 54.523 ("An eligible school . . . must pay the non-discount portion of services or products purchased with universal service discounts.")

The E-rate program is not an unrestricted, unlimited government fund to subsidize services provided to schools. Indeed, price is the most important factor in the program, as shown by the overall history and structure of the program, including the focus on competitive bidding requirements, *see* 47 C.F.R. § 54.503, and through the LCP rule itself. The FCC imposes cost-conscious telecommunications service selection rules on *both* schools and their prospective service providers. First, the FCC defines the term "lowest corresponding price:" the lowest price that a service provider charges to non-residential customers who are similarly situated to a particular school . . . for similar services." 47 C.F.R. § 54.500. Second, the FCC demands that school districts choose the most "cost-effective service," with "price … the primary factor considered." *See* Ordering Services, 47 C.F.R. § 54.511(a) (copy attached as Ex. 1); *see also* 47 C.F.R. § 54.503(c)(2)(ii)(B) ("all bids submitted for eligible products and services will be carefully considered, *with price being the primary factor*, and the bid selected will be for the

most cost-effective service offering consistent with §54.511.") (emphasis added). Third, the FCC orders that service providers may not "charge schools . . . a price above the lowest corresponding price for supported services," *unless* the Commission determines that LCP will not adequately compensate the service provider for its services. *See* 47 C.F.R. § 54.511(b) (structuring the regulation in two parts, one focusing on the school's selection duties, the other focusing on the service provider's offering and charging duties).

Working together, these provisions mean that, where there is a competitive bidding contest to provide a particular telecommunications service to a school in Wisconsin, the service provider "shall not submit bids for" a price higher than its LCP -- *i.e.*, the price it charges similarly situated customers -- and in turn, schools must compare those different bids and select the most "cost-effective" service. *Id*. Where, for whatever reason, there are not multiple bids, the service provider must still "charge" the school its lowest price, and if it believes that lowest price will not cover its costs, it is supposed to take that up with the FCC rather than independently deciding to charge the school a higher price. *Id*. In return for following these rules, the FCC pays a percentage of the overall bill for these services on the schools' behalf, starting with schools that have the most children living in poverty, until funds for the year run out. *See* 47 C.F.R. § 54.507(c) ("Funds shall be available to fund discounts for eligible schools . . . on a first-come-first-served basis); 47 C.F.R. § 54.507(f)(1) ("The Administrator shall allocate the category one funds to these requests for support, beginning with the most economically disadvantaged schools . . . and shall continue committing funds for category one services in the same manner . . . until there are no funds remaining.")

The devil in determining the LCP, however, is in the details. A service provider need only offer its best price to customers and services that are "similarly situated." The FCC has

determined that service providers may determine which customers and services are similarly situated by considering such factors as call volumes, length of the contract, distance from the switching facilities, and participation in a consortium. *See Universal Service Order,* 12 FCC Rcd. 8776, ¶¶ 488-89.

Subsequent to determining its LCP, service providers are required to "keep and retain records of rates charged to and discounts allowed for eligible schools and libraries -- on their own or as part of consortium. Such records shall be available for public inspection." *See* 47 C.F.R. § 54.501(c)(2).

This regulatory scheme -- and its focus on price -- is confirmed by further FCC regulation. If there is a "rate dispute," where either side believes interstate rates are set too high or too low, schools and service providers may have recourse to the Commission. *See* Requests for Services, 47 C.F.R. § 54.504(c). A school may request lower rates if it believes that the rate offered by the service provider does not represent the LCP. 47 C.F.R. § 54.504(c)(1). Alternatively, a service provider may request higher rates if it believes the rate is not compensatory because "the relevant school . . . is not similarly situated to and subscribing to a similar set of services to the customer paying the [LCP]." 47 C.F.R. § 54.504(c)(2). Thus, a pre-condition to this regulatory scheme working is that the service provider has analyzed its prices and knows which customers are "similarly situated to" and "subscribing to a similar set of services" as its school customers.

