IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TODD HEATH, <br><br>            Plaintiff/Relator, <br><br>v. <br><br>WISCONSIN BELL, INC., <br><br>            Defendant. | Case No. 2:08-CV-000876-LA <br> (Lead Case No. 2:08-CV-00724-LA) <br><br> Judge Lynn Adelman |

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES OF AMERICA'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED ON ALLEGED UNCONSTITUTIONALITY OF THE *QUI TAM* PROVISIONS OF THE FALSE CLAIMS ACT**

In accordance with its Notice of Intervention pursuant to 28 U.S.C. § 2403(a) for the purposes of defending the constitutionality of the *qui tam* provisions of the False Claims Act filed contemporaneously herewith, the United States of America hereby opposes the Defendant's Motion for Summary Judgment based on the alleged unconstitutionality of the *qui tam* provisions of the False Claims Act.

This Court should reject Defendant's argument that the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729–33 violate Article II of the U.S. Constitution. They do not. In accordance with its Notice of Intervention under 28 U.S.C. § 2403(a), the United States submits this brief in opposition to the Defendant's Motion for Summary Judgment, ECF Nos. 347, 348, to address Defendant's contention that the *qui tam* provisions of the False Claims Act violate Article II of the Constitution.[1]

---

[1] This memorandum of law addresses only Defendant's constitutional challenges. The United States takes no position on the other arguments raised by Defendant in its Motion.

1

# ARGUMENT

Wisconsin Bell argues that Relator's litigation of this declined *qui tam* case violates the Appointments Clause, Take Care Clause, and Vesting Clause of Article II of the U.S. Constitution. It does not.

Every court of appeals to have addressed the question has held that the False Claims Act's *qui tam* provisions are consistent with Article II. *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804-807 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753–58 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 749–59 (9th Cir. 1993); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993) (explaining, in rejecting an Article III challenge, that the *qui tam* "provisions do not usurp the executive branch's litigating function"). Although the Seventh Circuit has not confronted this issue directly, it appears skeptical that the False Claims Act's *qui tam* provisions raise constitutional concerns. *See United States ex rel. CIMZNHCA, LLC v. UCB Inc.*, 970 F.3d 835, 846-49 (7th Cir. 2020).

Almost all district courts, including all of those within the Seventh Circuit that have considered this issue, have followed suit. *See, e.g., United States ex rel. Gonite v. UnitedHealthcare of Ga., Inc.*, No. 5:19-CV-246 (MTT), 2025 WL 1184109, at *3-4 (M.D. Ga. Apr. 23, 2025); *United States ex rel. Penelow v. Janssen Prods., LP*, Civ. No. 12-7758 (ZNQ) (JBD), 2025 WL 937504, at *12 (D.N.J. Mar. 28, 2025); *United States ex rel. Miller v. Manpow*, 2023 WL 8290402, at **2-5 (C.D. Cal. Aug. 30, 2023); *United States ex rel. Bantsolas v. Superior Air & Ground Ambulance Trans., Inc.*, 2004 WL 609793, at **4-5 (N.D. Ill. March 22, 2004) (rejecting argument that the FCA's *qui tam* provisions violate the Appointments Clause and the

Take Care Clause and noting "other courts within this circuit have already squarely rejected" this argument); *United States ex rel. Sharp v. Consol. Med. Trans.*, 2001 WL 1035720, at *11 (N.D. Ill. Aug. 31, 2001) (noting "great weight of authority" against constitutional challenges to *qui tam* provisions of the FCA and declining to dismiss *qui tam* suit on constitutional grounds); *United States ex rel. Chandler v. Hektoen Inst. for Med. Rsch.*, 35 F. Supp.2d 1078, 1081-82 (N.D. Ill. 1999) (holding that *qui tam* provisions of FCA do not violate the Take Care Clause or the Appointments Clause); *United States ex rel. Fallon v. Accudyne Corp.*, 921 F.Supp. 611, 622-24 (W.D. Wisc. 1995) (rejecting challenge to *qui tam* provisions of FCA on basis of Take Care, Appointments, and Vesting Clauses); *United States ex rel. Robinson v. Northrop Corp.*, 824 F.Supp. 830, 833-38 (N.D. Ill. 1993) (holding that *qui tam* provisions of FCA do not violate, among other things, the Vesting Clause, Appointments Clause, or separation of powers principles); *but see United States ex rel. Zafirov v. Fla. Med. Assocs., LLC,* 731 F. Supp.3d 1293 (M.D. Fla. 2024).[2]

This Court should likewise reject Wisconsin Bell's arguments that the *qui tam* provisions of the False Claims Act are unconstitutional.

