# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA ex rel.**
**TODD HEATH,**
       **Plaintiff,**

     **v.**                          **Case No. 08-CV-724**

**WISCONSIN BELL, INC.,**
       **Defendants.**

---

## DECISION AND ORDER

Relator Todd Heath brings this qui tam action under the False Claims Act ("FCA") alleging that defendant Wisconsin Bell, Inc., fraudulently obtained subsidies by falsely certifying that it was providing telecommunications services to schools and libraries at the lowest rate charged to similarly situated customers for similar services. *See* 47 U.S.C. § 254(h)(1)(B); 47 C.F.R. § 54.511(b). Before me are Wisconsin Bell's motion for leave to file an amended answer and motion for summary judgment. For the reasons discussed below, I will grant the former and deny the latter.

## I.      BACKGROUND

### A. Factual Background

Wisconsin Bell is a common carrier that receives subsidies under the Education Rate ("E-rate") Program. Congress established the E-rate program as part of the Telecommunications Act of 1996. 110 Stat. 56. The program subsidizes 20–90% of the price of certain telecommunications and information services provided to eligible schools and libraries. 47 C.F.R. § 54.505.

These subsidies are distributed from the Universal Services Fund ("the Fund"), which is financed primarily through contributions made by telecommunications carriers. 47 U.S.C. § 254(d). The amount each carrier must contribute is determined by the Federal Communications Commission ("FCC"). *See* 47 C.F.R. §§ 54.706, 54.709(a). However, the federal government also sometimes deposits money into the Fund from U.S. Treasury accounts. This deposited money comes from delinquent contributions, civil settlements, and criminal restitution payments collected by the Treasury. *See U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 92 F.4th 654, 667 (7th Cir. 2024).

Although Congress created the program and federal law mandates contributions to the Fund, the Universal Service Administrative Company (USAC) administers the Fund as a private not-for-profit corporation. 47 C.F.R. § 54.701(a). USAC's administrative duties include billing and collecting contributions from carriers and distributing the subsidies. 47 C.F.R. § 54.702(b). The subsidies may be distributed either to the libraries and schools, which then pay the carriers, or they may be requested directly from the carrier. 47 C.F.R. § 54.514(c).

Under FCC regulations, carriers must adhere to the "lowest corresponding price" ("LCP") rule to participate in the program. The LCP rule requires carriers to offer schools and libraries "the lowest price . . . charge[d] to non-residential customers who are similarly situated" for "similar services," unless the FCC or equivalent state commission finds that the LCP is "not compensatory." 47 C.F.R. §§ 54.500, 54.511(b). Carriers must annually certify that they are charging the school or library the LCP. 47 C.F.R. § 54.504(f); 62 C.F.R. 32942, ¶ 589.

Relator Todd Heath brought this qui tam action under the FCA in 2008. Heath is an auditor of telecommunications bills who claims that Wisconsin Bell flouted the FCC's LCP rule from approximately 2002 through 2015. As a result, Heath alleges, Wisconsin Bell defrauded the government out of millions of dollars by submitting false claims and causing others to submit false claims for more money than they were allowed to charge.

**B. Procedural Posture**

This suit was filed in 2008. In 2011, the federal government declined to intervene. I then granted Wisconsin Bell's motion to dismiss for lack of subject matter jurisdiction, finding that the public disclosure bar applied. *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, No. 08-CV-724, 2012 WL 4128020 (E.D. Wis. Sept. 18, 2022). The Seventh Circuit reversed. *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 692 (7th Cir. 2014). In 2015, I allowed Health to file a second amended complaint and denied Wisconsin Bell's motion to dismiss. *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 111 F. Supp. 3d 923 (E.D. Wis. 2015) [hereinafter *Heath I*]. In that order, I held that the alleged overcharges at issue were funds "provided" by the government and therefore constituted "claims" under the FCA. *Id*. at 926–28.

For many years following that order, the parties engaged in discovery and I made several rulings during this time on discovery-related matters. I also denied Wisconsin Bell's motion for judgment on the pleadings. *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 272 F. Supp. 3d 1094, 1094–98 (E.D. Wis. 2017). Eventually, Wisconsin Bell moved for summary judgment, which I granted upon finding that Heath had not shown falsity or scienter, as required by the FCA. *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 593 F. Supp. 3d 855, 858–861 (E.D. Wis. 2022). The Seventh Circuit reversed, holding that Heath had

3

made the necessary threshold showing on both falsity and scienter. *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 92 F.4th 654, 660–64 (7th Cir. 2024) [hereinafter *Heath II*]. In addition, the Seventh Circuit also affirmed my finding in *Heath I* that the subsidies constituted government funds and thus were "claims" under the FCA. *Id.* at 667–671.

The Supreme Court then granted certiorari on just one question: whether the payments at issue in this case constitute "claims" under the FCA. On this point, the Supreme Court affirmed both my opinion in *Heath I* and the Seventh Circuit in *Heath II*, holding that the payments fell within the FCA's statutory definition of claims. *Wisconsin Bell, Inc. v. U.S. ex rel. Heath*, 604 U.S. 140 (2025) [hereinafter *Heath III*]. The case was then remanded to this court for further proceedings.

## II. AMENDED ANSWER

I ordered all non-dispositive pretrial motions to be filed pursuant to Civil L.R. 7(h) unless I permit otherwise. ECF No. 239 at 2. Under this rule, motions may not be longer than three pages and no separate memoranda may be filed. *Id.* However, Wisconsin Bell seeks leave to file a motion under Civil L.R. 7(f) instead, which increases page limits to thirty pages and does not place restrictions on memoranda. ECF No. 245. I will grant the motion for, essentially, an expanded page limit and allowance of a memorandum.[1]

---

[1] Wisconsin Bell requested that all briefs filed in connection with this motion be subject to Civil L.R. 7(f), meaning respondent's memorandum may be up to fifteen pages rather than the three pages allowed under Civil L.R. 7(h). Heath appears to have heeded this direction, as his brief in opposition was five pages long. Thus, there is no prejudice to either party by granting the motion for an expanded page limit.