It would make no fiscal sense, under a program in which the government pays a percentage of a school's overall telecommunications costs out of a limited fund, to allow service providers to bid or to charge prices *higher* than the prices they offer to other customers, simply because the government is paying part of charge. *Cf. United States ex rel. Garbe v. Kmart*

*Corp.*, 824 F.3d 632, 644-45 (7th Cir. 2016) (rejecting efforts by defendant to charge the government more for prescription drugs and thereby undermine the "statutory and regulatory structure" of the Medicare Part D Program by creating a discount club with lower prices that are not offered to the government). Thus, price is always material to the E-rate program.

## II.    *Escobar* and Implied False Certifications

In *Escobar*, 136 S. Ct. 1989, the Supreme Court confirmed that an implied false certification is actionable under the FCA. The Supreme Court held that even claims that are not false on their face can give rise to liability under an implied false certification theory at least where they satisfy the following two conditions: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001. [3]

The Supreme Court further emphasized that the violated regulation or contract provision must be material to the government's decision to pay the claim. The standard for materiality is set out in 31 U.S.C. § 3729(b)(4) and, citing the statutory definition of materiality under the FCA, *Escobar* reaffirmed that a material contract term is one that has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Escobar*, 136 S. Ct. at 2002 (citing *Neder v. United States*, 527 U.S. 1, 16 (1999); *see Kungys v. United States*, 485 U.S. 759, 770 (1988)). By embracing the "natural tendency" test codified in the FCA

---

[3] The Supreme Court reserved on the issue of whether all claims for payment implicitly represent the billing party is legally entitled to payment without making any further representation or "half-truths." *Escobar,* 136 S. Ct. at 2000; *but see United States v. Sanford Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016) (acknowledging *Escobar* ruling but finding no representations or materiality in a program participation agreement after remand by the Supreme Court).

and enshrined in the common law, *Escobar* made clear that materiality is determined through a holistic assessment of the tendency or capacity of the undisclosed violation to affect the government decision maker.

The Supreme Court did not impose a heightened requirement that the government or relator must demonstrate that the government would actually refuse payment. Citing tort and contract treatises, the Court explained that a matter is material if either a "reasonable person would attach importance" to it or "the defendant knew or had reason to know" that the government attached importance to it. *Escobar*, 136 S. Ct. at 2002-03 (citations omitted).

The numerous factors the Supreme Court identified as relevant to the materiality inquiry confirm that *Escobar* did not *sub silentio* depart from the statutory and common law definitions of materiality and endorse an "outcome-materiality" standard. *See also United States ex rel. Winkelman v. CVS Caremark*, 2016 WL 3568145, at *8 (1st Cir. June 30, 2016) (noting that *Escobar* adopted common law understanding of materiality); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003) (explaining that the materiality inquiry focuses on the "potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered"). [4]

---

[4] In short, the Supreme Court did not purport to impose a heightened test for materiality beyond the "natural tendency" test codified in the False Claims Act and entrenched in the common law, and applied by this Court and others. *See United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (rejecting argument that testimony of federal officials that they would not have paid claim was necessary); *see also United States ex rel. Feldman v. Van Gorp.*, 697 F.3d 78, 96 (2d Cir. 2012) (test for materiality "does not require evidence that a program officer relied upon the specific falsehoods proven"); *United State ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1228-29 (11th Cir. 2012) (same); *United States ex rel. Loughren v. Unum Group*, 613 F.3d 300, 307 (1st Cir. 2010) (stating that "a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of decision making body to which it was addressed"); *United States ex rel. Longhi v. United States*, 575 F.3d 458, 469-70 (5th Cir. 2009) (mere potential to influence is sufficient); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003).

*Escobar* explained that the materiality inquiry can be undertaken from either the perspective of a "reasonable person" or the particular defendant: a matter is material (1) "if a reasonable [person] would attach importance to it in determining a choice of action in the transaction"; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter "in determining [a] choice of action with respect to the transaction involved," regardless of whether a reasonable person would do so. *Escobar*, 136 S. Ct. at 2002-2003 (quoting in part Restatement (Second) of Torts § 538, at 80)).