## I. Relators Need Not Be Appointed in the Manner Prescribed by the Appointments Clause

Wisconsin Bell contends that the False Claims Act's *qui tam* provisions are inconsistent with the Appointments Clause, which specifies the permissible means of appointing "Officers of the United States" to public offices "established by Law." U.S. Const. art. II, § 2, cl. 2. However, relators possess none of the indicia of officeholders within the meaning of the Appointments Clause: Their roles are limited in time and scope, confined to a particular case, and fundamentally personal in nature.

---

[2] An appeal in *Zafirov* is pending before the Eleventh Circuit (Nos. 24-13581, -13583).

### A. Relators Do Not Occupy Continuing Positions

To be an "Officer of the United States" subject to the Appointments Clause, a person "must occupy a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018). This requirement comes from the Supreme Court's decision in *United States v. Germaine*, 99 U.S. 508 (1878), which "held that 'civil surgeons' (doctors hired to perform various physical exams) were mere employees because their duties were 'occasional or temporary' rather than 'continuing and permanent.'" *Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 508, 511-512). A hallmark of an office is that its "duties continue, though the person" occupying it "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.). Relators' roles, in contrast, are limited in time and scope rather than continuing from officeholder to officeholder over time, and Wisconsin Bell has not shown otherwise.

Defendant asserts that relator occupies a continuing position, like the independent counsel or bank receivers that have been found to be officers. ECF No. 348 at 23 (quoting from *Zafirov*, 751 F.Supp. 3d at 1313 and omitting citations in *Zafirov* to, *inter alia*, *Morrison v. Olson*, 487 U.S. 654, 660-63, 670-73 (1988) (independent counsel); *United States v. Weitzel*, 246 U.S. 533, 541 (1918) (bank receiver); *United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022)). But unlike relators' roles, these roles were not specific to the individuals appointed to perform them. These offices were continuing in the crucial sense that their "duties" would "continue" even "though the person" performing them "be changed." *Maurice*, 26 F. Cas. at 1214. As the Supreme Court explained, Alexia Morrison was not even the first person to hold her independent counsel office; the court that appointed her had initially appointed James McKay, who had resigned and been replaced by her. *Morrison*, 487 U.S. at 667. Ms. Morrison's role was thus clearly "continuing" even though it was not permanent. Similarly, the duties of a bank receiver were not limited to performance by

4

a single individual.  *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. at 111.  If a given person appointed to act as a receiver became unable to perform his duties, that would not negate the need for a receivership; it would simply require the appointment of another receiver in place of the first.  In *Stanton v. Wilkeson*, 22 F. Cas. 1074 (S.D.N.Y. 1876), another bank-receiver case, the court made this point clear when explaining that "[v]acation of office by the comptroller" of the currency, who delegated authority to the receiver, would not "vacate the receivership."  22 F. Cas. at 1074–75.  And in *Donziger*, the Second Circuit—citing *Maurice*—specifically based its ruling on the premise that "the individuals appointed as special prosecutors could be replaced without the duties of the positions terminating." 38 F.4th at 297.

The role of a relator is nothing like that.  If a particular relator who has blown the whistle on a fraud by filing a *qui tam* action decides she is no longer interested in pursuing the action, another person cannot simply take her place as relator.  The False Claims Act states expressly that "[w]hen a person brings an action under" the *qui tam* provisions, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

Defendant also asserts that the role of relator is continuing because any person can be a relator if she satisfies the statutory prerequisites.  ECF No. 348 at 24.  But whether multiple people can hold the so-called office of "relator" at any given time has no bearing on whether that role is continuing.  What matters is whether the duty—here, the duty of litigating a *particular qui tam* action—can continue from inhabitant to inhabitant of that office, and it clearly cannot.  A relator's pursuit of a *qui tam* action is personal to that relator and not transferable from relator to relator.  Wisconsin Bell also contends that relators hold a continuing role because an individual can serve
5

as a relator in a particular *qui tam* case for years, but this too is irrelevant to whether a role is continuing in the relevant sense, *i.e.*, whether the duties of the role can be passed from one person who occupies the role to the next. An Attorney General is no more an officeholder with a continuing role if she serves four years than if she serves 100 days.