4

Along with the Rule 7(h) motion, Wisconsin Bell has filed the proposed Rule 7(f) motion, which seeks to file an amended answer to the second amended complaint. I will consider this motion as though it had been filed. I address that motion here.

Wisconsin Bell seeks to amend its answer to include the affirmative defense that the qui tam provisions of the FCA violate Article II of the Constitution. ECF No. 245-3 at 1. Generally, a party may amend a pleading with the court's leave, and "the court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This "liberal standard" "require[s] a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357–58 (7th Cir. 2015).

Heath contends that allowing this amendment is unduly prejudicial in part due to undue delay and, in any event, futile. ECF No. 366 at 1. I disagree. Heath is correct Wisconsin Bell's constitutionality arguments have been available since it received notice of this action approximately fourteen years ago. *Id.* at 4. But Heath provides no evidence of *why* this delay would be considered prejudicial other than to assert that "consideration of a new argument that could have been raised during the pleadings stage is extreme and prejudicial." *Id.* True, "when extreme, delay itself *may* be considered prejudicial." *Tamari v. Bache & Co. (Lebanon S.A.L.*, 838 F.2d 904, 909 (7th Cir. 1988) (internal quotations omitted) (emphasis added). But this is hardly a mandatory rule, and I am directed to apply a liberal standard in determining when amendment is permissible. Here, I find no prejudice because the affirmative defense at issue has also been raised in Wisconsin Bell's motion for summary judgment and is fully briefed by all parties (including

5

the United States). Irrespective of any delay, therefore, there is no prejudice to Heath in the amendment. Heath has been heard on the issue.

The question, then, is whether the amendment is futile. Wisconsin Bell claims that the legal landscape has shifted significantly in recent years, relying on a district court opinion, *U.S. ex rel. Zafirov v. Florida Medical Associates*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024), a Fifth Circuit concurrence, *U.S. ex rel. Montcrief v. Peripheral Vascular Assoc., P.A.*, 133 F.4th 395, 410 (5th Cir. 2025) (Duncan, J., concurring), and finally two Supreme Court concurrences, *U.S. ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 442 (2023) (Kavanaugh, J., joined by Barrett, J., concurring); *Wisconsin Bell, Inc. v. U.S. ex rel. Heath*, 604 U.S. 140, 167 (2025) (Kavanaugh, J., joined by Thomas, J., concurring). There is a much longer list of cases affirming the constitutionality of the FCA's qui tam provisions. *See, e.g.*, ECF No. 366 at 4–5, ECF No. 386 at 2–3. But this does not necessarily make the argument futile. At least one district court has held the qui tam provisions of the FCA unconstitutional. *See Zafirov*, 751 F. Supp. 3d 1293. For these reasons, I will grant Wisconsin Bell's motion to amend its answer to the second amended complaint. I turn now Wisconsin Bell's motion for summary judgment.

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

I must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may seek summary judgment on "part of [a] claim or defense," *id.*, including on the issue of damages in an FCA case, *see U.S. ex rel. Patzer v. Sikorsky Aircraft Corp.*, 2023 WL 6883637, at *24–29 (E.D. Wis. Oct. 17, 2023).

6

"Material facts" are those facts that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Christensen v. Weiss*, 145 F.4th 743, 751 (7th Cir. 2025) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016)). To survive summary judgment, the nonmoving party must provide specific facts demonstrating a genuine issue of material fact. *Jenkins v. Barlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In evaluating a motion for summary judgment, I must review the evidence in the light most favorable to the nonmoving party. *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017).

## IV.    SUMMARY JUDGMENT ANALYSIS

Wisconsin Bell moves for summary judgment on three grounds. First, Wisconsin Bell moves for partial summary judgment on the issue of damages, arguing that it cannot be liable for any damages as a matter of law or, at the most, can only be liable for up to the amount of money the government put into the fund. It also asks me to determine the proper measure of damages. Second, Wisconsin Bell moves for summary judgment on any claims related to BadgerNet (one of the telecommunications services provided by Wisconsin Bell). Wisconsin Bell contends that Heath's expert compared customers who were not "similarly situated," as required by law, and compared technologies that were not "similar services," also required by law. Finally, Wisconsin Bell argues that the entire action must be thrown out because the qui tam provisions of the FCA violate Article II of the Constitution. For the reasons discussed below, I will deny summary judgment on all three grounds.

7

## A. Damages

Violations of the FCA result in civil penalties "plus three times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). Wisconsin Bell argues that there have been no damages "sustain[ed]" by the government because the money distributed from the Fund never belonged to the government. Therefore, according to Wisconsin Bell, it cannot be liable for any damages. I am not persuaded by this argument.

Heath's allegations center around the use of money distributed by the Fund. Specifically, Heath claims that Wisconsin Bell submitted false claims to USAC seeking reimbursement for services despite not following the LCP rule. Recall that the Fund at issue, administered by USAC, is predominantly (though not exclusively) funded by telecommunications carriers. *See supra* Section I.A. Wisconsin Bell argues that, to the extent the government did not hold title to the money distributed, the government did not sustain any "damages" under the FCA.

I previously addressed the closely related issue of whether the payment of subsidies could be considered "claims" under the FCA. *See Heath I*, 111 F. Supp. 3d at 926. The FCA imposes a liability on "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). In 2009, Congress amended the FCA to clarify that a claim "means any request or demand . . . for money or property . . . whether or not the United States has title to the money or property" if that "request or demand" is either (1) "presented to an officer, employee or agent of the United States" or (2) is made to another recipient "if the money or property is to be spent or used on the Government's behalf or to advance a

8

government program or interest, and if the United States government provides or has provided any portion of the money or property requested or demanded." § 3729(b)(2)(A).