The Supreme Court held that in applying this standard, the label attached to a particular rule, regulation or contract term may be relevant, but is not determinative. Thus, the Court rejected the false dichotomy invoked by some courts between a so-called condition of participation and a condition of payment: "Section 3729(a)(1)(A) imposes liability on those who present 'false or fraudulent claims' but does not limit such claims to misrepresentations about express conditions of payment." *Id*. at 2001 (citing *United States v. Science Applications Int'l Corp*., 626 F.3d 1257, 1268 (D.C. Cir. 2010)); *see also id*. at 2003 ("the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive"). Instead, the Supreme Court identified a variety of additional factors bearing on the materiality inquiry. These include whether the violation is significant or "minor or insubstantial," *id*. at 2003, whether the violation goes to the "essence of the bargain," *id*. at 2003 n.5 (quoting *Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400 (1931)), and the actions the government took in this or other cases where the government had actual knowledge of similar violations. *Id*. at 2003. The Court emphasized that the FCA's materiality standard should ameliorate "concerns about fair notice and open-ended liability." *Id*. at 2002-03.

# **ARGUMENT**

A violation of the LCP is manifestly material to the government's payment decision on a claim because the LCP dictates how much the government pays. It is therefore difficult to imagine a violation that more clearly has a natural tendency to affect the government's payment decision. *Escobar,* 136 S. Ct. at 2002.

Nevertheless, Wisconsin Bell makes four primary arguments as to why the LCP rule is not material to the Government under the *Escobar* decision: first, the LCP is not an express condition of payment under the E-rate program; second, the FCC has not taken enforcement action against the Defendant to date; third, service providers have discretion when computing the LCP; and fourth, the FCC continues to pay Wisconsin Bell's E-rate claims for schools in Wisconsin despite the filing of the Relator's complaint. All of these arguments are in error and do not show, as a matter of law, that the LCP is not material to the United States.

*Escobar* decided the opposite from the Defendant's arguments. First, express conditions of payment are not necessary to a finding of materiality, but in any case, the Defendant did expressly certify that it would follow the E-rate rules, including the LCP, in order to get paid; second, per regulation the FCC cannot debar the Defendant until after a settlement or judgment but the FCC has taken enforcement action against a sister-subsidiary of the Defendant in Florida concerning the LCP rule; third, the LCP rule is not discretionary; and fourth, this case has not yet been adjudicated to determine whether the Defendant violated the LCP in Wisconsin, and if so, for what schools and which services, and as such, the government does not yet have "actual knowledge," as required by *Escobar* that certain requirements were violated. The United States will address in more detail each of these arguments in turn; but first, for the reasons that follow, this is not an implied false certification case, it is a factually false claim case.

# I.     LCP Violations Are Factually False Claims, Not Implied False Certifications

As a threshold matter, claims submitted in violation of the LCP rule are factually false claims, not false by virtue of an implied false certification of compliance with a rule. To our knowledge, no other FCA cases concerning the LCP have been litigated to summary judgment,[5] but the LCP rule itself is much like the Price Reduction Clause required by the General Services Administration's (GSA) Multiple Award Schedule (MAS) contracts. GSA MAS contracts typically include a Price Reduction Clause, which requires contractors to maintain a static relationship between GSA's negotiated discounts or prices and those for a designated customer or category of customers. *See, e.g., United States ex rel. Frascella v. Oracle Corp.*, 751 F. Supp. 2d 842, 845 (E.D. Va. 2010). Just like the LCP, under a MAS contract, a service provider must determine which customers are similarly situated to government customers and thereafter must monitor its pricing to other customers to ensure that it does not charge government customers a higher price.