Further, a relator's *qui tam* action survives her death and may be pursued by her estate's personal representative—not a different relator—just as the estates of deceased plaintiffs routinely maintain other types of actions personal to the deceased plaintiff. *See United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993). This underscores that a relator's role is personal and unlike the duties of actual office holder, such as an Attorney General, Ambassador, or Secretary of the Treasury, whose duties are not personal in any way and are not inherited by the official's estate if she dies. *See also United States ex rel. Spicer v. Westbrook*, 751 F.3d 354 (5th Cir. 2014) (bankruptcy trustee, as opposed to new relator, can assert False Claims Act claims belonging to relator's bankruptcy estate).

### B. Congress Did Not Vest Relators with Uniquely Governmental Authority

Relators are also not officeholders subject to the Appointments Clause because Congress envisioned their roles as fundamentally personal rather than governmental in nature. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), the Supreme Court held that *qui tam* relators have Article III standing to sue under the False Claims Act on the ground that the Act "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" by entitling the relator to a share of any ultimate recovery. *Id.* at 773; *see United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 425 (2023) (same). The Supreme Court expressly rejected the theory that relators bring suit as agents of the United States. *Stevens*, 529 U.S. at 772. And in another part of the opinion holding that

6

relators cannot pursue *qui tam* actions against States, the Supreme Court emphasized that *qui tam* actions are "private suit[s]" brought by "private parties." *Id.* at 780 n.9, 786 n.17.

*Stevens* thus recognized that when Congress authorized relators to bring *qui tam* suits under the False Claims Act, it did not intend to create a governmental office subject to the Appointments Clause. Rather, Congress was authorizing relators to pursue a personal monetary recovery—employing "the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting … under … the hope of gain." *United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885) (quoted in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.5 (1943); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997)).

That a relator brings a *qui tam* suit "in the name of the Government," 31 U.S.C. § 3730(b)(1), does not alter the nature of the relator's interest in the suit. The Supreme Court explained in *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019), that the statutory provision for *qui tam* actions to be brought "'for the [relator] and for the … Government,'" and "'in the name of the Government,' … does not make the relator anything other than a private person" as opposed to an "'official of the United States.'" *Id.* at 272; *see also, e.g.*, *Taxpayers Against Fraud*, 41 F.3d at 1041 ("Although a relator may sue in the government's name, the relator is not vested with governmental power.").

The fact that relators decide whether to commence litigation by filing a *qui tam* complaint likewise does not make them governmental officeholders. The False Claims Act provides that a *qui tam* action cannot proceed—indeed, it cannot even be unsealed—until after the government has had an opportunity to determine whether to "intervene and proceed with the action," intervene

7

and move to dismiss it, or allow the relator "to conduct the action" subject to ongoing government oversight. 31 U.S.C. § 3730(b)(2)-(4). This upfront review by the government makes clear that relators are not acting as government officials when they bring suit. It is the government that determines whether the action should go forward and, if so, who should litigate it.

\* \* \*

Relators do not act on a continuing basis, and they do not perform a function that only the government can constitutionally perform. Congress routinely chooses "to rely … on private enforcement to implement public policy." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 263 (1975). And as explained below, there is abundant evidence that Congress and the courts have historically viewed private *qui tam* suits as a constitutionally permissible means of redressing and deterring violations of federal law. For all these reasons, relators need not be appointed in a manner consistent with the Appointments Clause.

## II. The *Qui Tam* Provisions Do Not Violate the Vesting and Take Care Clauses

The Vesting and Take Care Clauses state that "[t]he executive power shall be vested in a President of the United States" and that the President "shall take care that the laws be faithfully executed." U.S. Const. art. II, § 3. Wisconsin Bell contends that relator exercises executive power in a manner inconsistent with these Clauses, but this Court should reject that argument too.

Congress unquestionably has the power to authorize private parties who have suffered Article III injury to sue to enforce federal statutes, like Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f) or the antitrust laws, 15 U.S.C. § 15. It is long-established that Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of" protecting the government's interests. *Riley*, 252 F.3d at 753. Private suits under such provisions generally do not raise Article II concerns even if Congress has created a private right of action for the purpose of supplementing government enforcement actions. The Supreme Court has routinely

8

described private suits as a means of enforcing federal statutes for the benefit of the public, not just as a means of redressing private injuries. *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) ("'[P]rivate individuals may sue to enforce' … antidiscrimination statutes[.]"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ("Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition.").