In its earlier motion to dismiss, Wisconsin Bell argued that the funds in question were not "provided" by the government and thus, the alleged conduct could not qualify as FCA "claims." *Heath I*, 111 F. Supp. 3d at 926. I rejected this argument. I explained that even though most of the money did not pass through a Treasury account, the government still "provided" all of the money because it required common carriers to pay into the Fund. *Id*. at 926–28. Without Congress's direction to establish the Fund and the FCC's regulation of the Fund, the program—and thus the subsidies—would not exist. *Id*. at 926. "[T]he Fund is little more than a mechanism to pay for a federal program." *Id*. I also explained that the close relationship between the Fund and the government establishes a "sufficiently close nexus such that a loss to the Fund is effectively a loss to the government." *Id*. at 927 (cleaned up) (quoting *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.4d 731, 738 (D.C. Cir. 1998)).

The Seventh Circuit affirmed this finding. *Heath II*, 92 F.4th at 669 ("The high degree of government involvement in the E-Rate program demonstrates that such a nexus exists here."). In addition, the Seventh Circuit found two other "independent paths" to the same conclusion. *Id*. at 666. First, the panel noted that approximately $100 million were provided to the Fund from the federal government during the time in question, satisfying the requirement that "any portion" of the money was "provided" by the government.[2]  *Id*. at 667. In addition, the 2009 amendments to the FCA clarified that a

_____

[2] Recall that the United States government supplements the Fund with money from delinquent debts, civil settlements, and criminal restitution payments collected by the

9

claim may be "presented to an officer, employee, or *agent* of the United States" regardless of "whether or not the United States has title to the money or property." 31 U.S.C. §3729(b)(2)(A) (emphasis added). The Seventh Circuit found that the structure of the program was such that USAC is an agent of the government and, therefore, any claims presented to USAC were as though presented to the government.

The Supreme Court declined to express any view on the agency theory (*Heath III*, 604 U.S. at 146 n.2), but affirmed the Seventh Circuit's finding that the government had "provided" a "portion" of the money at issue through its $100 million contribution to the fund (*Id.* at 148). Because this narrow ground was enough to find that the suit could proceed under the FCA, the Court held that it was "immaterial whether the Government, by exercising regulatory control, provides all the money so used." *Id.* at 149. In other words, the Court did not ultimately reach the issue of whether *all* or *some* of the funds belonged to the United States government but clearly held that *at least some* of the funds (the $100 million) undoubtedly did.

Wisconsin Bell now argues, notwithstanding the holdings as to whether the subsidies constitute "claims," that the government nonetheless did not "sustain" a loss, and therefore it is not entitled to any damages. This argument hinges primarily on Wisconsin Bell's assertion that the word "damages" in the FCA means, essentially, "loss." ECF No. 348 at 6–7. Moreover, because "one cannot lose what one never had," the government—and Heath, by proxy—is not entitled to any damages. *Id.* at 7. But even if I

---

Treasury. *See supra* Section I.A. The $100 million represents the approximate amount that the government paid into the Fund between 2003 and 2015, the timeframe at issue during this litigation. *Heath II*, 92 F.4th at 667.

accept this definition of "damages," this does not mean the United States has not sustained any losses. As I explained previously, the deep relationship between the government and USAC makes it such that *all* of the money in the Fund is effectively from the United States government. *Heath I*, 111 F. Supp. 3d at 926. Any losses to the Fund are, thus, losses to the government. "A financial loss to the government does not require a direct loss to the Treasury." *Id.* at 927.

But this is not only my finding. I am bound by Seventh Circuit precedent,[3] and the Seventh Circuit also held that "the federal government can be deemed to 'provide' money for the purposes of the False Claims Act by maintaining an active role in its collection and distribution, as is the case here." *Heath II*, 92 F.4th at 670. The Supreme Court also understood the Seventh Circuit to hold that *all* funds at issue were provided by the government. *Heath III*, 604 U.S. at 147 ("[T]he [Court of Appeals] held that the Government provided all the money in the program through its regulatory role in the

---

[3] Wisconsin Bell argues that I am not bound by Seventh Circuit precedent in this instance because the Supreme Court ruled on the issue on narrower grounds. ECF No. 348 at 10–11. Their support for this contention is a Sixth Circuit dissent (which is unquestionably nonbinding on this court):

> When a lower court rules on a particular theory and the reviewing court affirms on narrower grounds, the affirmance can indicate that the broader portion of the lower court's theory was unnecessary and therefore dictum—even if the lower court did not recognize it as such at the time of the decision.

*King v. United States*, 917 F.3d 409, 463 (6th Cir. 2019) (Rogers, J., dissenting), *rev'd sub nom. Brownback v. King*, 592 U.S. 209 (2021). I first note that Wisconsin Bell's own authority states only that this situation *can* indicate dictum. I do not believe that it does in this case. But furthermore, I am not only adhering to the Seventh Circuit's precedent, I am also adhering to my own prior opinions and logic. In 2015, I found that all of the funds in question were provided by the government. *Heath I*, 111 F. Supp. 3d at 926–29. I once again find this is true.

11

'collection and distribution' of contributions . . ."). Because all of the subsidies were provided by the government, all losses to the Fund are losses to the government.

Nonetheless, Wisconsin Bell argues that the government is only eligible for damages if it loses its "own" money. ECF No. 348 at 7. As evidence, they point to the structure of the FCA. *Id*. Specifically, Wisconsin Bell notes that some courts have held that the FCA can, at times, apply "even where the government suffers no monetary injury." *U.S. ex rel. Sanders v. American-Amicable Life Ins. Co. of Tex.*, 545 F.3d 256, 259 (3d Cir. 2008). In those instances, the FCA's civil penalties may apply. *Id*. But the fact that the government does not have to suffer monetary injury for the FCA to apply does not mean that is what is happening in this case.