The implied certification theory of FCA liability is not needed to find liability in cases alleging a violation of a pricing requirement that results in an overcharge, because an overcharge is a classic example of a factually false claim. Courts have consistently held that a claim for payment that overcharges the government is a false claim for purposes of the FCA without

---

[5] After filing the instant matter, the Relator also filed a *qui tam* suit against AT&T, Inc. in the District of Columbia alleging similar fraudulent conduct as that alleged in Wisconsin, but conducted nationwide. That lawsuit was dismissed under the FCA's first-to-file rule by the District Court, *see United States ex rel. Heath v. AT&T, Inc.*, 47 F.Supp.3d 42 (D.D.C. 2014), and later revived by the Appellate Court. *See United States ex rel. Heath v. AT&T, Inc.,* 791 F.3d 112 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (June 27, 2016). The matter has been stayed since September 2015 pending the disposition of the *writ of certiorari*. The U.S. Court of Appeals for the D.C. Circuit did discuss that case as potentially falling under the implied certification theory, but noted it may have differences from the Wisconsin matter. *AT&T*, 47 F. Supp. 3d at 124.

further inquiring into whether the defendant made a false certification, implied or express. *See, e.g.*, *United States v. Rogan,* 459 F. Supp. 2d 692, 717-18 (N.D. Ill. 2006), *aff'd,* 517 F.3d 449 (7th Cir. 2008); *Ebeid v. Lungwitz*, 616 F.3d 993, 995 (9th Cir. 2010) (determining that "a typical FCA claim" alleges that a defendant "overcharged the government for services provided"); *United States ex rel. Howard v. KBR, Inc.*, 139 F. Supp. 3d. 917, 945-46 (C.D. Ill. 2015) (finding factual falsity in a claim for payment that "consisted of unallowable and unreasonable costs" that directly impacted the government's payment decision, such that certification is not an issue).

In line with these principles, courts have found that invoices submitted by a GSA MAS contractor are false claims where the contractor has violated the pricing terms of the contract, thereby overcharging the government. *See Oracle Corp.*, 751 F. Supp. 2d at 856 (denying motion to dismiss where complaint alleged that defendant submitted invoices that were inflated because they violated the Price Reduction Clause); *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 198, 205-06 (D.D.C. 2011) (denying motion to dismiss FCA claims where defendant allegedly failed to properly disclose pricing information as required by GSA MAS contract solicitation); *United States ex rel. Vosika v. Starkey Labs, Inc.*, No. Civ. 01-709, 2004 WL 2065127, at *4-5 (Sept. 8, 2004 D. Minn.) (denying motion to dismiss FCA claims where defendant allegedly violated the Price Reduction Clause). Like the GSA cases, LCP overcharges are factually false claims. The allegation is that the Defendant overcharged the FCC for the telecommunications services provided to various Wisconsin schools under the E-rate program. These alleged violations of the LCP by the Defendant go the "essence of its bargain" with the government, that is, the price charged. *Escobar*, 136 S. Ct. at 2003. The allegations are not "minor or insubstantial," but pervasive, and thus, material. *Id.*

**II.**     **LCP Violations Are Conditions of Payment And Material To The FCC**

Finding an implied false certification is therefore not a necessary predicate for liability in this case even though claims for payment that violate the LCP could also be deemed false under an implied certification theory. *See United States ex rel. Heath v. AT&T, Inc.,* 791 F.3d 112, 124 (D.C. Cir. 2015).

Before submitting any claims to E-rate, all service providers that participate in the program must annually submit a signed FCC Form 473 (examples attached as Ex. 2 and 3). Since at least 1999, that form's instructions have stated that the "purpose of form" is to "confirm that the invoice forms submitted by each service provider are in compliance with the FCC's rules governing the schools and libraries universal service support mechanism," and since 2013, the form itself has included the certification that the "Service Provider is in compliance with the rules and orders governing the schools and libraries universal service support program, and acknowledges that failure to be in compliance and remain in compliance with those rules and orders *may result in the denial of discount funding and/or cancellation of funding commitments*" (emphasis added). Thus, service providers certify their compliance with all the rules of the E-rate program -- one of which is the LCP rule -- as a condition of payment.[6] *See United States ex rel. Miller v. Weston Educ., Inc.,* 840 F.3d 494, 502 (8th Cir. 2016) (finding a condition of payment based upon the statute, the regulation, and via the contract with the defendant, in addition to enforcement efforts).