Private suits under statutes like these differ in significant respects from *qui tam* suits under the False Claims Act. *Qui tam* relators are authorized to pursue False Claims Act suits solely on the basis of the government's partial assignment of a share of its right to a monetary recovery, *see Stevens*, 529 U.S. at 773, whereas private plaintiffs under other statutes must establish a personal injury as a basis for standing. A judgment on the merits in a *qui tam* action under the False Claims Act can have claim-preclusive effect against the United States, whereas judgments in private suits under other statutes do not. And the United States receives a share (indeed, the majority) of a monetary judgment in a *qui tam* action under the False Claims Act, whereas judgments in private suits under other statutes are payable solely to the plaintiffs. If Congress's use of the *qui tam* mechanism were a new development, these features of *qui tam* actions under the False Claims Act would give rise to substantial questions about whether such actions are consistent with the Vesting and Take Care Clauses of Article II.

Those questions are resolved, however, by the extensive body of evidence that *qui tam* provisions have, since the Founding, been understood as established features of American law. As the Supreme Court observed, "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our

9

[G]overnment." *Hess*, 317 U.S. at 541 n.4 (1943) (quoting *Marvin v. Trout*, 199 U.S. 212, 225 (1905)). In *Stevens*, the Supreme Court reviewed this "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of statutes with *qui tam* provisions passed by the First Congress. *Stevens*, 529 U.S. at 774–77. The Supreme Court found this body of history about the deep historical roots of *qui tam* provisions "well nigh conclusive" in the Article III context, *id.* 529 U.S. at 777, and it is just as "conclusive with respect to the Article II question" raised here. *Riley*, 252 F.3d at 752; *see Stevens*, 529 U.S. at 801 (Stevens, J., dissenting); *Butler*, 2024 WL 4354807, at *11 ("[D]ecades—nay, centuries—of litigation through the use of the *qui tam* device under the [False Claims Act] undercuts [defendant's] argument" against the constitutionality of the False Claims Act's *qui tam* provisions).

This is because legislation "'passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, … is contemporaneous and weighty evidence of its true meaning.'" *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, No. 22-448, 610 U.S. 416, 432 (2024) (same); *Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (same). Likewise, "'traditional ways of conducting government … give meaning' to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).

The history here shows that *qui tam* provisions are consistent with the original understanding of Article II. The First Congress enacted "a considerable number of" *qui tam* provisions, including those that "provided both a bounty and an express cause of action" for informers. *Stevens*, 529 U.S. at 776-777, 777 n.6. For example, one statute allowed "informer[s] to sue for, and receive half of [the] fine for, [a] failure to file [a] census return." *Stevens*, 529 U.S.

10

at 777 n.6 (citing Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. at 102). Another allowed "private individual[s] to sue for, and receive half of [the] fine for, carriage of seamen without contract or illegal harboring of runaway seamen." *Id.* (citing Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. at 131, 133). And another allowed "private individual[s] to sue for, and receive half of [the] goods forfeited for, unlicensed trading with Indian tribes." *Id.* (citing Act of July 22, 1790, ch. 33, § 3, 1 Stat. at 137-138). The enactment of *qui tam* statutes immediately after the Founding clearly indicates that the Framers viewed them as fully compliant with Article II of the Constitution.

The Executive Branch likewise recognized *qui tam* litigation as an established feature of American law when the Attorney General included, in draft legislation in 1795, a cost-shifting provision for *qui tam* suits. *See* 1 William S. Hein & Co., *American State Papers, Class X, Miscellaneous* 117, 121 (1998) (provision for cost-shifting in suits brought by "any informer or plaintiff, on a penal statute, to whose benefit the penalty, or any part thereof, if recovered, is directed by law to accrue"), https://perma.cc/JGR5-8AQA. This suggests that the early Executive Branch also perceived no constitutional problem with *qui tam* suits.

The Supreme Court has repeatedly recognized *qui tam* provisions as common and legitimate. For example, in *Marvin v. Trout*, 199 U.S. 212 (1905), the Supreme Court commented, while upholding the constitutionality of a state *qui tam* provision, that to reach a contrary conclusion "would be in effect to hold invalid all legislation providing for proceedings in the nature of *qui tam* actions," even though such statutes had "been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Id.* at 225. And in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), the Supreme Court found that a court of appeals construing the False Claims Act narrowly "on the premise that *qui tam* or informer actions 'have always been regarded with disfavor'" was wrong to do so because "*[q]ui tam* suits

11

have been frequently permitted by legislative action" and "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it." *Id.* at 540-542. The historical record thus suggests that all three branches of the early American government accepted *qui tam* statutes as an established feature of the legal system.