In *Sanders*, the Third Circuit gave two examples of times when the FCA could apply despite a lack of monetary injury to the government: when the government discovers the falsity of the claim before payment and when the government passes the cost of the false claim to a third party. *Id*. But the third party the Third Circuit referred to in *Sanders* is a private manufacturer of secure radio communications systems which were purchased by the U.S. Department of Defense. *Id*.; *U.S. ex rel. Hayes v. MCM Electronics, Inc.*, 297 F. Supp. 2d 734, 735 (D.N.J. 2003). That is inapposite to the present situation, where the USAC was created by Congress, its activities are directed and overseen by Congress and the FCC, and the FCC regulates and oversees contributions to and distributions from the Fund. Thus, even if I were to accept the premise that when the government does not suffer monetary injury damages are limited to civil penalties,

12

damages would still be available in this case. The government *has* suffered monetary injury by virtue of providing the funds—*all* of the funds—in question.[4]

Wisconsin Bell further argues that, in any event, damages should be capped at either the pro rata rate at which the government contributed to the Fund, or at the total $100 million that the government contributed. ECF No. 348 at 12–14. During the time in question, the Fund disbursed somewhere near $80 billion (perhaps a little more or less).[5] Since the government contributed only about $100 million during that time, Wisconsin Bell argues that any damages should be reduced in proportion to the amount contributed. Alternatively, they argue that at the most, Wisconsin Bell's liability can be no more than $100 million because the government only contributed $100 million to the Fund. But, at the risk of sounding like a broken record, I repeat that *all* of the money was provided by the government, and it is as though the government had contributed the entirety of the

---

[4] To further illustrate this point, consider the fact that Congress could have chosen to fund the subsidies through new or existing tax revenues. Instead, it mandated carriers to pay into the Fund and for the funds to be distributed to advance universal service. 47 U.S.C. § 254. If Congress had collected these funds through the Treasury Department via a tax before depositing the money into the Fund, it would be plainly obvious that the government suffered a loss. The fact that Congress chose to bypass the establishment of a new tax, collection of money, and redirecting of the money into the Fund does not change the fact that the sum of money in question was in the control of the government, regardless of whether it held title to the money. The government directed the carriers to pay into the Fund and the government directed the disbursement of the fund. "The fact that the government requires entities to contribute directly to the Fund rather than using a two-step process of collecting money through taxes and transferring it to the Fund should not be a basis for enabling a party who attempts to defraud the Fund to escape liability." *Heath I*, 111 F. Supp. 3d at 928. I reiterate that the abundant regulation of USAC and the Fund by the FCC and Congress make any injury to USAC and the Fund effectively an injury to the government.

[5] The exact amount is contested by the parties. ECF No. 368 at 32–33.

Fund. Thus, *any* loss to the Fund is equivalent to a loss to the government. The entire balance of damages (i.e., losses) may be recovered.

Finally, Wisconsin Bell asks me to determine whether the appropriate measure of damages is the entire claim, or the difference between the subsidy actually paid and the subsidy that would have been paid under the LCP rule. The legislative history of the FCA reveals that there is "[n]o single rule" governing the determination of damages. *U.S. ex rel. Concilio De Salud Integral De Loíza, Inc. v. J.C. Remodeling, Inc.*, 926 F.3d 34, 42 (1st Cir. 2020) (quoting S. Rep. No. 96-615, at 4 (1980)). Rather, courts may "fashion measures of damages on a case-by-case basis" under the guiding principle "that the United States' damages should be liberally measured to effectuate the remedial purposes of the Act, and that the United States should be afforded a full and complete recovery of all its damages." *Id*.

In an FCA action, the proper measure of damages is generally the amount that "puts the government in the same position as it would have been if the defendant's claims had not been false." *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.,* 764 F.3d 699, 710 n.11 (7th Cir. 2014) (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010) [hereinafter *SAIC*]). The focus is on the injured party (i.e., the United States) not the injuring party. "Disgorgement of profits is not a remedy recoverable under the FCA." *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F.Supp. 2d 719, 732 (N.D. Ill. 2007). *See also Astellas US Holding, Inc. v. Fed. Ins. Co.*, 66 F.4th 1055, 1063–64, 1074–76 (7th Cir. 2023) (finding that the FCA contemplates compensatory damages which make the government whole, not restitutionary damages which disgorge the party at fault of ill-gotten profits).

14

The way to measure compensatory damages is to calculate the difference in value between what the government contracted for (i.e., the value of the goods or services absent the fraud) and what the government received (i.e., the actual value of the goods or services). *J.C. Remodeling*, 962 F.3d at 42 ; *U.S. ex rel. Wall v. Circle C Constr., LLC*, 868 F.3d 466, 470–71 (6th Cir. 2017); *U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 652–53 (5th Cir. 2017); *U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78, 87–88 (2d Cir. 2012); *SAIC*, 626 F.3d at 1278–79; *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 922–23 (4th Cir. 2003). However, this amount could be the entire contract or claim when a contract "provided no tangible benefit to the government and where the intangible benefit is impossible to calculate." *J.C. Remodeling*, 962 F.3d at 43 (cleaned up) (quoting *U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 473 (5th Cir. 2009)). This occurs when a good or service is rendered effectively worthless or unusable as a result of the fraud, *e.g., U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998); *United States v. Aerodex, Inc.*, 469 F.2d 1003 (5th Cir. 1972), or when a third-party is the recipient of goods or services, *e.g., Longhi*, 575 F.3d at 473.