---

[6] Notably, this certification does not implicate *Escobar*'s prohibition that it would also not be material for the government to require contractors to aver their compliance with the entire U.S. Code and Code of Federal Regulations. *See Escobar*, 136 S. Ct. at 2004. The FCC's certifications require only compliance with "rules and orders governing the schools and libraries universal service support program," also known as the E-rate program.

The Defendant quibbles with the fact that, over the years, the FCC has considered adding an explicit certification on E-rate claim forms specific to the LCP, but has not done so. The Defendant cites to *Escobar* in that, if the government does explicitly designate a rule as a condition of payment, it may signal that rule's importance to the government. However, rather than support the Defendant's position, that is, that the LCP rule is not material because it has not been designated an express condition of payment, *Escobar* rejects the idea that the government should be forced to expressly designate all conditions of payment. *Escobar*, 136 S. Ct. at 2003 ("In sum, when evaluating materiality under the [FCA], the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive.")

*Escobar* holds that requiring the government to expressly designate all conditions of payment would "create further arbitrariness" because "the Government might respond by designating every legal requirement an express condition of payment." *Id*. at 2002. Thus, the fact that the FCC has considered adding an express certification about the LCP four times over the last eighteen years to its small list of express certifications made by service providers shows the importance of the rule to the FCC, rather than its insignificance.

### III. The Record As To The FCC's Treatment Of The Same Or Similar Violations Supports A Finding Of Materiality

#### A. The FCC Enforces The LCP Rule

Even better evidence of the materiality of the LCP rule is the FCC's enforcement of the rule. The Defendant failed to mention that in just the last six months the FCC proposed a $106,425 penalty against a sister-subsidiary of the Defendant, BellSouth Telecommunications, LLC, d/b/a AT&T Southeast (BellSouth), for "apparently willfully and repeatedly violating the Communications Act of 1934 (Act), as amended, and the Commission's rules by failing to charge legally mandated lower prices to two school districts in Florida." 31 FCC Rcd. 8501

15

(F.C.C.) (July 27, 2016).  In that Notice of Apparent Liability for Forfeiture (NAL), the Commission stated that the LCP rule is "designed to ensure that the schools and libraries who participate in the E-rate program receive fair, competitive rates and that public funds are disbursed efficiently to support these services."  *Id*. at 8502.

The NAL emphasized the importance of the LCP rule to the protection of the E-rate program, characterizing the rule as "critical to the effective functioning of the Fund."  *Id*. at 8523.  In the NAL, the FCC focused on two particular telephone services called non-Centrex Primary Rate Interface Integrated Services Digital Network (PRI) and business flat-rate multiline (MFB), both of which are common enterprise landline telephone services.  *Id*. at 8504.  The FCC found that, since at least July 2012, BellSouth charged two schools in Florida, Orange County and Dixie School District, higher prices for PRI and/or MFB service than other business customers in Florida.  *Id*.  Additionally, and similar to the instant matter, the FCC found that the school districts were paying more that the rates available in a state-wide Florida contract that schools were eligible to order from.  *Id*.  Rather than charge the school districts at lower annual contract rates, however, BellSouth charged the schools month-to-month service rates that were much higher without providing any justification for its pricing to the FCC, even though the schools had requested an annual rate.  *Id*. at 8507-8508.  In the NAL, the FCC discussed the following considerations: (1) geography; (2) type of service; (3) contract term length; (4) what services and contract term the customers had requested to be provided; and (5) whether the service provider had justified the pricing to the FCC.

In accordance with *Escobar*, the FCC's NAL against BellSouth concerning the LCP rule supports a finding of materiality because it is strong evidence that the government "refuses to

pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Escobar*, 136 S. Ct. at 2003.