Further, the False Claims Act's *qui tam* provisions provide greater means for governmental control than the early *qui tam* statutes did. As explained *supra*, the government performs an upfront review before a *qui tam* action can proceed, or even be unsealed. *See* 31 U.S.C. § 3730(b)(2)-(4). Even if the government initially declines to intervene, it may still intervene at a later time for good cause. *See* 31 U.S.C. § 3730(c)(2)(D)(3). And the government may move to dismiss a False Claims Act action over a relator's objection, subject to highly deferential review under Federal Rule of Civil Procedure 41(a). *Id.* § 3730(c)(2)(A). The Supreme Court emphasized that district courts must grant dismissal "in all but the most exceptional cases … even if the relator presents a credible assessment to the contrary." *Polansky*, 599 U.S. at 437. The government may also settle a pending suit over the objections of the relator, *see* 31 U.S.C. § 3730(c)(2)(B); and veto a relator's proposed settlement or voluntary dismissal of his action, *id.* § 3730(b)(1). The United States may also stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4). If early *qui tam* statutes, which lacked such controls, were understood to pose no Article II problem, then the False Claims Act's *qui tam* provisions cannot be understood to pose any Article II problem either.

It is true that if relators exercised executive power, then constraints on the President's "ability to supervise and remove" relators would be unconstitutional. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 238 (2020). But Wisconsin Bell is incorrect to suggest that this

12

renders the *qui tam* provisions unconstitutional in full and requires a grant of summary judgment in its favor here. Instead, the appropriate remedy would be to hold invalid—and sever from the rest of the *qui tam* provisions—the statutory constraints on the government's ability to control *qui tam* litigation, including 31 U.S.C. § 3730(c)(3) (requiring good cause to intervene after initial decision not to); 31 U.S.C. § 3730(c)(2)(A)-(B) (constraints on government's settlement or dismissal of action over relator's objection); and 31 U.S.C. § 3730(c)(2)(C) (relator's right to participate in litigation after government intervention). This is consistent with the Supreme Court's treatment of what it regarded as unconstitutional restrictions on the supervision of administrative patent judges in *United States v. Arthrex, Inc.*, 594 U.S. 1, 24-25 (2021), and respects the judicial obligation to "limit the solution to the problem" "when confronting a constitutional flaw in a statute," by "sever[ing] its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006).

The historical context of the False Claims Act's *qui tam* provisions demonstrates that they are consistent with the Take Care Clause and the Vesting Clause and with the original understanding of Article II. Wisconsin Bell's arguments to the contrary should be rejected.

## **CONCLUSION**

As set forth above, the False Claims Act's *qui tam* provisions are consistent with the Constitution. The Court should reject Defendant's arguments—as every federal Circuit Court to address these issues has done—and deny Defendant's motions based on the alleged

unconstitutionality of the *qui tam* provisions of the False Claims Act.

Dated: October 3, 2025

        BRETT A. SHUMATE
        Assistant Attorney General

        RICHARD G. FROHLING
        Acting United States Attorney

        By: /s/ David M. Sobotkin

        JAMIE ANN YAVELBERG
        PATRICK KLEIN
        JENNIFER CHORPENING
        DAVID M. SOBOTKIN
        Attorneys
        U.S. Department of Justice
        Civil Division
        Commercial Litigation Branch
        P.O. Box 271, Ben Franklin Station
        Washington, DC 20044
        Telephone: (202) 353-1291
        Email: david.m.sobotkin@usdoj.gov

        By: /s/ Christian R. Larsen

        CHRISTIAN R. LARSEN
        MICHAEL A. CARTER
        Assistant United States Attorneys
        Wisconsin Bar No. 1005336
        Wisconsin Bar No. 1090041
        United States Attorney's Office
        Eastern District of Wisconsin
        517 E. Wisconsin Avenue, Rm. 530
        Milwaukee, WI 53202
        Telephone: (414) 297-1700
        Fax: (414) 297-1738
        Email: chris.larsen@usdoj.gov

        *Attorneys for the United States*