In this case, Heath is alleging that Wisconsin Bell inaccurately represented to USAC that it was in compliance with the LCP rule. The USAC subsidy was given on the basis of this allegedly inaccurate information. If it is determined that Wisconsin Bell did knowingly violate the LCP rule, the United States must be compensated for the total amount of its injury. Wisconsin Bell argues that this is the difference between the subsidy actually given (with the fraud) to the subsidy that would have been given if Wisconsin Bell had been compliance with the LCP rule. If Wisconsin Bell had followed the LCP rule, the

15

cost of services would be lower, and the amount of the subsidy (which is based on a specific percentage that the school or library is eligible for) would have been lower. However, this proposed method does not accurately account for the fraud.

The FCA makes entities liable for false claims. In other words, liability follows from the falsehood. The allegation is not merely that Wisconsin Bell did not follow the LCP rule, but that Wisconsin Bell *lied* about following the LCP rule. Liability flows from the latter. To calculate damages, we consider what would have happened absent the fraud. If Wisconsin Bell did not follow the LCP rule and was truthful, any subsidies that were charged on contracts that did not follow the LCP rule would have been denied. The damage is, thus, the entire subsidy. Moreover, the government never received any benefits from the subsidies. The subsidies were effectively grants to schools and libraries so that said schools and libraries could obtain telecommunication services.

In defense of its proposed approach, Wisconsin Bell cites *Sikorsky*, where I held that the government was entitled to recover the difference between the contract price and the *quantum meruit* value of the contractor's performance. *United States v. Sikorsky Aircraft Corp.*, No. 11-CV-0560 2023 WL 6883637, at *25–26 (E.D. Wis. Oct. 17, 2023). But there is a key difference between that case and this one: in that case, the United States itself receive a good or service. Here, it did not. Moreover, I am using the same method of calculation. In *Sikorsky*, I first recognized that, absent the fraud, the government would not have awarded the contract at all. *Id.* Then, I noted that, if the government had refused to pay for the contract, the liable party would still be able to recover the value of its performance under *quantum meruit*. *Id.* In this case, the government similarly would have denied the subsidy. However, Wisconsin Bell could not

16

be able to recover in *quantum meruit* from the government because no service was provided to the government. Therefore, the entire subsidy is recoverable as damages.

My approach is also similar to that of *United States v. Rogan*, which found that the government's entire Medicare subsidy was recoverable under the FCA. 517 F.3d 449, 453 (7th Cir. 2008). In that case, the Seventh Circuit held that when "[t]he government offers a subsidy . . . with conditions [and] . . . the conditions are not satisfied, nothing is due." *Id*. This is true even if, absent the government subsidy for these claims, the government might have paid the subsidy to another provider. *Id*. If Heath's allegations prove true, damages are calculated on the assumption that Wisconsin Bell would have alternatively told the truth in submitting subsidy claims. If it had, the subsidies would have been denied. It is immaterial whether the schools or libraries seeking the subsidies would have, as a result, sought services from another provider in order to obtain the subsidies. It is also immaterial whether the schools would have found a way to do without the subsidies. The point is that Wisconsin Bell would have been denied the subsidies and the government would not have paid them. The government's injury is the entirety of the subsidy and the correct measure of damages accounts for the entire amount of the subsidies awarded.

## B. Similarity of Technologies and Customers

In the statute establishing the E-rate program, Congress directed that carriers should provide their services "to elementary schools, secondary schools, and libraries . . . at rates less than the amounts charged for similar services to other parties." 47 U.S.C. § 254(h)(1)(B). The FCC interpreted this phrase to mean that carriers "shall not submit bids for or charge . . . a price above the lowest corresponding price," where "lowest

17

corresponding price" is defined as "the lowest price that a service provider charges to non-residential customers who are similarly situated to a particular school, library, or library consortium for similar services." 47 C.F.R. §§ 54.500, 54.511(b).

Heath alleges that Wisconsin Bell contravened the LCP rule as interpreted by the FCC. As evidence, he presents an analysis by an expert witness, that Wisconsin Bell charged less for other "similar services" procured by "similarly situated" customers. Specifically, the expert compares Wisconsin Bell's contracts with a school and library consortium for BadgerNet Converged Network services to Wisconsin Bell's contracts with the Madison Metro School District for OPT-E-MAN services. Wisconsin Bell disputes that the school and library consortium is a "similarly situated" customer to the Madison Metro School District and that BadgerNet and OPT-E-MAN are "similar services" within the meaning of the LCP rule. For this reason, Wisconsin Bell also asks me to bar any claims related to the allegedly dissimilar comparisons. But, as I explain below, whether the technologies and the customers are "similar" under the LCP rule is highly dependent on the credibility and accuracy of Wisconsin Bell and Heath's experts. That is a judgment reserved for a factfinder. Therefore, I cannot grant Wisconsin Bell's motion for summary judgment on this issue.

i.    **"Similar Services"**

Wisconsin Bell points to three differences between BadgerNet and OPT-E-MAN that it claims demonstrate they are not "similar services" for the purposes of the LCP rule. First, BadgerNet was "designed, developed, constructed, and operated by a consortium of telecommunications carriers" while OPT-E-MAN belongs to and is deployed only by Wisconsin Bell. ECF No. 348 at 18–19. Second, OPT-E-MAN, according to Wisconsin

18

Case 2:08-cv-00724-LA    Filed 10/29/25    Page 18 of 29    Document 392

Bell, is a component of BadgerNet, and it is thus inappropriate to compare the two. *Id*. at 19. Finally, BadgerNet is a statewide network while OPT-E-MAN is available only in certain metropolitan areas. *Id*. at 18–19.