### B.  The FCC's Failure To Debar Defendant Does Not Demonstrate That The Price Charged Is Immaterial

Wisconsin Bell also argues, based upon *Escobar*, that the LCP rule is not material to the FCC because the government has not yet debarred Wisconsin Bell from participating in the E-rate program.  The Defendant cites *Escobar* for the proposition that, "[I]f the government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."  Memo, p. 10.

Under FCC rules, the FCC can only suspend or debar service providers participating in the E-rate program after a verdict, decision, settlement with admission of liability, stipulation, or other final determination.  47 C.F.R. § 54.8.  Therefore, to argue that the LCP rule must not be material because Wisconsin Bell has not yet been debarred, when the FCC cannot debar until after this case goes to judgment, is untenable.  If, after discovery and trial, Wisconsin Bell is found liable, the FCC can and will take up debarment at that time.  *Id*. at 54.8(b) ("The Commission shall suspend and debar a person for any of the causes in paragraph (c) of this section using procedures established in this section, absent extraordinary circumstances.")

### IV.    Wisconsin Bell's Mischaracterization Of LCP Prices As Potentially Discretionary Does Not Undercut Materiality

Wisconsin Bell makes the extraordinary claim that service providers have discretion when computing their LCP, and because of that, the rule must not be material to the government's E-rate reimbursement decisions.  The recent NAL, which addressed a similar issue of whether the LCP was discretionary, shows this not to be the case.

The FCC found that BellSouth should be "able to demonstrate that none of the entities receiving lower prices were similarly situated to either Dixie County or Orange County, or that the lower prices were not compensatory." *Id*. at 8518. However, rather than having a harmonized system of pricing in which BellSouth can easily answer which of its non-E-rate customers were similarly situated to these schools, "[BellSouth] could not confirm that it had examined other non-residential customers receiving a lower price to determine whether any were similarly situated to the Districts." *Id*. Instead, the only evidence was that BellSouth only conducted an after-the-fact analysis by its lawyers in response to the FCC's investigation. *Id.* at 8520.

Thus, the only thing that is discretionary about the LCP is that the service provider calculates the LCP based upon its knowledge of its pricing, without pre-approval of that pricing by the FCC. It is not discretionary that service providers have a LCP, and, as previously discussed, if either party to the contract, the school or the service provider, believes that the LCP is not accurate, either side can seek a "rate dispute" and have the Commission determine the correct LCP. *See* Requests for Services, 47 C.F.R. § 54.504(c).

The Defendant cites to *U.S. ex rel. Marshall v. Woodward, Inc*., 812 F.3d 556, 563 (7th Cir. 2015), to support its argument that "discretion" negates "materiality" under the FCA. *Marshall*, however, was not a case about pricing, but allegedly defective helicopter engine parts sold to the government. The relator there alleged that the defendant failed to follow its own inspection procedures, which included an X-ray on the part in question, which may or may not have been done. *Id*. But the court found that, under the contract, the defendant had the right to change its shop procedures, including the decision to X-ray or not, at any time without the

government's permission.  *Id.*  In the instant case, having an LCP and providing it to Wisconsin schools is not optional, so the *Marshall* court's findings are inapposite to the case at hand.

**V.    The FCC Does Not Have Actual Knowledge Of Defendant's Liability**

The Defendant also argues that the government has actual knowledge of its fraud based upon the Relator's complaint, but has not yet fined it, so therefore the fraud cannot be material under *Escobar.*  But, as the Defendant itself argues in the background section of its brief, while the Relator makes certain price comparisons in his Second Amended Complaint, he does not fully detail, to the level described in the NAL against BellSouth, whether the multitude of geographically disparate schools in Wisconsin that ordered different telecommunications products should have received similar pricing under the E-rate program.  *See* Memorandum in Support of Defendant's Motion for Judgment on the Pleadings ("Memo"), p. 5.  Similarly, the Relator's Second Amended Complaint acknowledges that in 2009, Wisconsin Bell began to give many of its Wisconsin E-rate customers the State contract rates.  *See* Second Amended Complaint, ¶ 42.  Assuming this allegation is true, that Wisconsin Bell began submitting many of its claims at its LCP in 2009, it undermines Wisconsin Bell's argument that the government must have immediately taken some additional action against it, back in 2009, other than monitoring this litigation which was already pursuing claims on the government's behalf.