It is only on the first point that both parties indisputably agree. ECF 376 ¶ 20. Although Heath outright disputes Wisconsin Bell's assertion that OPT-E-MAN is a component of BadgerNet, ECF No. 376 ¶ 21, Heath's response seems to recognize that OPT-E-MAN is the "underlying transport" for BadgerNet and, therefore, impliedly a component of BadgerNet. *Id*. Nonetheless, it remains unclear whether OPT-E-MAN is comparable to a particular component service within BadgerNet, as Heath's expert claims. ECF No. 367 at 16. Finally, the evidence shows that OPT-E-MAN networks were not physically connected statewide. ECF No. 376 ¶ 22; ECF No. 350-22 at 3, Berendsen 89:3–21. However, it is unclear whether OPT-E-MAN is *capable* of functioning on a statewide basis. ECF No. 376 ¶ 22. It is also unclear whether schools and libraries actually needed the statewide connection capabilities and, therefore, whether this is a meaningful difference between the services. ECF No. 367 at 16. These disagreements, which have not been fully fleshed out in the evidence before me, are material to determine how technically similar or substitutable the two services are.

At the heart of Wisconsin Bell's argument is a protest that Heath's expert "does not meaningfully evaluate" the differences between these technologies. ECF No. 375 at 9. "On summary judgment [I] do not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). The overall technical similarities and differences between the services are questions of fact to be

19

illustrated through expert testimony provided by Heath and Wisconsin Bell. Since summary judgment is not an appropriate method to resolve disagreements between experts, I cannot grant summary judgment on this issue.

In addition, summary judgment would be inappropriate even in the absence of any disputed facts. This is because, as I explain below, I am not convinced that these three characteristics make BadgerNet and OPT-E-MAN different enough that they cannot be classified as "similar services" as a matter of law.

As Wisconsin Bell notes, there is no statutory or regulatory definition of "similar services" or "similarly situated." ECF 348 at 18. Therefore, they bear their ordinary meaning. *Fed. Deposit Ins. Corp. v. Chicago Title Ins. Co.*, 12 F.4th 676, 683 (7th Cir. 2021). But, unfortunately, this doesn't get us much closer to a concrete definition. Wisconsin Bell asks me to apply a definition from the American Heritage Dictionary where "similar" means "[r]elated in appearance or nature; alike though not identical." ECF 348 at 18; *American Heritage Dictionary* 1682 (3d ed. 1996). Webster's defines "similar" as "resembling though not completely identical." *Webster's II New College Dictionary* (1995). Both definitions highlight a very important quality about similarity: two things may be "similar" even if there are aspects in which they are dissimilar.

The legislative and regulatory history of the LPC sheds no additional light on the definition of "similar" as used in the LCP rule. Instead, we learn that there is no exact standard for what constitutes similarity in the context of "similar services" or "similarly situated." The FCC has, however, stated that providers may be able to show they "face demonstrably and significantly higher costs" under certain circumstances, such as "mileage from switching facility[, ]length of contract," "traffic volumes," and "any other

20

factor the state public service commission has recognized as being a significant cost factor."[6] *Id.*; *In re Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd. 8776, ¶¶ 488–89. Both parties agree that "application of the LCP rule may require some exercise of judgment on the part of service providers."[7] ECF 376 ¶ 11. This evidence shows that these similarities and differences must be weighed together on a case-by-case basis to determine whether the technologies are "similar services" for which an LCP must be respected.

Wisconsin Bell points to no authority stating that the difference in state or local coverage, or provision by a singular carrier rather than a consortium of carriers is inherently enough to prove that two services are not similar. Nor could it, because no such guidance exists. In other respects, the two services are share many similarities. ECF No. 350 at 87–96 (expert report detailing similarities between OPT-E-MAN and certain BadgerNet services). Even if Wisconsin Bell is correct about these three specific differences, it is not evident that these differences make the two services incomparable as a matter of law.

ii.    "Similarly Situated" Customers

Wisconsin Bell presents a parallel argument with respect to the customers Heath's expert compares. BadgerNet, created and operated by a consortium of providers as

---

[6] Note that these are only examples given by the FCC, not an exhaustive list. As the United States pointed out in a previous filing, "all circumstances that would make a service or customer 'not similarly situated' would be impossible to identify in advance." ECF No. 245 at 13.

[7] This does not, however, mean that service providers have unfettered discretion or the final say on whether two services are "similar." Rather, this is illustrative that there is no one hard-and-fast rule as to similarity for the purposes of the LCP rule.

21

previously described, was born of a Request for Proposal from the Wisconsin Department of Administration ("WDOA"). Through BadgerNet, WDOA sought a service that could support libraries, schools, and government institutions in all seventy-two Wisconsin counties. ECF No. 376 ¶ 15.[8] Wisconsin Bell claims that this consortium cannot be a "similarly situated" customer to the Madison Metro School District as a matter of law. ECF No. 348 at 19–20. Aside from the fact that one is a consortium and the other is an individual customer, Wisconsin Bell points out that the consortium contains some rural areas, unlike the Madison Metro School District. *Id*. These differences make the two customers incomparable, it claims.

But, again, Wisconsin Bell cannot point to any evidence that these characteristics necessarily disqualify the two customers from being "similarly situated." As with "similar services," there is no statutory or regulatory definition of "similarly situated." *Heath II*, 92 F.4th 654, 658 ("The regulations do not impose a specific formula to determine when a school or library is similarly situated to a particular non-residential customer for purposes of comparing prices."). Wisconsin Bell's own statement of proposed facts points out that corporate representatives from USAC stated that "there's not a concrete definition" of whether two customers are "similarly situated." ECF No. 376 ¶ 12. As with the definition of "similar services," USAC has provided examples of factors that indicate "similarly situated" customers, such as geography, volume of services, quantity, and number of locations, but noted there is no "definitive list" of factors to be considered. *Id*.

---

[8] Heath denies this fact on the basis that the evidence cited by Wisconsin Bell does not support the proposed fact. ECF No. 376 ¶ 15. Having reviewed the evidence cited, I disagree with Heath. This is inconsequential, though.