Thus, the pleadings before the Court do not demonstrate that the government has actual knowledge, per *Escobar*, that the Defendant violated the LCP at this time.  *See United States ex. rel. Escobar v. Universal Health Services, Inc*., 842 F.3d 103, 112 (1st Cir. 2016) (denying motion to dismiss on the basis that the government continued to pay the claims at issue because there was no evidence in the complaint that the entity paying the claims had actual knowledge of any of the violations, much less their veracity, as it paid them).  The types of details necessary to

determine "similar services" under the LCP have not been alleged and discovery has not taken place to elucidate them. These details would include whether (and when) Wisconsin Bell offered its lowest pricing, or if it did not do so for some permissible reason, such as it reasonably believed that schools were not similarly situated after a careful review of its pricing policies.

Moreover, the Court in *Escobar* emphasized that even where the government has actually paid a claim with knowledge of its falsity, that is not determinative, but only provides "very strong evidence that those requirements are not material." *Escobar*, 136 S. Ct. at 2003. More fundamentally, even where the government has actual knowledge of a defendant's wrongful conduct and continues to pay claims, such action does not necessarily undermine a materiality finding because there are many good reasons, including important public policy and safety considerations, why the government might continue to pay claims in such circumstances. *See Harrison*, 352 F.3d at 917 (observing that the government might have good reason to pay despite the violation because the contract is "advantageous to the government" or is too far along to terminate without excessive costs). Nothing in *Escobar* suggests there is an absolute prerequisite that the government initiate proceedings to recoup payments previously made in order to establish that certain types of violations are material to payment.

Finally, at its base, the Defendant's argument -- that the materiality of this action is dependent upon whether the government has already excluded or fined Wisconsin Bell -- undermines the structure and history of the FCA.[7] The FCA gives rights to whistleblowers to bring cases on behalf of the government, who may then earn a percentage of any damages award, plus attorney's fees and costs. *See* 31 U.S.C. § 3730(b)(1), (d). The Attorney General retains the

---

[7] Nor would it serve defendants for the government to stop all payments to a defendant in a *qui tam* case any time a case is declined, based upon a relator's unproven allegations.

authority to intervene in a relator's ongoing action or to bring an FCA suit in the first instance. *See* 31 U.S.C. § 3730(a)-(b).  This system benefits both the government and the relator, because it "encourage[s] more private enforcement suits" and serves to "strengthen the Government's hand in fighting false claims."  *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 298 (2010).  If, after a declination in a *qui tam* suit, the government must always immediately stop payment on all of that defendant's claims for payment in order to preserve the relator's right to go forward with the case, the FCA would be less effective as a "useful tool against fraud in modern times."  *Id*. at 294.  For that policy reason, as well as all the others stated above, the Court should decline to find that because the government has not yet fined Wisconsin Bell for its alleged conduct the LCP rule is not material under the FCA.

## CONCLUSION

For the preceding reasons, Wisconsin Bell's Motion for Judgment on the Pleadings should be denied.

Dated:  December 21, 2016

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

By:  /s/ Jennifer Chorpening

MICHAEL D. GRANSTON
PATRICIA L. HANOWER
JENNIFER CHORPENING
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 271, Ben Franklin Station
Washington, DC 20044
Tel: (202) 514-8112
Jennifer.chorpening@usdoj.gov

GREGORY J. HAANSTAD
United States Attorney

By: /s/ Chris R. Larsen

CHRIS R. LARSEN
Special Assistant United States Attorney
Wisconsin Bar No. 1005336
Office of the United States Attorney
Federal Building, Room 530
517 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 297-1700
Fax: (414) 297-4394
Chris.larsen@usdoj.gov

*Attorneys for the United States*