22

Suffice it to say that, once again, Wisconsin Bell has not provided enough evidence that these two customers are incomparable as a matter of law. Moreover, it is only appropriate for a factfinder to determine whether Heath or Wisconsin Bell's experts are more credible and accurate in describing how similarly situated the two customers are.[9] For these reasons, I must also deny summary judgment on the issue of whether the the customers at issue are "similarly situated."

## C. Constitutionality of Qui Tam Provisions

Finally, Wisconsin Bell asks me to find that the qui tam provisions of the FCA are unconstitutional under Article II and, therefore, grant summary judgment on the entire action in favor of Wisconsin Bell. ECF No. 348 at 24–26. Wisconsin Bell posits that three separate clauses deem the statute unconstitutional. First, the provisions violate the Appointments Clause because qui tam relators are "Officers of the United States." *Id.* In addition, the qui tam provisions violate the Executive Vesting and Take Care Clauses because they delegate executive power without sufficient supervision by the executive. *Id.* I join the five circuit courts[10] and numerous district courts, including many in the

---

[9] I will also note that Heath's expert has calculated damages using three different methods. ECF No. 350-17 at 112–14. All three compare BadgerNet and OPT-E-MAN contracts, but only two compare BadgerNet Contracts with Madison Metro School District contracts; the third uses contracts throughout the state as a point of comparison. *Id.* It would therefore be inappropriate in any case to bar all BadgerNet claims on the basis of this comparison.

[10] *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804-807 (10th Cir. 2002) (rejecting arguments that the FCA qui tam provisions are unconstitutional under the Appointments and Take Care Clauses); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753–58 (5th Cir. 2001) (en banc) (rejecting arguments that the FCA qui tam provisions are unconstitutional under the Appointments and Take Care Clauses); *U.S. ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994) (rejecting arguments that the FCA qui tam provisions are unconstitutional under the Appointments Clause or separation of powers principles); *U.S. ex rel. Kelly v. Boeing Co.*,

Seventh Circuit,[11] who have rejected these arguments. Therefore, I will also deny summary judgment on this issue.[12]

### i.     The Argument is Properly Before the Court

As an initial matter, Heath argues that this issue is not properly before the court to begin with. Because this claim was served upon Wisconsin Bell approximately fourteen years ago and answered nearly ten years ago, Heath claims that this issue is waived as untimely. ECF No. 367 at 20–21. Furthermore, Heath argues that a facial constitutional challenge is an affirmative defense and, therefore, waived if not raised in an answer. *Id.* at 21–22. However, because I have granted Wisconsin Bell's motion to amend its answer, *see supra* Section II, I find that this issue is properly before the court.

### ii.    Appointments Clause

The Appointments Clause describes the requirements for appointing "Officers of the United States." U.S. Cons. Art. II, § 2, cl. 2. "Only the President, with the advice and consent of the Senate, can appoint . . . 'principal' officers," *United States v. Arthrex, Inc.*,

---

9 F.3d 743, 749–59 (9th Cir. 1993) (rejecting arguments that the FCA qui tam provisions are unconstitutional under the Appointments Clause).

[11] *E.g., U.S. ex rel. McCullough v. Anthem Ins. Companies, Inc.*, No. 1:21-CV-00325-TWP-TAB, 2025 WL 2782576, at *15–16 (S.D. Ind. Sept. 30, 2025); *U.S. ex rel. Bantsolas v. Superior Air & Ground Ambulance Transp., Inc.*, No. 01-C-6168, 2004 WL 609793, at *5 (N.D. Ill. Mar. 22, 2004); *U.S. ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 623 (W.D. Wis. 1995).

[12] Neither the Seventh Circuit nor the Supreme Court have addressed the issue of the FCA qui tam provisions' constitutionality. Strictly speaking, I am not bound by any precedent on this issue. However, I find the other circuit and district courts cited within persuasive. Moreover, the Seventh Circuit has intimated that the qui tam provisions of the FCA are likely constitutional. *See U.S. ex rel. CIMZNHCA, LLC v. UCB Inc.*, 970 F.3d 835, 848 (7th Cir. 2020) (finding that the "ancient pedigree [of qui tam actions] . . . together with their widespread use at the time of the Founding, suggests that the False Claims Act as a whole is not in imminent danger of unconstitutionally usurping the executive power")

24

594 U.S. 1, 12 (2021), while Congress may vest appointments for "inferior officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II, § 2, cl. 2. Wisconsin Bell argues that qui tam relators are "Officers of the United States," but are not appointed the Appointments Clause requires. ECF No. 348 at 22. Undoubtedly, qui tam relators are not appointed in the method described by the Appointments Clause. The only question is whether a qui tam relator qualifies as an "Officer of the United States" in the context of the FCA.

An "Officer of the United States" is someone who (1) exercises "significant authority pursuant to the laws of the United States" and (2) holds a position that is "continuing and permanent." *Lucia v. Securities and Exchange Commission*, 585 U.S. 237, 245 (2018). Wisconsin Bell argues that relators wield "significant authority" because they are vindicating public rights through FCA qui tam actions, determine when, whether, and how to pursue said actions, and can "extract daunting monetary penalties against private parties on behalf of the United States." ECF No. 348 at 23 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 219 (2020)). But this vastly overstates the relator's role.

A relator's power is hardly "unfettered," as Wisconsin Bell claims. ECF No. 348 at 23 (quoting *Zafirov*, 751 F.Supp.3d at 1301). Upon commencing an action, a relator must notify the United States government, who is then given the opportunity to investigate and intervene. 31 U.S.C. § 3730(b)(2). Until the United States makes its decision, the entire action is maintained under seal. *Id.* By intervening, the government can effectively take over the prosecution of the case. *Id.* § 3730(c)(1). Moreover, the government can dismiss the action over the objection of the relator (as long as there is a hearing on the matter) or restrict the participation of the relator. *Id.* § 3730(c)(2). If the government does not

25

intervene, it may nonetheless remain appraised of the action upon request and intervene at a later time. *Id.* § 3730(c)(3). For all of these reasons, relators lack the necessary authority to be deemed "Officers of the United States." *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 758 (9th Cir. 1993) ("[W]e find it impossible to characterize the authority exercised by relators as so 'significant' that it must only be exercised by officers appointed in the manner which [the Appointments Clause] prescribes."); *U.S. ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 623 (W.D. Wis. 1995) ("[R]elators are not vested with sufficient authority to be deemed 'Officers of the United States.'").

But even if I were to concede the significant authority of the relators, the position is not "continuing and permanent." To be "continuing" means that the "duties continue, though the person . . . change[s]." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747). As the United States notes, the position of a qui tam relator is fundamentally personal. Once an FCA qui tam action has commenced, the only entity that may intervene is the United States. 31 U.S.C. § 3730(b)(5). Thus, no one can take over the duties of the relator—the action begins with a particular relator and ends with a particular relator. [13] The position cannot be occupied by any other person. Contrast this with the office of the Attorney General, which can be occupied by anyone so appointed, and which continues to exist if the individual occupying the position dies, resigns, or otherwise vacates the office. Many other courts have found

---

[13] The only exception is that, upon the death of a relator, the estate's personal representative may maintain the action. *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993). But, as the United States points out, this serves to underscore the personal nature of the position. It is only by death that another entity can step into the relator's shoes, and even then it can only be the entity representing the relator's continuing interests.

likewise. *E.g., U.S. ex rel. Stone v. Rockwell Int'l Corp.,* 282 F.3d 787, 805 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757–58 (5th Cir. 2001); *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041–42 (6th Cir. 1994). Therefore, I find that the qui tam provisions of the FCA do not violate the Appointments Clause of the Constitution.

### iii.   Executive Vesting Clause and Take Care Clause

Wisconsin Bell also argues that the qui tam provisions violate the Executive Vesting and Take Care Clauses because they delegate the power to enforce federal law to private individuals without providing the Executive sufficient supervisory control. ECF No. 348 at 25. As detailed above, this is an overstatement of the relator's power. Under the FCA, the government retains significant control over qui tam actions and can intervene to direct litigation in a particular way. Moreover, a relator cannot bring an FCA qui tam action if the United States files a case based upon the same underlying facts. 31 U.S.C. § 3730(e)(3). A relator is similarly barred from filing suit if the government makes public the findings of an investigation revealing the underlying facts, unless the relator is an original and independent source for the information. 31 U.S.C. § 3730(e)(4). In other words, when the United States is aware of a potential FCA violation, it has the power to bring suit without a relator. The government is in control of the suit.

As an apt example, in this very case, the United States has exercised significant authority throughout litigation. At the government's request, this case remained sealed for nearly three years while it investigated and decided whether to intervene. The government was required to give consent (and did) for the voluntary dismissal of several defendants. 31 U.S.C. § 3730(b)(1). The government was heard on Wisconsin Bell's

27

motions to dismiss, ECF Nos. 106, 111, 122, for judgment on the pleadings, ECF No. 168, to compel production, ECF No. 245, and for summary judgment, ECF No. 385.[14] It can hardly be said that the Executive branch has not had sufficient supervisory control in the case at bar.

Moreover, the long and storied history of qui tam actions is at minimum persuasive if not dispositive that these provisions are consistent with the original understanding of Article II. "An act 'passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, is contemporaneous and weighty evidence of its true meaning.'" *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (quoting *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888)). Qui tam actions have a "long tradition" in England and the American Colonies dating all the way back to the end of the 13th century, and the First Congress passed a number of statutes with qui tam provisions. *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 774–77 (2000). "[I]t is logically inescapable that the same history that was conclusive on the Article III question in *Stevens* with respect to qui tam lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning this statute." *Riley*, 252 F.3d at 752.

Finally, many other courts have persuasively rejected these constitutional challenges to the FCA's qui tam provisions. *E.g., United States ex rel. McCullough v. Anthem Ins. Companies, Inc.*, No. 1:21-CV-00325-TWP-TAB, 2025 WL 2782576, at \*15–

---

[14] In response to the government's brief, Wisconsin Bell seeks leave to file a supplemental reply in support of its motion for summary judgment, ECF No. 389. That supplemental reply is meant to address the United States' brief in opposition, ECF No. 386. I will grant Wisconsin Bell's motion and consider its supplemental reply.

28

16 (S.D. Ind. Sept. 30, 2025); *U.S. ex rel. Bantsolas v. Superior Air & Ground Ambulance Transp., Inc.*, No. 01 C 6168, 2004 WL 609793, at *5 (N.D. Ill. Mar. 18, 2004); *Stone*, 282 F.3d 787, 805–06; *Riley*, 252 F.3d 749, 753; *Fallon*, 921 F. Supp. at 623; *Taxpayers Against Fraud*, 41 F.3d at 1041; *see U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993) ("FCA *qui tam* provisions do not usurp the executive branch's litigating function because the statute gives the executive branch substantial control over the litigation."). For all of these reasons, I will not grant summary judgment on the basis that the FCA's qui tam provisions are unconstitutional.

## V.    CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendant's motion for leave to file a motion for leave to file an amended answer (ECF No. 345) is **GRANTED**. The clerk will file Exhibit 3 to ECF No. 345 as an amended answer to the second amended complaint.

**IT IS FURTHERMORE ORDERED** that defendant's motion for summary judgment (ECF No. 347) is **DENIED**.

**IT IS FURTHERMORE ORDERED** that defendant's motion for leave to file a supplemental reply in support of this motion for summary judgment (ECF No. 389) is **GRANTED**. I will consider the supplemental reply filed along with this motion as though it had been filed.

Dated at Milwaukee, Wisconsin, this _29th_ day of October, 2025.


s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge


29